IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

Case No. **25 CV 1000**

GREG E. LINDBERG,

                Petitioner,

v.

RONALD CIEUTAT, TODD VEREEN,
DAVID GLENN FINNEGAN, FLOYD
SLAY, JR., TIMOTHY ANDREWS, TYLA
FOWLKES, DEBRA LITTLE, THOMAS
WILLIAMS, ERIN ANDERSON, JAN
WHEELER EUGENE DREHER, IV,
NANCY DREHER, JOSEPH MOORE,
PHILLIP EPSTEIN, MICHAEL
DANDURAND, WILLIAM MCFARLAND,
ANGELA CLARK, CAROL REED, and
MICHAEL RUDGE,

                Respondents.



## <u>VERIFIED PETITION TO COMPEL ARBITRATION<br>AND STAY ALL COURT PROCEEDINGS</u>

Petitioner Greg E. Lindberg ("Lindberg"), pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, does hereby file this *Verified Petition to Compel Arbitration and Stay All Court Proceedings* and accompanying *Memorandum of Law.* In support of this petition Lindberg shows as follows:

### <u>PARTIES</u>

1. Petitioner Lindberg is a natural person over the age of eighteen (18) and a resident of Thonotosassa, FL and is otherwise *sui juris.*

2. Petitioner is the non-controlling ultimate beneficial owner of HPCSP Investments, LLC ("HPC") which purchased all stock, operations, and assets of HPC Specialty Pharmacy from the Respondents on January 19, 2018 per the terms of the Purchase Agreement attached hereto as **Exhibit A** and Promissory Note attached hereto as **Exhibit B**.

3. Respondents are residents of Alabama and are signatories to the Purchase Agreement.

4. The Purchase Agreement defines Ronald Cieutat as the Sellers Representative.

5. The Purchase Agreement requires the arbitration of any and all disputes under the arbitration rules of the International Chamber of Commerce.

6. Ronald Cieutat is listed in the Purchase Agreement as the Sellers Representative and as such is the representative for the Respondents for the purposes of any disputes related to the Purchase Agreement.

7. This Court has diversity jurisdiction under 28 U.S.C. § 1332 inasmuch as the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and costs, and is between citizens of different states.

8. This court has jurisdiction to hear this petition to compel arbitration pursuant to 9 U.S.C. § 4 which states, "A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court...for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4.

9. Per the arbitration demand attached hereto as **Exhibit C**, Lindberg has given the Respondent five days' notice as required by 9 U.S.C. § 4 which states "Five days' notice in writing of such application shall be served upon the party in default." 9 U.S.C. § 4.

10. The Respondents have not responded to Lindberg's demand for arbitration.

## FACTUAL ALLEGATIONS

11. The Respondents and the Petitioner (in his previous capacity as manager of HPCSP Investments, LLC) signed the Purchase Agreement attached hereto as Exhibit A.

12. Under the terms of this Purchase Agreement HPCSP Investments, LLC purchased all stock, operations, and assets of HPC Specialty Pharmacy from the Respondents on January 19, 2018.

13. Petitioner, in his individual capacity and in his previous capacity as manager of Eli Global, LLC, signed the Promissory Note attached here as Exhibit B.

14. The Promissory Note expressly incorporates the Purchase Agreement.

15. On June 3, 2021, Petitioner transferred control of HPCSP Investments, LLC to a trust controller by a third-party trustee. After the date of this transfer Petitioner has had no control over HPCSP Investments, LLC, or any of its subsidiaries.

16. Below is a true and correct copy of the organizational chart showing the transfer of HPCSP Investments, LLC into a trust:



17.  On May 8 2024, numerous subsidiaries of HPCSP Investments, LLC, none of which are under the control of the Petitioner, filed a lawsuit against Ronald Cieutat and numerous others alleging among other things, violations of the Purchase Agreement. That lawsuit is attached hereto as **Exhibit D**.

18.  The lawsuit against Cieutat *et. al.* alleges that Cieutat violated Section 6.4 of the Purchase Agreement where he agreed to  "hold in confidence the Confidential Information [he was provided with] and will not directly or directly, disclose, publish, or otherwise make available any of the Confidential Information to the public or to any Person[.]"

19.  The lawsuit further alleges that Cieutat has been receiving Confidential Information from former employees of Plaintiffs, including Mr. Shoemaker and Ms. Clark, and is using it to compete unfairly with HPCSP Investments, LLC, and its subsidiaries.

20.  The lawsuit alleges that as a direct result of Cieutat's actions, HPCSP Investments, LLC and its subsidiaries have suffered the loss of at least $6 million in revenue.

21.  The loss of $6 million in revenue substantially damages HPCSP

Investments, LLC and its subsidiaries and provides more than ample grounds to offset the entirety of the $12 million allegedly owed to Cieutat *et al* under the terms of the Promissory Note.

22.  On June 29 2024, the Petitioner sent Cieutat as Sellers Representative a demand for offset against the Promissory Note attached hereto as **Exhibit E**.

23.  The demand for offset notes that per the plain terms of the Promissory Note, the maker is entitled to offset the full amount of all claims against the sellers, including all claims against Cieutat *et al,* against the balance of the Note:

> Right of Offset. In accordance with Section 11.10 of the Purchase Agreement, Maker is authorized, at any time and from time to time, to the fullest extent permitted by Law, to set-off and apply any and all amounts payable by Maker to Payee under this Promissory Note against any amounts payable by Payee to Buyer under Article XI of the Purchase Agreement or otherwise. In the event of such offset, Maker will provide notice to Payee of such setoff amount and promptly deliver a replacement Promissory Note reflecting the new principal amount owed thereunder to Payee. Payee agrees, in exchange for such replacement Promissory Note and upon receipt thereof, to return this Promissory Note to Maker for cancellation.

24.  Cieutat never responded to the Petitioner's demand for offset sent on June 29 2024.

25. The Purchase Agreement contains a valid and binding arbitration clause which states in part as follows:

12.10. <u>Arbitration of Disputes</u>.  Any and all disputes arising out of, relating to, or in connection with this Agreement, including any question regarding its existence, validity, or termination, and any question as to whether a particular dispute is arbitrable hereunder, shall be referred to and finally resolved by binding arbitration administered by the International Chamber of Commerce and conducted pursuant to its Rules of Arbitration by three arbitrators appointed in accordance with said Rules, with the two co-arbitrators (one appointed by Sellers' Representative and one by Buyer) and such two arbitrators shall have 30 days from the appointment of the second arbitrator to nominate a third arbitrator who shall act as the chair.  The place of arbitration shall be New York County, New York, and the language to be used in the arbitral proceedings shall be English.  Judgment upon the award may be entered by any court having jurisdiction thereof.  The Parties hereby waive any defense of lack of personal jurisdiction or forum non conveniens or other similar doctrine in any legal proceedings

26. The Respondents have violated the terms of the Purchase Agreement, have caused Petitioner substantial damages in excess of the value of the Promissory Note, have failed to respond to the demand for offset, and have failed to respond to the demand for arbitration to resolve the Petitioner's demand for offset.

27. In light of the foregoing, per the terms of 9 U.S.C. § 4, Lindberg requests that arbitration proceedings on the merits be conducted in New York, New York as required by the terms of the Purchase Agreement. "The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed." 9 U.S.C. § 4

28. Upon granting Lindberg's petition to compel arbitration, a stay of all proceedings related to the Promissory Note is required.

29. The United States Supreme Court just months ago held in *Smith* that "When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding." The court ruled that the "Statutory text, structure, and purpose all point to this conclusion." *Smith v. Spizzirri*, 601 U.S. 472, 144 S.Ct. 1173, 218, L.Ed.2d 494 (2024).

30. As the Supreme Court held in *Smith*, "If there were any doubt, the FAA's structure and purpose confirm that a stay is required. When a court denies a request for arbitration, § 16 of the FAA authorizes an immediate interlocutory appeal. See 9 U.S.C. § 16(a)(1)(C)."

WHEREFORE, Petitioner Lindberg requests that this court grant an Order:

(a) Directing the Respondents to proceed to arbitration to be held as required by statute in New York, New York, or upon the failure of the Respondents to proceed, directing that a full arbitration on the merits proceed in this District forthwith without Respondents;

(b) Staying all court proceedings related to the Promissory Note during the pendency of the full arbitration on the merits;

(c) Awarding Petitioner costs and attorney's fees associated with this Petition; and

(d) Granting such other and further relief as the court may determine is just and proper given the circumstances.

Dated: January 29, 2025

    Fort Lauderdale, Florida

                    Respectfully submitted,

                    s/ Greg E. Lindberg                     .
                    Greg E. Lindberg,
                    E-mail address: gelindberg@gmail.com
                    10652 BROADLAND PASS
                    Thonotosassa, FL 33592
                    919-308-9686

EXHIBIT A

[EXECUTION COPY]

EQUITY PURCHASE AGREEMENT

by and among

RONALD CIEUTAT, TODD VEREEN, TERRY SIMISON, DAVID GLENN FINNEGAN,
FLOYD SLAY, JR., TIMOTHY ANDREWS, TYLA FOWLKES, DEBRA LITTLE, JOSHUA
WHITES, THOMAS WILLIAMS, ERIN ANDERSON, JAN WHEELER, EUGENE DREHER,
IV, NANCY DREHER, JOSEPH MOOSE, PHILIP EPSTEIN, CORY WIGGINS, MICHAEL
DANDURAND, BENJAMIN DANDURAND, WILLIAM MCFARLAND, MICHAEL
RUDGE, ANGELA CLARK, AND CAROL REED

as Sellers,

RONALD CIEUTAT
as Sellers' Representative, and

HPCSP INVESTMENTS, LLC
as Buyer

Dated January 19, 2018

TABLE OF CONTENTS

Page

ARTICLE I Definitions .................................................................................................... 1

ARTICLE II Purchase and Sale of Acquired Shares; Closing .................................................. 14

   2.1.   Purchase of Acquired Shares......................................................................... 14

   2.2.   Estimated Closing Payment .......................................................................... 14

   2.3.   Final Closing Payment ................................................................................. 15

   2.4.   Equity Equivalence Agreement Payments ....................................................... 17

   2.5.   Closing ..................................................................................................... 17

   2.6.   Allocation of the Purchase Price .................................................................... 17

   2.7.   Withholding Tax ......................................................................................... 17

ARTICLE III Representations and Warranties of Sellers about the Acquired Entities............... 18

   3.1.   Organization, Good Standing and Qualification; Authority ................................ 18

   3.2.   Capitalization; Subsidiaries; Encumbrances; Debt ........................................... 18

   3.3.   Government Consents and Approvals; No Conflicts .......................................... 19

   3.4.   Financial Statements ................................................................................... 19

   3.5.   Absence of Certain Changes ......................................................................... 20

   3.6.   Litigation and Liabilities .............................................................................. 22

   3.7.   Employee Benefit Plans ............................................................................... 23

   3.8.   Compliance with Laws................................................................................. 24

   3.9.   Material Contracts ...................................................................................... 24

   3.10.  Property ................................................................................................... 26

   3.11.  Environmental Matters ................................................................................ 26

   3.12.  Tax Matters .............................................................................................. 27

   3.13.  Labor Matters ........................................................................................... 28

   3.14.  Insurance ................................................................................................. 28

   3.15.  Related Party Transactions........................................................................... 29

   3.16.  Brokers and Finders ................................................................................... 29

   3.17.  Intellectual Property Assets.......................................................................... 29

   3.18.  Customers and Suppliers ............................................................................. 30

   3.19.  Inventory ................................................................................................. 31

992976v.19 3899/00002

3.20. Accounts Receivable .................................................................................................... 31

3.21. Foreign Corrupt Practices Act........................................................................................ 31

3.22. Powers of Attorney......................................................................................................... 32

3.23. Assets ............................................................................................................................. 32

3.24. Certain Health Care Matters........................................................................................... 32

3.25. No Material Misstatements or Omissions ...................................................................... 34

ARTICLE IV Representations and Warranties of Sellers About Sellers .................................... 34

4.1. Capacity........................................................................................................................... 34

4.2. Binding Effect ................................................................................................................ 34

4.3. Contravention ................................................................................................................. 35

4.4. Litigation ........................................................................................................................ 35

4.5. Title to Acquired Shares................................................................................................. 35

4.6. Sophisticated Seller; Adequate Information; Securities Laws........................................ 36

4.7. Transactions with the Acquired Entities ........................................................................ 36

ARTICLE V Representations and Warranties of Buyer .............................................................. 36

5.1. Organization, Good Standing and Qualification; Authority ........................................... 36

5.2. Authorization................................................................................................................... 37

5.3. Government Consents and Approvals; No Conflicts ...................................................... 37

5.4. Litigation ........................................................................................................................ 37

5.5. Independent Investigation .............................................................................................. 37

ARTICLE VI Covenants............................................................................................................... 38

6.1. Conduct of Business Pending Closing ........................................................................... 38

6.2. Further Actions; Notification ......................................................................................... 39

6.3. Access.............................................................................................................................. 40

6.4 Confidentiality................................................................................................................ 41

6.5. Non Compete; Non Solicitation ..................................................................................... 41

6.6. Employees ....................................................................................................................... 42

6.7. Brokers' Fees................................................................................................................... 43

6.8. Insurance Matters ........................................................................................................... 43

6.9. Seller Restrictions .......................................................................................................... 43

6.10. Disclosure Schedule Updates......................................................................................... 43

6.11. Further Assurances.......................................................................................................... 44

6.12.  Open Diligence Matters Covenant ................................................................ 44

ARTICLE VII Taxes ........................................................................................... 44

7.1.  Indemnification ....................................................................................... 44

7.2.  Filing and Payment Responsibility ........................................................ 45

7.3.  Tax Refunds ........................................................................................... 46

7.4.  Audits ..................................................................................................... 47

7.5.  Cooperation ............................................................................................ 47

7.6.  Coordination with Other Provisions ...................................................... 48

7.7.  Transfer Taxes ....................................................................................... 48

7.8.  Period of Limitation .............................................................................. 48

7.9.  Amended Returns ................................................................................... 48

7.10.  Section 336(e) and Comparable Elections ........................................... 48

7.11.  Right of Offset ...................................................................................... 49

ARTICLE VIII Appointment and Authority of Sellers' Representative .............. 49

8.1.  Appointment ........................................................................................... 49

8.2.  Authority to Make Decisions ................................................................. 49

8.3.  Authority and Covenant to Receive Payments ...................................... 50

8.4.  Authority and Covenant to Make Payments .......................................... 50

8.5.  Indemnification of Sellers' Representative ............................................ 50

ARTICLE IX Conditions to Closing .................................................................. 51

9.1.  Conditions to Obligations of Sellers and Buyer .................................... 51

9.2.  Conditions to the Obligations of Sellers ................................................ 51

9.3.  Conditions to the Obligations of Buyer .................................................. 52

ARTICLE X Termination .................................................................................... 54

10.1.  Termination ............................................................................................ 54

10.2.  Effect of Termination and Abandonment ............................................. 55

ARTICLE XI Survival and Indemnification ....................................................... 55

11.1.  Survival ................................................................................................. 55

11.2.  Indemnification by Buyer ...................................................................... 55

11.3.  Indemnification by Sellers ..................................................................... 56

11.4.  Limitations on Rights of Indemnitees ................................................... 56

992976v 19 3899/00002

11.5.    Specific Indemnifications ............................................................................ 57
11.6.    Procedure for Third Party Claims ............................................................... 57
11.7.    Indemnification Payments as Purchase Price Adjustment ........................... 58
11.8.    Exclusive Remedy ....................................................................................... 58
11.9.    Certain Additional Matters ......................................................................... 58
11.10.  Set-Off ....................................................................................................... 59

ARTICLE XII Miscellaneous ..................................................................................... 59
12.1.    Publicity ..................................................................................................... 59
12.2.    Entire Agreement ....................................................................................... 59
12.3.    Succession and Assignment ....................................................................... 59
12.4.    Expenses ..................................................................................................... 60
12.5.    Interpretation .............................................................................................. 60
12.6.    Notices ....................................................................................................... 60
12.7.    Governing Law ........................................................................................... 61
12.8.    Amendments and Waivers .......................................................................... 61
12.9.    Severability ................................................................................................. 61
12.10.  Arbitration of Disputes ............................................................................... 61
12.11.  No Third Party Beneficiaries ..................................................................... 62
12.12.  No Presumption Against Drafting Party ..................................................... 62
12.13.  Signatures ................................................................................................... 62
12.14.  Computation of Time ................................................................................. 62
12.15.  Release ....................................................................................................... 62

## EXHIBITS

| | |
|---|---|
| Exhibit A | Employment Agreements |
| Exhibit B | Equity Equivalence Agreement |
| Exhibit C | Disclosure Schedules (see below) |
| Exhibit D | Sellers' Note |
| Exhibit E | Bill of Sale |

## SCHEDULES

| | |
|---|---|
| Schedule A | List of Sellers and their Notice Information |
| Schedule B | Sellers' Acquired Shares |
| Schedule C | Sellers' Representative's Wire Transfer Instructions |
| Schedule 2.6 | Pro Rata Shares of Sellers |

| *Exhibit C* | *Disclosure Schedules* |
|---|---|
| Schedule 3.1(b) | Directors, Managers and Officers |
| Schedule 3.2(a) | Authorized Equity Interests |
| Schedule 3.2(e) | Encumbrances |
| Schedule 3.2(f) | Debt |
| Schedule 3.3(a) | Seller Governmental Consents |
| Schedule 3.3(b)(iv) | Required Consents, Waivers, Notices under Material Contracts |
| Schedule 3.4 | Financial Statements |
| Schedule 3.5(b) | Changes |
| Schedule 3.6(a) | Litigation |
| Schedule 3.7(a) | Material Employee Benefit Plans and Outstanding Employment Agreements |
| Schedule 3.8 | Governmental Legal Actions/Permits |
| Schedule 3.9(a) | Material Contracts |
| Schedule 3.10(b) | Leases |
| Schedule 3.11 | Environmental Matters |
| Schedule 3.13(b) | Labor Matters |
| Schedule 3.13(c) | Lay Offs and Involuntary Dismissals |
| Schedule 3.14 | Insurance Policies |
| Schedule 3.15 | Related Party Transactions |
| Schedule 3.16 | Brokers and Finders |
| Schedule 3.17(a) | Intellectual Property Registrations and Intellectual Property Assets |
| Schedule 3.17(b) | Intellectual Property Agreements |
| Schedule 3.18(a) | Material Customers |
| Schedule 3.18(b) | Material Suppliers |
| Schedule 3.20 | Accounts Receivables |
| Schedule 3.22 | Powers of Attorney |
| Schedule 3.24(a) | Non-Compliance with Applicable Privacy Laws |
| Schedule 3.24(c) | Government Payment Programs |
| Schedule 3.24(d) | Government Payment Program Violations |
| Schedule 4.7 | Transactions with Acquired Entities |
| Schedule 5.3(a) | Buyer Governmental Consents |

992976v 19 3899/00002

v

Schedule 5.3(b)          No Buyer Contravention or Encumbrance

*Other Schedules*:

Schedule 6.5(e)          Seller Competing Businesses
Schedule 6.12            Open Diligence Matters Covenant
Schedule 7.10            Initial Section 336 Allocation Statement
Schedule 9.3(d)          Required Governmental Consents
Schedule 9.3(e)          Required Contract Consents
Schedule 9.3(f)          Resignations
Schedule 9.3(q)          Termination of Liens
Schedule 9.3(r)          Open Diligence Matters

992976v 19 3899/00002

## EQUITY PURCHASE AGREEMENT

EQUITY PURCHASE AGREEMENT, dated as of January 19, 2018 (the "Agreement"), by and among the individuals set forth on Schedule A (collectively, "Sellers"), Ronald Cieutat, as Sellers' representative ("Sellers' Representative"), and HPCSP Investments, LLC, a North Carolina limited liability company ("Buyer"). Sellers, Sellers' Representative and Buyer are separately referred to herein as a "Party" and, together, as the "Parties."

### WITNESSETH

WHEREAS, Sellers directly own in the aggregate 100% of the issued and outstanding equity interests of each of HPC, LLC, Hemophilia Preferred Care of Memphis, Inc., HPC Biologicals, Inc., HPCNC, Inc., HPC Specialty Rx West Virginia Inc., HPC Specialty Rx of Kansas, Inc., Hemophilia Preferred Care of Oklahoma, Inc., HPC Specialty Rx Reed, Inc. and Hemophilia Preferred Care of Mississippi, Inc. (collectively, the "Acquired Entities");

WHEREAS, the Acquired Entities are engaged in the business of providing specialty pharmacy products and services and related products and services;

WHEREAS, upon the terms and subject to the conditions of this Agreement, Buyer desires to purchase from Sellers, and Sellers desire to sell to Buyer, 100% of the issued and outstanding equity interests of the Acquired Entities (collectively, the "Acquired Shares");

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, covenants and agreements herein contained, the Parties agree as follows:

### ARTICLE I

### Definitions

As used in this Agreement, the following terms have the respective meanings set forth below:

"Accounts Receivable" means all accounts or notes receivable held by the Acquired Entities, and any security, claim, remedy or other right related to any of the foregoing.

"Acquired Entities" shall have the meaning assigned to such term in the Recitals.

"Acquired Shares" shall have the meaning assigned to such term in the Recitals.

"Action" means any civil, criminal, regulatory, administrative or other action, cause of action, lawsuit, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, information request, suit, claim, demand, citation, subpoena, hearing, arbitration, investigation or other proceeding by or before any Governmental Entity or arbitrator, whether at law or in equity.

"Actual Adjustment" means (a) the Closing Payment as set forth on the Final Statement of Closing Payment minus (b) the Estimated Closing Payment.

"Affiliate" means, with respect to a Person, any Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person. For purposes of this definition, "control" (including the terms "controlled by" and under "common control with") means (x) the ownership, directly or indirectly, of more than 50 percent of the capital stock or other equity interests the holders of which are generally entitled to vote for the election of the board of directors or other governing body of such corporation or other legal entity and/or (y) the possession of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" shall have the meaning assigned to such term in the Preamble.

"Applicable Privacy Laws" means those Laws which protect private health and patient information, which include the Health Information Portability and Accountability Act of 1996 and the rules and regulations promulgated thereunder, the Health Information Technology for Economic and Clinical Health Act of 2009 and the rules and regulations promulgated thereunder, and other federal and state laws and regulations governing the privacy and security of patient information and data privacy.

"Bankruptcy and Equity Exception" shall have the meaning assigned to such term in Section 4.2.

"Benefit Plan" means each formal or informal, written or unwritten plan, program, policy, payroll practice, contract, agreement (including any employment, consulting or collective bargaining agreement) or other arrangement providing for compensation, severance, termination pay, performance awards, stock or other equity awards, fringe benefits or other employee benefits of any kind, whether or not legally binding, including each "employee benefit plan," within the meaning of Section 3(3) of ERISA and each "multi-employer plan" within the meaning of Sections 3(37) or 4001(a)(3) of ERISA, for the benefit of any current or former employee, officer, director, manager, partner, retiree, independent contractor or consultant, or any spouse or dependent of such individual, pursuant to which the Acquired Entities or their ERISA Affiliates have or may have any Liability, contingent or otherwise, including successor liability.

"Business Day" means a day, other than a Saturday or Sunday, on which commercial banks in New York City and Alabama are open for the general transaction of business.

"Buyer" shall have the meaning assigned to such term in the Preamble.

"Buyer Governmental Consents" shall mean all Permits and other approvals required to be obtained by Buyer in order to consummate the transactions pursuant to this Agreement, including all CHOW Approvals and any consents listed on Schedule 5.3(a).

2

"Buyer Indemnitees" shall have the meaning assigned to such term in Section 11.3.

"Cap" means an amount equal to the product of (x) the Enterprise Value multiplied by (y) 15%.

"Cash and Cash Equivalents" means the sum of the fair market value (expressed in United States dollars) of all cash and cash equivalents (including marketable securities and short term investments) of the Acquired Entities as of immediately prior to the Closing.

"CHOW Approvals" shall have the meaning assigned to such term in Section 9.3(d).

"Closing" shall have the meaning assigned to such term in Section 2.5(a).

"Closing Balance Sheet" shall have the meaning assigned to such term in Section 2.3(a)(i).

"Closing Date" shall have the meaning assigned to such term in Section 2.5(a).

"Closing Payment" means (a) $33,550,000, plus (b) the Net Working Capital Adjustment (which may be a negative number if the calculation results in a negative number under clause (b) of the definition of "Net Working Capital Adjustment").

"Closing Payment Dispute Notice" shall have the meaning assigned to such term in Section 2.3(a)(ii).

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

"Code" means the Internal Revenue Code of 1986, as amended.

"Competing Business" means a business that derives any revenues from the dispensing of specialty pharmacy products and the provision of related products and services.

"Confidential Information" means confidential information relating to the Acquired Entities, excluding information that is or becomes available to the public through means other than breach of this Agreement (including any information filed or submitted to a Governmental Entity that is free of any obligation of confidence and that is in the public domain).

"Confidentiality Agreement" means that certain Mutual Confidentiality Agreement, dated as of July 1, 2017, by and between Eli Global, LLC and HPC, LLC.

"Consulting Firm" shall have the meaning assigned to such term in Section 2.3(a)(iii).

"Continuing Employees" shall have the meaning assigned to such term in Section 6.6(a).

"Contract" means any agreement, lease, license, contract, commitment, note, mortgage, indenture, arrangement or other obligation (whether written or oral).

"Data Room" means the electronic data site with DealRoom created by Sellers' investment banker.

"DEA" means the U.S. Drug Enforcement Administration.

"Debt" means, without duplication, the outstanding principal amount of, all accrued and unpaid interest on and other payment obligations (including any premiums, termination fees, expenses or breakage costs) in respect of, (a) any indebtedness for borrowed money of an Acquired Entity, whether or not recourse to such Acquired Entity, (b) any obligation of an Acquired Entity evidenced by bonds, debentures, notes or other similar instruments, (c) any lease obligation of an Acquired Entity required to be classified as a capitalized lease obligation under GAAP, and (d) any obligation of the type referred to in clauses (a) through (c) of this definition of another Person the payment of which an Acquired Entity has guaranteed, that are secured by any assets of an Acquired Entity or for which an Acquired Entity is responsible or liable, directly or indirectly, jointly or severally, as obligor, guarantor or otherwise.

"Defined Benefit Plan" shall have the meaning assigned to such term in Section 3.7(b).

"Disclosure Schedules" shall have the meaning assigned to such term in the introductory language of Article III.

"Dollars" or "$" means dollars of the United States of America.

"Employee Benefit Plan" means each Benefit Plan which is now or previously has been sponsored, maintained, contributed to, or required to be contributed to, by any of the Acquired Entities or their ERISA Affiliates and pursuant to which such Acquired Entity or ERISA Affiliate has or may have any liability, contingent or otherwise.

"Employment Agreements" means the employment agreements to be entered into pursuant to Section 9.3(i), in each case substantially in the form of Exhibit A.

"Encumbrance" means any mortgage, pledge, hypothecation, lien, encumbrance, claim, deed of trust, adverse claim, third party right of any kind, option, right of first refusal or offer, charge, security interest, easement, restrictive covenant, encroachment, restriction or encumbrance of any kind, or other similar restriction(s).

"Enterprise Value" means an amount equal to $61,000,000, on a cash-free, debt-free basis.

"Environment" means surface or subsurface soil or strata, surface waters and sediments, navigable waters, wetlands, groundwater, sediments, drinking water supply, ambient air, species, plants, wildlife, animals and natural resources. The term also includes indoor air, surfaces and building materials, to the extent regulated under any Environmental Law.

"Environmental Claim" means any Action, Order, lien, fine, penalty, or, as to each, any settlement or judgment arising therefrom, by or from any Person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (a) the presence, Release of, or exposure to, any Hazardous Materials; or (b) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"Environmental Laws" means any applicable Laws relating to Hazardous Materials or the Environment and includes the following (including their implementing regulations and any similar state Laws): the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601 et seq. ("CERCLA"); the Solid Waste Disposal Act, as amended, 42 U.S.C. §§ 6901 et seq.("RCRA"); the Federal Water Pollution Control Act of 1972, as amended, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; and the Clean Air Act, as amended 42 U.S.C. §§ 7401 et seq. and, as it relates to Hazardous Materials, the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§651 et. seq.  The term includes any Permit issued, granted, given, authorized or made by a Governmental Entity pursuant to any Environmental Law.

"Environmental Liabilities" means any damages, injuries, losses, penalties, fines, liabilities or costs and expenses (including attorneys and consultants fees) arising under any Environmental Law.

"Environmental Notice" means any written directive, notice of violation or infraction, or notice respecting any Environmental Claim relating to actual or alleged non-compliance with any Environmental Law or any term or condition of any Environmental Permit.

"Environmental Permits" means all Permits, licenses, authorizations, registrations, certifications, and other governmental consents required under applicable Environmental Laws.

"Equity Equivalence Agreement" means the equity equivalence agreement in substantially the form of Exhibit B.

"Equity Equivalence Agreement Payments" shall have the meaning assigned to such term in Section 2.4(a).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any regulations promulgated or proposed thereunder.

"ERISA Affiliate" means each business or entity which is a member of a "controlled group of corporations," under "common control" or an "affiliated service group" with any Acquired Entity within the meaning of Sections 414(b), (c) or (m) of the Code, or is required to be aggregated with any Acquired Entity under Section 414(o) of the Code, or is under "common control" with any Acquired Entity within the meaning of Section 4001(a)(14) of ERISA.

"Estimated Balance Sheet" shall have the meaning assigned to such term in Section 2.2(a).

"Estimated Closing Payment" shall have the meaning assigned to such term in Section 2.2(a).

"Estimated Net Working Capital" shall have the meaning assigned to such term in Section 2.2(a).

"Final Section 336 Allocation Statement" shall have the meaning assigned to such term in Section 7.10.

"Final Statement of Closing Payment" shall have the meaning assigned to such term in Section 2.3(a)(iii).

"Financial Statements" shall have the meaning assigned to such term in Section 3.4.

"Fundamental Representations" means the representations set forth in Sections 3.1 (Organization, Good Standing and Qualification; Authority), 3.2 (Capitalization; Subsidiaries; Encumbrances; Debt), 3.16 (Brokers and Finders), 4.1 (Capacity), 4.2 (Binding Effect), and Section 4.5 (Title to Acquired Shares).

"GAAP" means generally accepted accounting principles in the United States as in effect from time to time, consistently applied throughout the periods to which reference is made.

"Governmental Entity" means the government of the United States of America, or any political subdivision of the United States of America, whether state or local, and any agency, authority, instrumentality, regulatory body, court, or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of government, any non-governmental authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such non- or quasi-governmental authority have the force of Law), including any self-regulatory organization, any Medicare Program, any Medicaid Program, the Medi-Cal Program (to the extent applicable to each

Acquired Entity) and any other Government Payment Programs from which the Acquired Entities derive any revenues, and any pharmacy board (including the California Board of Pharmacy) or regulatory agency or other body with authority over any Acquired Entity.

"Government Payment Program" means the Medicare Program, Medicaid Program, the Medi-Cal Program (to the extent applicable to each Acquired Entity), and TRICARE Program, and any similar or successor federal and state programs with or for the benefit of Governmental Entities.

"Hazardous Materials" means any solid, liquid, or gaseous material or substance that is regulated by a Governmental Entity and includes those substances listed or defined as "hazardous substance," "hazardous waste," or otherwise classified as hazardous or toxic under CERCLA or any other Environmental Law and shall include petroleum hydrocarbons, radon, radioactive materials, asbestos, and polychlorinated biphenyls.

"Healthcare Laws and Practices" means any federal, state or local laws, rules, regulations or guidelines regarding (a) any Government Payment Program, and including those laws, rules, regulations and guidelines related to covered services, charging practices, billing, collection, marketing and advertising; (b) Applicable Privacy Laws; (c) the proper and appropriate operation and maintenance of any pharmacy, preparing and maintaining appropriate patient records, quality assurance programs and maintaining and establishing compliance programs; (d) any other directives, rules or regulations promulgated by the U.S. Department of Health and Human Services, the Center for Medicare and Medicaid Services, or any comparable rules and regulations promulgated by any other federal or state agency; (e) over-utilization or inappropriate utilization of health care goods or services by patients or improper denial of health care services to patients; or (f) obtaining or maintaining the proper and appropriate licenses or permits from any Governmental Entities for the type of facility or provider operated by the Acquired Entities.

"including" or "include" or words of similar import means including without limitation.

"Indemnitee" shall have the meaning assigned to such term in Section 11.6(a).

"Indemnitor" shall have the meaning assigned to such term in Section 11.6(a).

"Initial Section 336 Allocation Statement" shall have the meaning assigned to such term in Section 7.10.

"Insurance Policies" shall have the meaning assigned to such term in Section 3.14.

"Intellectual Property" means all intellectual property and industrial property rights and assets, and all rights, interests and protections that are associated with, similar to, or required for the exercise of, any of the foregoing, however arising, pursuant to the Laws of any jurisdiction throughout the world, whether registered or unregistered, including any and all: (a) trademarks, service marks, trade names, brand names, logos,

7

trade dress, design rights and other similar designations of source, sponsorship, association or origin, together with the goodwill connected with the use of and symbolized by, and all registrations, applications and renewals for, any of the foregoing; (b) internet domain names, whether or not trademarks, registered in any top-level domain by any authorized private registrar or Governmental Entity, web addresses, web pages, websites and related content, accounts with Twitter, Facebook and other social media companies and the content found thereon and related thereto, and URLs; (c) works of authorship, expressions, designs and design registrations, whether or not copyrightable, including copyrights, author, performer, moral and neighboring rights, and all registrations, applications for registration and renewals of such copyrights; (d) inventions, discoveries, trade secrets, business and technical information and know-how, databases, data collections and other confidential and proprietary information and all rights therein; (e) patents (including all reissues, divisionals, provisionals, continuations and continuations-in-part, re-examinations, renewals, substitutions and extensions thereof), patent applications, and other patent rights and any other Governmental Entity-issued indicia of invention ownership (including inventor's certificates, petty patents and patent utility models); (f) software and firmware, including data files, source code, object code, application programming interfaces, architecture, files, records, schematics, computerized databases and other related specifications and documentation; (g) semiconductor chips and mask works; (h) royalties, fees, income, payments and other proceeds now or hereafter due or payable with respect to any and all of the foregoing; and (i) all rights to any Actions of any nature available to or being pursued by any Acquired Entity to the extent related to the foregoing, whether accruing before, on or after the date hereof, including all rights to and claims for damages, restitution and injunctive relief for infringement, dilution, misappropriation, violation, misuse, breach or default, with the right but no obligation to sue for such legal and equitable relief, and to collect, or otherwise recover, any such damages.

"Intellectual Property Agreements" means all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, permissions and other Contracts (including any right to receive or obligation to pay royalties or any other consideration), whether written or oral, relating to any Intellectual Property that is used in or necessary for the conduct of the businesses of the Acquired Entities as currently conducted and to which any Acquired Entity is a party, beneficiary or otherwise bound.

"Intellectual Property Assets" means all Intellectual Property that is owned by the Acquired Entities and used in or necessary for the conduct of the businesses of the Acquired Entities as currently conducted.

"Intellectual Property Registrations" means all Intellectual Property Assets that are subject to any issuance, registration, application or other filing by, to or with any Governmental Entity or authorized private registrar in any jurisdiction, including registered trademarks, domain names and copyrights, issued and reissued patents and pending applications for any of the foregoing.

"Inventory" means all of the Acquired Entities' inventory of stock in trade on hand including all unexpired pharmaceutical goods or products held in the pharmacy for

resale to customers, whether located at a premises of an Acquired Entity or located at any third-party location, and all other medical products and supplies, inventory of pharmaceuticals, finished products, work in process, raw material, goods in transit, goods at customer sites and other inventory or goods held for sale in all of its forms, wherever located, now or hereafter existing.

"IRS" means the Internal Revenue Service.

"Knowledge of Buyer" means the knowledge, after reasonable inquiry, of the executive officers of Buyer.

"Knowledge of Sellers" means the knowledge, after reasonable inquiry, of Ronald Cieutat, Todd Vereen, Timothy Andrews, Jan Wheeler, Philip Epstein, Erin Anderson, Melissa Zoghby, Cory Wiggins, and Leslie Jackson.

"Latest Balance Sheet" shall have the meaning assigned to such term in Section 3.4.

"Latest Balance Sheet Date" means November 30, 2017.

"Laws" means any federal, state, or local constitution, statute or ordinance, common law, or any rule, regulation, standard, judgment, order, writ, injunction or decree of any Governmental Entity, including any Healthcare Laws and Practices.

"Leased Real Property" shall have the meaning assigned to such term in Section 3.10(b).

"Leases" shall have the meaning assigned to such term in Section 3.10(b).

"Liability" or "Liabilities" means any liability(ies) (whether known or unknown, disclosed or undisclosed on any Disclosure Schedule or otherwise, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, and due or to become due), including indemnities, funding obligations, investment commitments, suits, claims, refunds, recoupments, adjustments, environmental liabilities, disgorgement obligations, equitable subordination requirements or similar obligations and/or Taxes.

"Losses" means actual losses, liabilities, damages, fines, interest and penalties, costs and expenses (including reasonable attorneys' fees); provided that Losses shall not include any consequential, punitive, special, exemplary, indirect (including loss of revenue, diminution in value and damages based on any type of multiplier) and similar damages (except to the extent payable pursuant to a third party in a Third Party Claim).

"Material Adverse Effect" means any event, state of facts, circumstance, development, change or effect that, individually or in the aggregate with all other events, states of fact, circumstances, developments, changes and effects, (a) is or would reasonably be likely to be materially adverse to the business, Permits, assets, liabilities, condition (financial or otherwise), or results of operations of the Acquired Entities, taken as a whole, other than any event, state of facts, circumstance, development, change or

9

effect resulting from (i) changes in general economic or political conditions, (ii) any act of war or terrorism, (iii) general changes or developments in the industries in which any of the Acquired Entities operates, (iv) the announcement of this Agreement and the transactions contemplated hereby, (v) any action taken, delayed or omitted to be taken by Sellers or the Acquired Entities in accordance with this Agreement or taken at the request of Buyer and not contemplated by this Agreement, (vi) changes in GAAP or Laws, or (vii) loss of patients in the ordinary course of business, but only to the extent that less than 5% of the Acquired Entities' revenues for the most recent fiscal year is attributable to such lost patients, or (b) would (i) prevent or materially impair or materially delay the ability of any Seller to perform his or her obligations under this Agreement or to consummate the transactions contemplated by this Agreement or (ii) affect the legality, validity or enforcement of the Transaction Documents against any Seller.

"Material Contracts" shall have the meaning assigned to such term in Section 3.9(a).

"Material Customers" shall have the meaning assigned to such term in Section 3.18(a).

"Material Suppliers" shall have the meaning assigned to such term in Section 3.18(b).

"Medicaid Program" means the entitlement program under Title XIX of the Social Security Act that provides federal grants to states for medical assistance based on specific eligibility criteria (Social Security Act of 1965, Title XIX, P.L. 89-87, as amended; 42 U.S.C. §§1396 et seq.), including but not limited to Medicaid under the Patient Protection and Affordable Care Act of 2010 (Pub. L. 111-148) and Health Care Education Reconciliation Act of 2010 (Pub. L. 111-152) (the "Affordable Care Act") and the California Medicaid Program (to the extent applicable to each Acquired Entity).

"Medi-Cal Program" means the Medicaid Program as applied in California.

"Medicare Program" means the government-sponsored entitlement program under Title XVIII of the Social Security Act that provides for a health insurance system for eligible elderly and disabled individuals (Social Security Act of 1965, Title XVIII, P.L. 89-87 as amended; 42 U.S.C. §§ 1395 et seq.).

"Minor Claim" shall have the meaning assigned to such term in Section 11.4(b).

"Multiemployer Plan" shall have the meaning assigned to such term in Section 3.7(b).

"Negative Adjustment Amount" shall have the meaning assigned to such term in Section 2.3(b)(ii).

"Net Working Capital" means (a) the consolidated net book value of the current assets (other than Cash and Cash Equivalents) of the Acquired Entities, as of immediately prior to the Closing, minus (b) the consolidated net book value of the current liabilities of

9929769 19 3899/00002

the Acquired Entities (excluding any Debt), as of immediately prior to the Closing, in each case, without duplication and as determined in accordance with GAAP applied on a consistent basis in accordance with the past practice of the Acquired Entities.

"Net Working Capital Adjustment" means (a) the amount by which the Net Working Capital exceeds $1,450,000 or (b) the amount by which Net Working Capital is less than $1,250,000; provided that any amount which is calculated pursuant to clause (b) above shall be deemed to be a negative number.

"Notice" shall have the meaning assigned to such term in Section 12.6.

"Opposing Claim" shall have the meaning assigned to such term in Section 9.1(a).

"Order" means any writ, order, injunction, judgment, decree or ruling or similar action of any Governmental Entity (whether preliminary or final).

"ordinary course of business" means any action taken by a Person that is consistent in nature, scope and magnitude with the past practices of such Person and is taken in the ordinary course of the normal, day-to-day operations of such Person.

"Party" and "Parties" shall have the meaning assigned to such terms in the Preamble.

"Permit" shall have the meaning assigned to such term in Section 3.8.

"Permitted Encumbrances" means any mechanics', workmen's, repairmen's, warehousemen's, carriers' or other statutory Encumbrances arising or incurred in the ordinary course of business, in each case, to the extent that the obligations owed to such Persons are included in clause (b) of the definition of Net Working Capital.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, Governmental Entity or other entity.

"Positive Adjustment Amount" shall have the meaning assigned to such term in Section 2.3(b)(i).

"Post-Closing Tax Period" means (a) any taxable period beginning after the Closing Date and (b) the portion of any Straddle Period beginning immediately after the Closing Date and ending on the last day of a Straddle Period.

"Pre-Closing Claims" shall have the meaning assigned to it in Section 6.8.

"Pre-Closing Tax Period" means (a) any taxable period ending at or before the close of the Closing Date and (b) the portion of any Straddle Period beginning on the first day of such Straddle Period and ending at the close of the Closing Date.

"Proposed Closing Payment Calculation" shall have the meaning assigned to such term in Section 2.3(a)(i).

"Proposed Negative Adjustment Amount" shall have the meaning assigned to such term in Section 2.3(a)(i).

"Proposed Net Working Capital" shall have the meaning assigned to such term in Section 2.3(a)(i).

"Proposed Positive Adjustment Amount" shall have the meaning assigned to such term in Section 2.3(a)(i).

"Pro Rata Share" means the percentage for such Seller set for on Schedule 2.6.

"Purchase Price" means (x) the Closing Payment, plus (y) the Equity Equivalence Agreement Payments, plus (z) the Sellers' Note.

"Qualified Benefit Plan" shall have the meaning assigned to such term in Section 3.7(c).

"Release" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment (including the abandonment of above or underground containers containing or previously containing Hazardous Materials), disposing, migrating or allowing to escape or migrate into or through the Environment.

"Releasing Parties" shall have the meaning assigned to such term in Section 12.15.

"Required Governmental Consents" means the Seller Governmental Consents and the Buyer Governmental Consents.

"Restricted Payment" means (a) any dividend or other distribution of any kind on or in respect of any Acquired Entity's equity securities, and (b) any payments, in cash or otherwise, on account of the purchase, redemption, retirement or acquisition of (i) any Acquired Entity's equity securities, or (ii) any option, warrant or other right to acquire any Acquired Entity's equity securities.

"Restricted Period" shall have the meaning assigned to such term in Section 6.5(a).

"Seller Governmental Consents" shall mean all Permits and other approvals required to be obtained by Sellers in order to consummate the transactions contemplated by the Transaction Documents, including those listed on Schedule 3.3(a).

"Seller Indemnitees" shall have the meaning assigned to such term in Section 11.2.

"Sellers" shall have the meaning assigned to such term in the Preamble.

"Sellers' Claim" shall have the meaning assigned to such term in Section 12.15.

"Sellers' Note" shall have the meaning assigned to such term in Section 9.2(c).

"Sellers' Refunds" shall have the meaning assigned to such term in Section 7.3.

"Sellers' Representative" has the meaning stated in the Preamble.

"Straddle Period" means a taxable period beginning on or before and ending after the Closing Date.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, joint venture, or other legal entity of which such Person (either through or together with any other Subsidiary(ies)) owns, directly or indirectly, more than 50% of the capital stock or other equity interests the holders of which are generally entitled to vote for the election of the board of directors or other governing body of such corporation or other legal entity.

"Tax" or "Taxes" means (a) any federal, state, local or foreign net or gross income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code §59A), customs, duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, recording, intangible, documentary, goods and services, ad valorem, net proceeds, net worth, special assessments, workers' compensation, utility, production, gains, alternative or add-on minimum, or estimated tax, together with any interest, penalty, or addition thereto payable in connection with such taxes, or required payment in lieu thereof, whether disputed or not and (b) any liability of any Person for the payment of amounts of the type described in clause (a) as a transferee or successor.

"Tax Arbitrator" means, for purposes of Section 7.10, an internationally recognized accounting firm mutually satisfactory to Sellers' Representative and Buyer.

"Tax Law" means any Laws relating to Taxes, including the Code.

"Tax Proceeding" means any audit, action, suit, claim, examination, investigation, deficiency, assessment or other administrative or judicial proceeding by any Governmental Entity involving Taxes.

"Tax Representations" means the representations and warranties contained in Section 3.12.

"Tax Return" means any return, declaration, report, claim for refund, or information return, statement or other filing relating to Taxes and declaration of estimated Tax, including any schedule or attachment thereto, and including any amendment thereof.

"Territory" means the United States of America and its territories.

"Third Party Claim" shall have the meaning assigned to such term in Section 11.6(a).

"Threshold" means an amount equal to the product of (x) the Enterprise Value multiplied by (y) 0.25%.

"Transaction Documents" means this Agreement, the Equity Equivalence Agreement, the Employment Agreements and the Sellers' Note, together with any other agreements, instruments, certificates and documents executed in connection with the consummation of the transactions contemplated by this Agreement.

"Transaction Expenses" shall have the meaning assigned to such term in Section 12.4.

"TRICARE Program" means the federal TRICARE program established pursuant to 32 C.F.R. 199.17 in connection with the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS).

"Union" shall have the meaning assigned to such term in Section 3.13.

"WARN ACT" means the Workers Adjustment and Retraining Notification Act, 29 U.S.C. §2101, et seq.

## ARTICLE II

### Purchase and Sale of Acquired Shares; Closing

2.1.    Purchase of Acquired Shares.    Upon the terms and subject to the conditions of this Agreement, at the Closing, each Seller shall assign, transfer, convey and deliver to Buyer, and Buyer shall acquire from each Seller, all of the Acquired Shares held by such Seller, as set forth next to such Seller's name on Schedule B, free and clear of all Encumbrances (other than restrictions on transfer under applicable state and federal securities Laws).

2.2.    Estimated Closing Payment.

(a)    Calculation of Estimated Closing Payment. On or prior to the date which is seven (7) Business Days prior to the Closing Date, Sellers' Representative shall prepare and deliver to Buyer, and Buyer shall have the right to reasonably consent or object to, (i) a detailed balance sheet (as so prepared and consented to, the "Estimated Balance Sheet") which (x) reasonably estimates the financial position of the Acquired Entities as of the Closing Date in conformity with GAAP applied on a basis consistent with the preparation of the Latest Balance Sheet and (y) sets forth a detailed calculation of Sellers' Representative's estimate of the Net Working Capital as of the Closing Date (as so prepared and consented to, the "Estimated Net Working Capital"); and (ii) a statement setting forth Sellers' Representative's good faith calculation of the Closing Payment (using the Estimated Net Working Capital shown on the Estimated Balance Sheet) (as

so prepared and consented to, the "Estimated Closing Payment"). In the event Buyer objects to the Estimated Balance Sheet or the Estimated Closing Payment, the Closing shall not occur until the objections are resolved.

(b)     Payment of Estimated Closing Payment.  At the Closing, Buyer shall pay to Sellers' Representative (on behalf of Sellers) an amount in cash equal to the Estimated Closing Payment by wire transfer of immediately available funds to the account set forth on Schedule C.

2.3.     Final Closing Payment.

(a)     Preparation of the Final Statement of Closing Payment.

(i)     As soon as practicable, but no later than sixty (60) calendar days after the Closing Date, Buyer shall prepare and deliver to Sellers' Representative a balance sheet (the "Closing Balance Sheet") presenting the financial position of the Acquired Entities on the Closing Date in conformity with GAAP applied on a basis consistent with the preparation of the Estimated Balance Sheet, and setting forth a proposed calculation of the Closing Payment (the "Proposed Closing Payment Calculation") and the components thereof, including (A) a proposed calculation of Net Working Capital and the Net Working Capital Adjustment (the "Proposed Net Working Capital") and (B) a proposed calculation of the Positive Adjustment Amount (the "Proposed Positive Adjustment Amount") or Negative Adjustment Amount (the "Proposed Negative Adjustment Amount") (as the case may be).

(ii)     If Sellers' Representative does not give a written notice of dispute (a "Closing Payment Dispute Notice") to Buyer within thirty (30) days of receiving the Proposed Closing Payment Calculation, Buyer and Sellers agree that (A) the Proposed Net Working Capital shall be deemed to set forth the Net Working Capital and (B) the Proposed Closing Payment Calculation and the Proposed Positive Adjustment Amount or the Proposed Negative Adjustment Amount (as the case may be) shall be deemed to be final and binding in determining the Closing Payment. If Sellers' Representative gives a Closing Payment Dispute Notice to Buyer (which Closing Payment Dispute Notice must set forth, in reasonable detail, the items and amounts in dispute) within such thirty (30)-day period, Buyer and Sellers' Representative shall use commercially reasonable efforts to resolve the dispute during the thirty (30)-day period commencing on the date Buyer receives the applicable Closing Payment Dispute Notice from Sellers' Representative. Items and amounts not objected to by Sellers' Representative in the Closing Payment Dispute Notice shall be deemed resolved, and Buyer or Sellers' Representative (on behalf of Sellers)  (as the case may be) shall pay to the other an amount in cash equal to the undisputed portion of any Positive Adjustment Amount or Negative Adjustment Amount (as the case may be), if any, by wire transfer or delivery of other immediately available funds within ten (10) Business Days of Sellers' Representative's delivery of a Closing Payment Dispute Notice.

(iii)     If Sellers' Representative and Buyer do not obtain a final resolution of any disputed items or amounts within the thirty (30)-day resolution period, then the items in dispute shall be submitted immediately to Plante & Moran, PLLC or, if Plante & Moran,

15

PLLC does not accept the engagement, another nationally-recognized, independent accounting or financial consulting firm reasonably acceptable to Sellers' Representative and Buyer (the "Consulting Firm"). The Consulting Firm (x) shall be required to render a determination resolving the applicable dispute within thirty (30) days after referral of the matter to the Consulting Firm, which determination must be in writing and must set forth, in reasonable detail, the basis therefor, (y) shall only decide the specific items under dispute by the parties and its decision for each disputed matter must be within the range of values assigned to each such item in the Proposed Closing Payment Calculation and the Closing Payment Dispute Notice, respectively, and (z) shall resolve all issues of interpretation, including legal and accounting issues.    The determination of the Consulting Firm shall be conclusive and binding upon Sellers and Buyer absent manifest error.  Buyer will revise the Proposed Closing Payment Calculation as appropriate to reflect the resolution of any objections thereto pursuant to this Section 2.3(a). The "Final Statement of Closing Payment" means the Proposed Closing Payment Calculation together with any revisions thereto pursuant to this Section 2.3(a).

(iv)    In the event Sellers' Representative and Buyer submit any unresolved objections to the Consulting Firm for resolution as provided in Section 2.3(a)(iii), the responsibility for the fees and expenses of such Consulting Firm shall be borne by Sellers' Representative (on behalf of Sellers), on the one hand, and Buyer, on the other hand, on the basis of whose aggregate estimate of the disputed amount(s) differs most greatly from the determination of the Consulting Firm.

(v)    Buyer will make the financial records of the Acquired Entities available to the Consulting Firm and Sellers' Representative and their accountants and other representatives at reasonable times at any time during the preparation by Sellers' Representative and/or the review by the Consulting Firm, as the case may be, of, and the resolution of any objections with respect to, the Proposed Closing Payment Calculation.

(b)    Payment of Adjustment Amount for Closing Payment.

(i)    If the Actual Adjustment is a positive amount (the "Positive Adjustment Amount"), Buyer will pay, or cause to be paid, to Sellers' Representative (on behalf of Sellers) an amount in cash equal to the Positive Adjustment Amount, if any, by wire transfer or delivery of other immediately available funds within ten (10) Business Days after the date on which the Closing Payment is finally determined pursuant to Section 2.3(a), subject to adjustment for any amounts previously paid by Buyer or Sellers' Representative (on behalf of Sellers) (as the case may be) pursuant to Section 2.3(a)(ii).

(ii)    If the Actual Adjustment is a negative amount (the absolute value of such negative amount, the "Negative Adjustment Amount"), Sellers' Representative (on behalf of Sellers) will pay, or cause to be paid, to Buyer, an amount in cash equal to the Negative Adjustment Amount, if any, by wire transfer or delivery of other immediately available funds within ten (10) Business Days after the date on which the Closing Payment is finally determined pursuant to Section 2.3(a), subject to adjustment for any amounts previously paid by Buyer or Sellers' Representative (on behalf of Sellers) (as the case may be) pursuant to Section 2.3(a)(ii).

2.4.    Equity Equivalence Agreement Payments.

(a)    Equity Equivalence Agreement Payments.  Subject to the other terms hereof, Buyer shall pay, or shall cause to be paid, to Sellers' Representative (on behalf of Sellers) additional consideration, as part of the Purchase Price, in such amount(s) and at such time(s) as provided in the Equity Equivalence Agreement (the "Equity Equivalence Agreement Payments").

(b)    Tax Purposes.  Any Equity Equivalence Agreement Payments shall be treated as an adjustment to the Purchase Price for all Tax purposes, unless otherwise required by applicable Law.  A portion of the Equity Equivalence Agreement Payments (when actually paid) shall be treated for United States federal income tax purposes as imputed interest as determined in accordance with Treasury Regulations Section 1.1275-4(c) (or any analogous provision of state, local or foreign Law, as applicable) and the Parties shall report such imputed interest in accordance therewith.

2.5.    Closing.

(a)    Subject to the provisions of Article IX, the closing of the transactions contemplated by this Agreement (the "Closing") and all actions specified in this Agreement to occur at the Closing shall take place remotely via the exchange of documents and signatures on the Business Day immediately following the day on which the last of the conditions set forth in Article IX (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions) are satisfied or waived in accordance with this Agreement, or on such other date as Buyer and Sellers' Representative shall mutually agree upon, orally or in writing (the date on which the Closing takes place, the "Closing Date").

(b)    At the close of business on the Business Day immediately preceding the Closing Date, or on the Closing Date if possible, a physical inventory of all of the Acquired Entities' stock in trade and pharmaceutical supplies shall be taken by a professional inventory service, mutually agreeable to the parties, consistent with applicable DEA requirements and other applicable legal requirements.  The cost of the inventory service shall be borne equally between Buyer, on the one hand, and Sellers' Representative (on behalf of Sellers), on the other hand.

2.6.    Allocation of the Purchase Price.  The Purchase Price shall be allocated between the Acquired Shares of each Acquired Entity, and shall be paid by Buyer to Sellers' Representative as provided herein (to be allocated by Sellers' Representative among the Sellers as set forth in Schedule 2.6).  The Parties agree to, and shall cause their Affiliates to, file all Tax Returns consistently with Schedule 2.6.

2.7.    Withholding Tax.  Buyer shall be entitled to deduct and withhold from the Purchase Price all Taxes that Buyer may be required to deduct and withhold under any provision of Tax Law.  All such withheld amounts shall be treated as delivered to Sellers' Representative (on behalf of Sellers) hereunder.

ARTICLE III

Representations and Warranties of Sellers about the Acquired Entities

Except as set forth in the corresponding sections of the disclosure schedules delivered simultaneously with the execution and delivery of this Agreement and attached as Exhibit C (the "Disclosure Schedules"), each Seller hereby represents and warrants to Buyer on the date hereof and as of the Closing Date as follows:

3.1.    Organization, Good Standing and Qualification; Authority.

(a)    Organization, Good Standing and Qualification; Authority. Each Acquired Entity is an entity duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization and has all requisite power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted and is qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except in each case as would not cause a Material Adverse Effect.

(b)    Directors and Officers. Schedule 3.1(b) lists the directors, managers and officers of each Acquired Entity.  By execution of this Agreement, each Seller votes such Seller's Acquired Shares in favor of the appointment of each of the directors and managers set forth on Schedule 3.1(b) and the removal of any directors and managers not set forth on Schedule 3.1(b). Sellers' Representative has made available to Buyer complete and correct copies of each Acquired Entity's governing documents, each as amended to the date hereof, and each is in full force and effect.

(c)    Business Records. The minute books (containing the records of meetings of the stockholders, the board of directors, and any committees of the board of directors), stock certificate books and stock record books of each Acquired Entity (other than HPC, LLC) are true, correct and complete in all material respects.  The books and records of HPC, LLC are true, correct and complete in all material respects. Sellers' Representative has made copies of each of the foregoing available to Buyer.

3.2.    Capitalization; Subsidiaries; Encumbrances; Debt.

(a)    Schedule 3.2(a) sets forth a true, complete and correct list of the authorized capital stock, and the issued and outstanding capital stock or other equity interests, of each Acquired Entity.  All of the issued and outstanding capital stock or other equity interests of the Acquired Entities has been duly authorized, and validly issued and is fully paid and non-assessable.

(b)    There are no preemptive or other outstanding rights, options, warrants, conversion rights, stock appreciation rights, redemption rights, repurchase rights, agreements, arrangements, calls, commitments or rights of any kind that obligate any Acquired Entity to issue or sell any shares of capital stock, equity interests or other securities, or any securities or obligations convertible or exchangeable into or exercisable for, or giving any Person a right to subscribe for

or acquire, any shares of capital stock, equity interests or other securities of any Acquired Entity, and no securities or obligations evidencing such rights are authorized, issued or outstanding.

(c)     There are no voting trusts, stockholder agreements, investor rights agreements, proxies or any other Contracts or understandings in effect with respect to the voting or transfer of any securities of any Acquired Entity or with respect to the management or governance of any Acquired Entity.

(d)     None of the Acquired Entities has any direct or indirect Subsidiaries or owns or controls, directly or indirectly, any interest in any other corporation, partnership, trust, joint venture, limited liability company, association, or other business entity.

(e)     Schedule 3.2(e) sets forth a correct and complete list and description of all of the Encumbrances affecting or attaching to the assets of the Acquired Entities.

(f)     Schedule 3.2(f) sets forth a correct and complete list and description of the Debt outstanding, or which may be outstanding under the Material Contracts.

3.3.    Government Consents and Approvals; No Conflicts.

(a)     Except as set forth on Schedule 3.3(a), no material notices, reports or other filings, consents, registrations, certifications, waivers, orders, declarations, approvals, permits or authorizations are required to be made with or to be obtained from any Governmental Entity in connection with the execution, delivery and performance of this Agreement and the other Transaction Documents by each Seller and the consummation by each Seller of the transactions contemplated hereby and thereby.

(b)     The execution, delivery and performance of this Agreement and the other Transaction Documents by Sellers do not, and the consummation of the transactions contemplated hereby and thereby will not, constitute or result in (i) a breach or violation of, or a default under, the governing documents of any Acquired Entity, (ii) with or without notice, lapse of time or both, a breach or violation of, a termination (or right of termination) or a default under or the creation or acceleration of any obligations under, (A) any Material Contract binding upon any Acquired Entity or (B) any Law to which any Acquired Entity is subject, (iii) the creation of an Encumbrance on any of the assets or properties of any Acquired Entity (other than a Permitted Encumbrance), (iv) except as set forth on Schedule 3.3(b)(iv), require the consent or waiver of, notice to or other action by any Person under any Material Contract binding upon any Acquired Entity, or (v) any material change in the rights or obligations of any party under any Material Contract, except, in the case of clause (ii)(A), for any such breach, violation, termination, default, creation, acceleration or change that would not, individually or in the aggregate, be material to the Acquired Entities taken as a whole.

3.4.    Financial Statements. Sellers' Representative has delivered to Buyer copies of (a) the audited combined balance sheet dated as of December 31, 2016, (b) the unaudited combined balance sheet of the Acquired Entities for the 11-month period ended on the Latest Balance Sheet Date (the "Latest Balance Sheet"), (c) the unaudited statements of operations and statements of changes in shareholder's equity of the Acquired Entities for the 12-month period ended on December 31, 2016, and (d) the unaudited statement of operations and statements of

changes in shareholder's equity of the Acquired Entities for the 11-month period ended on the Latest Balance Sheet Date (collectively, the "Financial Statements"). True, complete and correct copies of the Financial Statements are set forth on Schedule 3.4. Each of the Financial Statements (including any related notes and schedules) fairly presents in all material respects the combined financial position of the Acquired Entities as of the respective dates they were prepared and the results of the operations of the Acquired Entities for the periods indicated. Except as set forth on Schedule 3.4, the Financial Statements have been prepared in accordance with GAAP applied on a consistent basis in accordance with the past practice of the Acquired Entities.

     3.5.   Absence of Certain Changes.

     (a)    Since the Latest Balance Sheet Date, the Acquired Entities have conducted their businesses only in the ordinary course of business, and there has not been any event or change which, individually or in the aggregate, has had or would be reasonably likely to have a Material Adverse Effect.

     (b)    Except as set forth on Schedule 3.5(b), since the Latest Balance Sheet Date, none of the following has been engaged in by, or occurred with respect to, any Acquired Entity:

     (i)    declaration or payment of any dividends or distributions on or in respect of any of its equity securities, or redemption, purchase or acquisition of any of its equity securities;

     (ii)    (A) adjustment, split, combination or reclassification of any of its equity securities, (B) grant (whether or not for consideration) of any option or other right to acquire any of its securities to any Person, (C) issuance (whether or not for consideration) of any securities, or (D) enter into any Contract with respect to the sale, voting, registration or repurchase of any of its securities;

     (iii)    material change in any method of accounting or accounting practice for its business, except as required by GAAP or as disclosed in the notes to the Financial Statements;

     (iv)    material change in its cash management practices and policies, practices and procedures with respect to collection of Accounts Receivable, establishment of reserves for uncollectible Accounts Receivable, accrual of Accounts Receivable, inventory control, prepayment of expenses, payment of trade accounts payable, accrual of other expenses, deferral of revenue and acceptance of customer deposits;

     (v)    entry into any Contract that would constitute a Material Contract;

     (vi)    incurrence, assumption or guarantee of any indebtedness for borrowed money in connection with its business, except unsecured current obligations and Liabilities incurred in the ordinary course of business consistent with past practice;

     (vii)    direct or indirect transfer, assignment, sale, pledge or other disposition of, or imposition of an Encumbrance (other than any Permitted Encumbrance) on, any

material amount of its assets, except for the sale of Inventory in the ordinary course of business;

(viii)    cancellation of any debts or claims or amendment, termination or waiver of any material rights with respect thereto;

(ix)    transfer, assignment or grant of any license or sublicense of any material rights under or with respect to any Intellectual Property Assets;

(x)    material damage, destruction or loss, or any material interruption in use, of any of its assets, whether or not covered by insurance;

(xi)    acceleration, termination, waiver, material modification, release, assignment or cancellation of any Material Contract or Permit or any material rights or claims with respect thereto, other than in the ordinary course of business (which includes renewal of leases);

(xii)    material capital expenditures;

(xiii)    (A) grant of any bonuses, whether monetary or otherwise, or increase in any wages, salary, severance, pension or other compensation or benefits in respect of any of its current or former employees, officers, directors, independent contractors or consultants, other than as provided for in any written agreements or required by applicable Law, (B) change in the terms of employment or service for any of its employees, independent contractors or consultants or any termination of any of its employees, independent contractors or consultants for which the aggregate costs and expenses exceed $50,000 (other than changes to compensation pursuant to the annual review process of the Acquired Entities in the ordinary course of business consistent with past practices; provided that aggregate compensation may not be increased by a greater percentage than the average percentage increase in aggregate compensation over the three most recent fiscal years ending prior to the Latest Balance Sheet Date), or (C) action to accelerate the vesting or payment of any compensation or benefit for any of its current or former employees, officers, directors, consultants or independent contractors;

(xiv)    hiring or promoting any person as or to (as the case may be) an officer;

(xv)    adoption, modification or termination of any: (A) employment, severance, retention or other agreement with any of its current or former employees, officers, directors, independent contractors or consultants, (B) Benefit Plan, or (C) collective bargaining or other agreement with a Union, in each case whether written or oral;

(xvi)    any loan to (or forgiveness of any loan to), or entry into any other transaction with, any of its current or former directors, officers, employees, independent contractors or consultants;

(xvii)    adoption of any plan of merger, consolidation, reorganization, liquidation or dissolution or filing of a petition in bankruptcy under any provisions of federal or state

bankruptcy Law or consent to the filing of any bankruptcy petition against it under any similar Law;

(xviii)  purchase, lease or other acquisition of the right to own, use or lease any property or assets in connection with its business for an amount in excess of $30,000, individually (in the case of a lease, per annum) or $150,000 in the aggregate (in the case of a lease, for the entire term of the lease, not including any option term), except for purchases of Inventory or supplies in the ordinary course of business consistent with past practice;

(xix)   amend any of its governing documents;

(xx)   (A) make, rescind or change any material Tax election, (B) enter into any settlement of or compromise any material Tax liability, (C) change any annual Tax accounting period, (D) enter into a closing agreement for any material amount of Tax, (E) surrender any right to any material Tax refund or (F) file any amended Tax Return or refund claim with respect to any material Tax; or

(xxi)   Contract to do any of the foregoing, or any action or omission that would result in any of the foregoing.

3.6.   Litigation and Liabilities.

(a)   Except as set forth in Schedule 3.6(a), no Acquired Entity has received notice of any Action that has been commenced or, to the Knowledge of Sellers, threatened against or relating to any of the Acquired Entities or their assets (including in connection with or relating to the transactions contemplated by the Transaction Documents or any action taken or to be taken in connection therewith or the consummation of the transactions contemplated thereby).

(b)   No Acquired Entity has any liabilities or obligations of any nature, whether accrued, absolute, fixed, contingent or otherwise, whether due or to become due, and no Acquired Entity has any Debt outstanding, except for (i) liabilities and obligations reflected in clause (b) of the definition of Net Working Capital finally determined hereunder, (ii) liabilities to the extent disclosed, reflected or reserved against on Financial Statements, (iii) liabilities specifically set forth on the Disclosure Schedules, (iv) liabilities incurred since the Most Recent Balance Sheet Date in the ordinary course of business in an aggregate amount not to exceed $100,000, excluding purchases of inventory in the ordinary course of business (none of which is a liability for breach of contract, tort, or infringement or a claim or lawsuit or an environmental liability), (v) contractual obligations under any Contract and other contracts entered into in the ordinary course of business in an aggregate amount not to exceed $100,000, excluding purchases of inventory in the ordinary course of business (none of which is a liability for breach of contract, breach of warranty, tort, infringement or violation of Law, claim or lawsuit), and (vi) liabilities and obligations under this Agreement and any agreement delivered pursuant to this Agreement.

22

3.7.    Employee Benefit Plans.

(a)    Schedule 3.7(a) contains a true and complete list of each material Employee Benefit Plan. Sellers' Representative has made available to Buyer current, accurate and complete copies of all documents embodying each such Employee Benefit Plan, including all amendments thereto.

(b)    No Employee Benefit Plan is a "multiemployer plan" (as defined in Section 3(37) or 4001(a)(3) of ERISA) (a "Multiemployer Plan"), a "defined benefit plan" (as defined in Section 3(35) of ERISA (a "Defined Benefit Plan"), or other pension plan subject to Title IV of ERISA or Section 412 of the Code. None of the Acquired Entities nor any of their ERISA Affiliates sponsors, maintains, or contributes to, or has any material Liability under or with respect to (or, has within the previous six years, sponsored, maintained or contributed to, or had any material Liability under or with respect to), a Multiemployer Plan, a Defined Benefit Plan or other pension plan subject to Title IV of ERISA or Section 412 of the Code, including withdrawal liability as defined in ERISA Section 4201. No Employee Benefit Plan provides post-termination or retiree welfare benefits to any individual for any reason, other than as required by COBRA.

(c)    Each Employee Benefit Plan and related trust has been established, administered and maintained in material compliance with its terms and in material compliance with all applicable Laws (including ERISA, the Code, COBRA, and any applicable state and local Laws). Each Employee Benefit Plan that is intended to be qualified under Section 401(a) of the Code (a "Qualified Benefit Plan") has received a favorable and current determination letter from the IRS, or with respect to a prototype plan, can rely on an opinion letter from the IRS to the prototype plan sponsor, and nothing has occurred that could reasonably be expected to adversely affect the qualified status of any Qualified Benefit Plan. Nothing has occurred with respect to any Employee Benefit Plan that has subjected or could reasonably be expected to subject any Acquired Entity or any of its ERISA Affiliates to a penalty under Section 502 of ERISA or to tax or penalty under Section 4975 of the Code. All benefits, contributions and premiums relating to each Employee Benefit Plan have been timely paid in accordance with the terms of such Employee Benefit Plan and all applicable Laws and accounting principles, and all benefits accrued under any unfunded Employee Benefit Plan have been paid, accrued or otherwise adequately reserved to the extent required by, and in accordance with, GAAP. There are no pending claims against any Employee Benefit Plan, other than routine claims for benefits.

(d)    Neither the execution, delivery and performance of this Agreement nor the consummation of the transactions herein contemplated will cause Buyer or any of its ERISA Affiliates to be liable to any Person under any of the Employee Benefit Plans pursuant to plan terms, ERISA or the Code. All payments due from the Acquired Entities (on account of employment contracts or otherwise) under the terms of any Employee Benefit Plan have been paid or accrued, and reflected on the Latest Balance Sheet for all periods ended on or prior to the date hereof, and all payments that shall become due under the terms of any Employee Benefit Plan for the period from the date hereof through the Closing Date, shall be timely paid by the Acquired Entities before the Closing Date.

3.8.    Compliance with Laws.  None of the Acquired Entities are in material violation of any Law and no Acquired Entity has received written notice alleging any violation of Law. Except as set forth on Schedule 3.8, no investigation, review, audit or administrative or other legal action by any Governmental Entity with respect to any Acquired Entity is pending or, to the Knowledge of Sellers, threatened.  The Acquired Entities have obtained, and are and have for the past 6 years been in material compliance with, all pharmacy and other permits, DEA and other registrations, licenses, approvals, consents, participation certifications, provider agreements and rights with all Government Payment Programs, authorizations, franchises, variances, exemptions and orders issued or granted by a Governmental Entity and needed to operate the businesses of the Acquired Entities in compliance with all applicable Laws (each a "Permit").  Schedule 3.8 contains a true and complete list of each Permit.  No material conflict, default or violation has occurred with respect to any Permit and no Acquired Entity has received written notice from any Governmental Entity threatening to revoke or modify any Permit, and to the Knowledge of Sellers, there exists no state of facts that would reasonably be expected to cause any Governmental Entity to limit, revoke or fail to renew or issue any Permit.

3.9.    Material Contracts.

(a)    Schedule 3.9(a) sets forth a correct and complete list and description of all of the Material Contracts to which any Acquired Entity is a party or by which any Acquired Entity or any of its properties, assets or rights, are or may be bound or subject. "Material Contracts" means all:

(i)    deposit agreements, indentures, mortgages, pledge agreements, security agreements, deeds of trust, conditional sale agreements or other Contracts granting an Encumbrance (other than Permitted Encumbrances) on any of the assets of any Acquired Entity to any Person;

(ii)    credit agreements, guarantees, indentures, loan agreements, purchase agreements, bonds, capitalized leases, bonds, debentures, notes, foreign exchange or other hedging arrangements, interest rate swaps, investments and other evidences of Debt providing for or relating to Debt in respect of which any Acquired Entity is in any manner directly or contingently obligated or liable;

(iii)    Contracts under which any Acquired Entity has, directly or indirectly, purchased or acquired any securities or otherwise made any advance, loan, extension of credit or capital contribution to, or other investment in, any Person, and all joint venture, partnership and limited liability company Contracts;

(iv)    Contracts under which any Acquired Entity (A) is lessee of, or holds or operates, any equipment, vehicle or other tangible personal property, or (B) has a leasehold interest or (C) is the lessor or sublessor of real property;

(v)    Contracts (A) for the sale or transfer by any Acquired Entity, or for the purchase or other acquisition by any Acquired Entity, of assets, including purchase orders, goods, materials, supplies, machinery, capital assets or services or capital expenditures or research and development, in each case, involving payments of more than

24

$25,000 in any 12-month period, (B) Contracts granting any Person any right of first refusal, right of first offer, buy/sell or economically preferential right or other similar rights, to purchase any equity interests in or assets of any Acquired Entity and (C) Contracts granting a warranty to any Person;

(vi)     Contracts relating in whole or in part to the Intellectual Property Assets;

(vii)     Contracts which (A) require any Acquired Entity to deal on an exclusive basis with any Person, (B) restrict or purport to restrict any Acquired Entity from doing any kind of business or from doing business with any Person or in any geographic area or from competing with any Person, (C) require any Acquired Entity to maintain the confidentiality of any matter, and (D) require any Acquired Entity to indemnify any Person;

(viii)     (A) employment, retainer, severance, separation, non-competition, non-solicitation and consulting Contracts with any of the Acquired Entities' current and former employees, officers, directors, consultants and independent contractors providing for annual compensation in excess of $50,000 per year, (B) Contracts between any Acquired Entity and any labor union or other collective bargaining group, (C) Contracts setting forth the terms of or otherwise relating to Benefit Plans, (D) sales agency, dealer, distribution, brokerage or franchise Contracts to which any Acquired Entity is party, (E) Contracts with any Seller or shareholder, member, manager, director, officer or other Affiliate of any Acquired Entity, (F) shareholders' agreements, investor rights agreements, registration rights agreements, voting agreements and other similar agreements relating to any Acquired Entity's equity securities, and (G) proxies, voting trusts, or powers of attorney to act on behalf of any Acquired Entity;

(ix)     Contracts between any Acquired Entity and any Governmental Entity;

(x)     Contracts not made in the ordinary course of business consistent with past practice of the Acquired Entities or which are materially adverse to the Acquired Entities; and

(xi)     other Contracts to which any Acquired Entity is a party or by or to which they or any of their assets are bound or subject which has an aggregate future liability, benefit or right to payment to any Person in excess of $25,000.

(b)     Sellers' Representative has made available to Buyer true, complete and correct copies of each Material Contract (including all amendments thereto). All of the Material Contracts are valid and legally binding obligations of the Acquired Entities, enforceable against the Acquired Entities in accordance with their respective terms, except as limited by the Bankruptcy and Equity Exception, and none of the Acquired Entities or, to the Knowledge of Sellers, any other party to any Material Contract is in material breach or default thereunder. To the Knowledge of Sellers, no event has occurred which, with notice or lapse of time or both, would constitute a material breach of or default under a Material Contract, or require indemnification by any Acquired Entity or permit termination or modification thereof or acceleration thereunder.

993976v.19 3899/00003

3.10.  Property.

(a)  No Acquired Entity owns any real property.

(b)  Schedule 3.10(b) includes a true and complete list of all licenses, leases, subleases, or other occupancies (collectively, the "Leases") used by any Acquired Entity or to which any Acquired Entity is a party (the "Leased Real Property"). Each Lease is valid and binding on the Acquired Entity party thereto and is in full force and effect, and each Lease is free and clear of any Encumbrances (other than Permitted Encumbrances), and there is no material breach or default by any Acquired Entity in respect of any such Lease or, to the Knowledge of Sellers, any other party to any Lease, and, to the Knowledge of Sellers, no event has occurred which, with notice or lapse of time or both, would constitute a material breach or default thereof, require indemnification by any Acquired Entity, or permit termination or modification thereof.

(c)  There is no pending or, to the Knowledge of Sellers, threatened condemnation or eminent domain proceeding or other claim, cause of action, lawsuit or legal proceeding with respect to, or that could affect, the Leased Real Property or the use thereof.

(d)  The Leased Real Property are in good working order, ordinary wear and tear excepted, for the use for which such Leased Real Property was intended and/or is currently used, and, to the Knowledge of Sellers, there are no material structural or mechanical defects in or to the improvements comprising the leased portions of the Leased Real Property, except for such defects as would not, individually or in the aggregate, have a Material Adverse Effect. All utilities necessary for the use for which the Leased Real Property is currently used are available.

3.11.  Environmental Matters. Except as set forth on Schedule 3.11:

(a)  Each Acquired Entity is in compliance in all material respects with all Environmental Laws. None of the Acquired Entities has received from any Person any: (i) Environmental Notice or Environmental Claim; or (ii) written request for information pursuant to Environmental Law, which, in each case, either remains pending or unresolved, or is the source of ongoing obligations or requirements as of the Closing Date.

(b)  No Acquired Entity, nor any real property currently or formerly owned, leased or operated by any Acquired Entity, is listed on, or has been proposed for listing on, the National Priorities List (or CERCLIS) under CERCLA, or any similar state list.

(c)  To Sellers' knowledge, none of the Acquired Entities has Released any Hazardous Materials in contravention of Environmental Law, including with respect to any real property currently or formerly owned, leased or operated by any Acquired Entity, and no Acquired Entity has received an Environmental Notice that any of real property currently or formerly owned, leased or operated by such Acquired Entity (including soils, groundwater, surface water, buildings and other structure located thereon) has been contaminated with any Hazardous Material which could reasonably be expected to result in an Environmental Claim against, or a violation of Environmental Law or term of any Environmental Permit by, any Acquired Entity.

(d)  To Sellers' knowledge, no Acquired Entity has retained or assumed, by Contract or operation of Law, any liabilities or obligations of third parties under Environmental Law.

992976v.19 3899/00002

(e)     Schedule 3.11 sets forth: (i) any and all environmental reports, studies, audits, records, sampling data, site assessments, risk assessments, economic models and other similar documents in the possession of Sellers or the Acquired Entities with respect to the Acquired Entities or any real property currently or formerly owned, leased or operated by any Acquired Entity related to compliance with Environmental Laws, Environmental Claims or an Environmental Notice or the Release of Hazardous Materials; and (ii) any and all material documents in the possession of Sellers or the Acquired Entities concerning planned or anticipated capital expenditures required to reduce, offset, limit or otherwise control pollution and/or emissions, manage waste or otherwise ensure compliance with current or future Environmental Laws (including costs of remediation, pollution control equipment and operational changes). Sellers' Representative has provided Buyer with true and complete copies of all of the foregoing.

3.12.   Tax Matters.

(a)     All federal, state, local and foreign Tax Returns required to be filed by, or with respect to, the Acquired Entities have been timely filed when due (taking into account all valid extensions of due dates) and all such Tax Returns are true, correct and complete in all material respects. All Taxes, whether or not shown to be due and payable on such Tax Returns, that are due and payable by the Acquired Entities have been timely paid in full by the due date thereof. No waivers of statutes of limitation are in effect in respect of any Taxes and no Acquired Entity has agreed to any extension of time with respect to a Tax assessment or deficiency.

(b)     The Acquired Entities have complied in all material respects with all applicable Laws and agreements relating to the payment and withholding of Taxes and have, within the time and in the manner prescribed by applicable Laws and agreements, withheld and paid over to the proper Governmental Entity all amounts required to have been withheld and paid in connection with amounts paid or owing to any past or present employee, independent contractor, creditor or stockholder.

(c)     No deficiencies for any federal, state, local or foreign Taxes have been asserted or assessed in writing against the Acquired Entities that remain unpaid or unresolved. No Tax Proceeding relating to the Acquired Entities is currently pending, or, to the Knowledge of Sellers, is threatened.

(d)     There are no Encumbrances for Taxes (other than Permitted Encumbrances) upon any of the assets of any of the Acquired Entities.

(e)     No power of attorney, which is currently in effect, has been granted with respect to any matter relating to Taxes of the Acquired Entities.

(f)     Sellers' Representative has delivered or made available to Buyer true, correct and complete copies of all material Tax Returns of, and all examination reports and statements of deficiencies assessed against or agreed to by, the Acquired Entities with respect to Taxes for the last three taxable years.

(g)     Each Acquired Entity is, and has been since its inception, taxed as an S-corporation under the Code for federal income tax purposes.

27

3.13.    Labor Matters.

(a)    No Acquired Entity is, nor has any Acquired Entity ever been, a party to, bound by, or negotiating any collective bargaining agreement or other Contract with a union, works council or labor organization (collectively, a "Union") and there is not, and there has not ever been, any Union representing or purporting to represent any employee of any Acquired Entity, and no Union or group of employees is seeking or has sought to organize employees for the purpose of collective bargaining. There has never been, nor has there been any threat of, any strike, slowdown, work stoppage, lockout, concerted refusal to work overtime or other similar labor disruption or dispute affecting any Acquired Entity or any employees of any Acquired Entity. No Acquired Entity has a duty to bargain with any Union.

(b)    Except as set forth on Schedule 3.13(b), each Acquired Entity is and has been for the past 6 years in compliance in all material respects with all applicable Laws pertaining to employment and employment practices, including all Laws relating to labor relations, unfair labor practices, equal employment opportunities, fair employment practices, employment discrimination, harassment, retaliation, reasonable accommodation, disability rights or benefits, immigration, wages, hours, overtime compensation, child labor, hiring, promotion and termination of employees, working conditions, meal and break periods, privacy, health and safety, workers' compensation, leaves of absence, paid sick leave, and unemployment insurance. All individuals characterized and treated by any Acquired Entity as consultants or independent contractors of such Acquired Entity are properly treated as independent contractors under all applicable Laws. All employees of any Acquired Entity classified as exempt under the Fair Labor Standards Act and state and local wage and hour laws are properly classified. There are no actions, suits, claims, hearings, investigations or proceedings against any Acquired Entity pending, or, to the Knowledge of Sellers, threatened to be brought or filed, by or with any Governmental Entity or arbitrator in connection with the employment of any current or former applicant, employee, consultant, volunteer, intern, or independent contractor of any Acquired Entity, including any claim relating to labor relations, unfair labor practices, equal employment opportunities, fair employment practices, employment discrimination, harassment, retaliation, reasonable accommodation, disability rights or benefits, immigration, wages, hours, overtime compensation, child labor, hiring, promotion and termination of employees, working conditions, meal and break periods, privacy, health and safety, workers' compensation, leaves of absence, paid sick leave, unemployment insurance, or any other employment-related matter arising under applicable Laws.

(c)    Except as set forth on Schedule 3.13(c), no Acquired Entity has laid off or involuntarily dismissed (other than for cause) any employees within the six months immediately prior to the Closing Date. No Acquired Entity has, within the 90 days immediately prior to the Closing Date, taken any action or actions which would, independently of the transactions contemplated by the Transaction Documents, result in a plant closing or mass layoff within the meaning of the WARN Act.

3.14.    Insurance. Schedule 3.14 contains a true, complete and correct list of all policies of excess loss, fire, liability, production, completion bond, workmen's compensation and other forms of insurance currently in effect covering any of the assets, business, officers, directors, employees, independent contractor or consultant of any of the Acquired Entities (the "Insurance

Policies"). All current Insurance Policies are in full force and effect, all premiums with respect thereto covering all periods up to and including the Closing Date have been paid or will be paid when due and no notice of cancellation, termination or reduction of coverage, and no notice of intention to cancel, terminate or reduce coverage, has been received. Sellers' Representative has given Buyer access to true, complete and correct copies of all Insurance Policies together with all riders and amendments thereto.

3.15.    Related Party Transactions. Except as set forth in Schedule 3.15, None of Sellers or any of their respective Affiliates (other than the Acquired Entities) nor, to the Knowledge of Sellers, any employee, officer, director, independent contractor or consultant of any of the Acquired Entities or any of their respective Affiliates (i) owns any property (real or personal, or mixed and whether tangible or intangible) used in the business of any Acquired Entity as currently conducted or (ii) is a party to any Contract with any Acquired Entity (except for employment Contracts).

3.16.    Brokers and Finders. Except as listed on Schedule 3.16, no Seller nor any Acquired Entity has employed, retained or engaged any broker or finder or incurred any liability for any brokerage, finder's or similar fees or commissions in connection with the transactions contemplated by this Agreement.

3.17.    Intellectual Property Assets.

(a)    Schedule 3.17(a) lists all (i) Intellectual Property Registrations and (ii) Intellectual Property Assets, including software, that are not registered but that are material to the operation of the business of any Acquired Entity. All required filings and fees related to the Intellectual Property Registrations have been timely filed with and paid to the relevant Governmental Entities and authorized registrars, and all Intellectual Property Registrations are otherwise in good standing. Sellers' Representative has provided Buyer with true and complete copies of all material file histories, documents, certificates, office actions, correspondence and other materials related to all Intellectual Property Registrations.

(b)    Schedule 3.17(b) lists all Intellectual Property Agreements. Sellers' Representative has provided Buyer with true and complete copies of all such Intellectual Property Agreements, including all modifications, amendments and supplements thereto and waivers thereunder. Each Intellectual Property Agreement is valid and binding on the applicable Acquired Entity in accordance with its terms and is in full force and effect. None of the Acquired Entities nor, to the Knowledge of Sellers, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under) in any material respect, or has provided or received any written notice of breach or default of or any intention to terminate, any Intellectual Property Agreement. To the Knowledge of Sellers, no event or circumstance has occurred that, with notice or lapse of time or both, would constitute an event of default under any Intellectual Property Agreement or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder.

(c)    The Acquired Entities are the sole and exclusive legal and beneficial, and with respect to the Intellectual Property Registrations, record, owners of all right, title and interest in and to the Intellectual Property Assets, and have the valid right to use all other Intellectual

29

Property used in or necessary for the conduct of the businesses of the Acquired Entities as currently conducted, in each case, free and clear of Encumbrances (other than Permitted Encumbrances). Sellers' Representative has provided Buyer with true and complete copies of all such agreements.

(d)     The Intellectual Property Assets and Intellectual Property licensed under the Intellectual Property Agreements are all of the Intellectual Property necessary to operate the businesses of the Acquired Entities as presently conducted. The consummation of the transactions contemplated hereunder will not result in the loss or impairment of or payment of any additional amounts with respect to, nor require the consent of any other Person in respect of, the Acquired Entities' right to continue to own, use or hold for use any Intellectual Property as owned, used or held for use in the conduct of the businesses of the Acquired Entities as currently conducted.

(e)     The Acquired Entities' rights in the Intellectual Property Assets are valid, subsisting and enforceable. The Acquired Entities have taken all reasonable steps to maintain the Intellectual Property Assets and to protect and preserve the confidentiality of all trade secrets included in the Intellectual Property Assets, including requiring all Persons having access thereto to execute written non-disclosure agreements.

(f)     To Sellers' knowledge, the conduct of the businesses of the Acquired Entities as currently and formerly conducted, and the Intellectual Property Assets and Intellectual Property licensed under the Intellectual Property Agreements as currently or formerly owned, licensed or used by the Acquired Entities, have not infringed, misappropriated, diluted or otherwise violated, and have not and do not infringe, dilute, misappropriate or otherwise violate, the Intellectual Property or other rights of any Person. To Sellers' knowledge, no Person has infringed, misappropriated, diluted or otherwise violated, or is currently infringing, misappropriating, diluting or otherwise violating, any Intellectual Property Assets.

(g)     There are no Actions (including any oppositions, interferences or re-examinations) settled, pending or, to Sellers' knowledge, threatened (including in the form of offers to obtain a license): (i) alleging any infringement, misappropriation, dilution or violation of the Intellectual Property of any Person by any Acquired Entity; (ii) challenging the validity, enforceability, registrability or ownership of any Intellectual Property Assets or any Acquired Entity's rights with respect to any Intellectual Property Assets; or (iii) by any Acquired Entity or any other Person alleging any infringement, misappropriation, dilution or violation by any Person of any Intellectual Property Assets. No Acquired Entity is subject to any outstanding or prospective Order (including any motion or petition therefor) that does or would restrict or impair the use of any Intellectual Property Assets.

3.18.   Customers and Suppliers.

(a)     Schedule 3.18(a) sets forth (i) each Government Payment Program and private payor who has paid aggregate consideration to the Acquired Entities for goods or services rendered in an amount greater than or equal to (x) $200,000 for fiscal year 2016 and (y) $166,667 for the 10-month period ended on October 31, 2017 (collectively, the "Material Customers"); and (ii) the amount of consideration paid by each Material Customer during such

periods. No Acquired Entity has received any written notice that any of the Material Customers has ceased, and to the Knowledge of Sellers no Material Customer intends to cease, to use the goods or services of the Acquired Entities or to otherwise terminate or materially reduce its relationship with the Acquired Entities.

(b)     Schedule 3.18(b) sets forth (i) each supplier to whom the Acquired Entities have paid aggregate consideration for goods or services rendered in an amount greater than or equal to (x) $200,000 for fiscal year 2016 and (y) $166,667 for the 10-month period ended on October 31, 2017 (collectively, the  "Material Suppliers"); and (ii) the amount of purchases from each Material Supplier during such periods. No Acquired Entity has received any written notice that any of the Material Suppliers has ceased, and to the Knowledge of Sellers no Material Supplier intends to cease, to supply goods or services to the Acquired Entities or to otherwise terminate or materially reduce its relationship with the Acquired Entities.

3.19.    Inventory. All Inventory, whether or not reflected in the Latest Balance Sheet, consists of a quality and quantity usable and salable in the ordinary course of business consistent with past practice, except for obsolete, damaged, defective or slow-moving items that have been written off or written down to fair market value or for which adequate reserves have been established. All Inventory is owned by the Acquired Entities free and clear of all Encumbrances, and no Inventory is held on a consignment basis.   All of the pharmaceuticals, drugs and biologicals included in Inventory have been properly stored in a manner consistent with industry standards and are not expired and are properly labeled and packaged.

3.20.    Accounts Receivable.    Except as set forth on Schedule 3.20, the Accounts Receivable reflected on the Latest Balance Sheet and the Accounts Receivable arising after the date thereof (a) have arisen from bona fide transactions entered into by the Acquired Entities involving the sale of goods or the rendering of services in the ordinary course of business consistent with past practice; (b) constitute only valid, undisputed claims of the Acquired Entities not subject to claims of set-off or other defenses or counterclaims other than normal cash discounts accrued in the ordinary course of business consistent with past practice; and (c) that are subject to a reserve for bad debts shown on the Latest Balance Sheet or, with respect to Accounts Receivable arising after the Latest Balance Sheet Date, on the accounting records of the Acquired Entities, are collectible in full within 120 days after billing. The reserve for bad debts shown on the Latest Balance Sheet or, with respect to Accounts Receivable arising after the Latest Balance Sheet Date, on the accounting records of the Acquired Entities, have been determined in accordance with GAAP, consistently applied, subject to normal year-end adjustments and the absence of disclosures normally made in footnotes.

3.21.    Foreign Corrupt Practices Act.

(a)     None of Sellers, the Acquired Entities or, to the Knowledge of Sellers, any of their respective employees, directors, officers or other representatives or agents has (i) taken any action that would cause the Acquired Entities to be in violation of the Foreign Corrupt Practices Act of 1977, as amended, or any rules and regulations thereunder, or (ii) directly or indirectly, made any contribution, gift, bribe, rebate, payoff, influence payment, kickback or other payment to any Person, whether in money, property or services, on behalf of the Acquired Entities: (A) to obtain or attempt to obtain favorable treatment in securing business, (B) to pay for favorable

treatment for business secured, (C) to obtain or attempt to obtain special concessions or for special concessions already obtained, for or in respect of Sellers or any of their respective Affiliates (including the Acquired Entities), or (D) in violation of any applicable Laws.

(b)    None of Sellers, the Acquired Entities or, to the Knowledge of Sellers, any of their respective employees, directors, officers or other representatives or agents has: (i) taken any action in furtherance of any boycott not sanctioned by the United States; (ii) entered into a Contract or agreement to conduct any transaction with any Governmental Entity, agent, representative, resident of, or any Person based or resident in any country that is the target at any time or from time to time of any of the several economic sanctions programs administered by the Office of Foreign Assets Control, U.S. Department of Treasury (or any successor thereto) or any other part of the U.S. government; and/or (iii) offered, promised, authorized or made, directly or indirectly, (A) any unlawful payments under applicable Laws, or (B) any unlawful payments or other inducements, to any government official, including any official of an entity owned or controlled by a government, political party or official thereof or any candidate for political office, with the intent or purpose of:  (1) influencing any act or decision of such official in his official capacity; (2) inducing such official to do or omit to do any act in violation of the lawful duty of such official; (3) receiving an improper advantage; or (4) inducing such official to use his influence with a Governmental Entity to affect or influence any act or decision of such Governmental Entity in order to assist any Acquired Entity in obtaining or retaining business for or with, or directing business to, any Person.

(c)    Each Seller and Acquired Entity is in compliance in all material respects with the USA Patriot Act to the extent applicable to such Seller or Acquired Entity.

3.22.   Powers of Attorney.  Schedule 3.22 sets forth the names and locations of each Person holding a power of attorney on behalf of any Acquired Entity.

3.23.   Assets.  The assets owned, leased and licensed by the Acquired Entities include all tangible assets and Intellectual Property Rights used in the conduct of the business by the Acquired Entities.

3.24.   Certain Health Care Matters.  With respect to the Acquired Entities and their business:

(a)    To the Knowledge of Sellers, each Acquired Entity and each of its Affiliates employees, directors, agents and licensed professionals (in each instance, as relates to such individual's employment or engagement by such Acquired Entity) is now, and has been at all times during the past 6 years, in material compliance with all Healthcare Laws and Practices. To the Knowledge of Sellers, no Acquired Entity, nor any Affiliates, employees, directors, agents or licensed professionals of any Acquired Entity, has in the course of performing services for any Acquired Entity: (i) knowingly and willfully made or caused to be made a false statement or representation of a material fact in any application for any benefit or payment under a Government Payment Program; (ii) knowingly and willfully made or caused to be made a false statement or representation of a material fact in determining rights to any benefit or payment under a Government Payment Program; (iii) presented or caused to be presented a claim for reimbursement for services that is for an item or service that was known or should have been

known to be (1) not provided as claimed, or (2) false and fraudulent; (iv) failed to disclose knowledge of the occurrence of any event affecting the initial or continued right to any benefit or payment on its own behalf or on behalf of another, with intent to fraudulently secure such benefit or payment under a Government Payment Program; (v) knowingly or willfully offered, paid, solicited or received any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or in kind (1) in return for referring an individual to a Person for the furnishing or arranging of any item or service for which payment may be made in whole or in part by any Government Payment Program, or (2) in return for purchasing, leasing, ordering or arranging for or recommending purchasing, leasing or ordering any good, facility, service or item for which payment may be made in whole or in part by any Government Payment Program; (vi) engaged in any other activity that violates any applicable Healthcare Laws and Practices prohibiting fraudulent, abusive or unlawful practices connected in any way with the provision of health care items or services or the billing for such items, goods or services provided to a beneficiary of any Government Payment Programs; or (vii) except as set forth on Schedule 3.24(a), failed to comply with, or suffered any breach in security contrary to, the privacy and security requirements established by any Applicable Privacy Laws.

(b)    Each Acquired Entity has maintained all records required to be maintained by the Food and Drug Administration, the DEA, the Board of Pharmacy or equivalent agency in each state that has issued a Permit to an Acquired Entity, the Medicare Program and Medicaid Program and the laws of all other applicable federal, state and local Governmental Entities, in each case consistent in all material respects with the requirements of applicable Healthcare Laws and Practices. To the Knowledge of Sellers, there are no presently existing circumstances which would result or would be reasonably likely to result in violations by or in connection with the records retention requirements under any such Healthcare Laws and Practices.

(c)    Each Acquired Entity is enrolled for participation in the Government Payment Programs set forth on Schedule 3.24(c), and each Acquired Entity has been for the last 6 years (or since its initial enrollment if shorter), and as of the date hereof is, in compliance in all material respects with all applicable requirements of participation, coverage and enrollment for, and where applicable, are parties to valid provider or supplier agreements related to, the Government Payment Programs. No Acquired Entity has received any written notice indicating that such qualification may be terminated or withdrawn nor, to the Knowledge of Sellers, does any Acquired Entity have any reason to reasonably believe that such qualification may be terminated or withdrawn, by virtue of the transactions contemplated by this Agreement (providing necessary CHOW Approvals are obtained) or otherwise. No Acquired Entity has any Liability to any Government Payment Program or non-governmental payor with respect thereto, except for Liabilities incurred in the ordinary course of business consistent with past practice in all material respects and which have been properly reflected and adequately reserved in the Financial Statements, and no Acquired Entity has received written notice of any dispute or claim by any Governmental Entity, administrative contractor or other Person regarding the Government Payment Programs or any Acquired Entity's participation therein. Except as set forth on Schedule 3.24(c) and any immaterial adjustments and claim denials received in the ordinary course of business, there are no pending appeals, overpayment determinations, adjustments, challenges, audits, litigation or notices of intent to open any Government Payment Program claim determinations or other reports required to be filed by any Acquired Entity related thereto.

(d)     Except as set forth in Schedule 3.24(d), no Acquired Entity nor any of its Affiliates, employees or licensed professionals or contractors: (i) has had a civil monetary penalty assessed against it under section 1128A of the Social Security Act or any regulations promulgated thereunder; (ii) has been convicted of, charged with, indicted or, investigated for a Medicare Program, Medicaid Program or other Government Payment Program related offense, or convicted of, charged with, indicted or investigated for a violation of federal or state law relating to fraud, theft, embezzlement, breach of fiduciary responsibility, financial misconduct, obstruction of an investigation or controlled substances, (iii) has been excluded or suspended from participation in any Government Payment Program, or has been disbarred, suspended or is otherwise ineligible to participate in any Government Payment Program, or (iv) to the Knowledge of Sellers, has committed any offense that may reasonably serve as the basis for any such exclusion, suspension, disbarment or other ineligibility.  No Acquired Entity nor any of its Affiliates, directors, officers, managing employees, employees, licensed professionals or contractors (A) is listed on the Department of Health and Human Services Office of Inspector General List of Excluded Individuals and Entities or the General Services Administration List of Excluded Parties and, to the Knowledge of Sellers, no such action is threatened or pending, (B) is excluded from any Government Payment Program pursuant to 42 U.S.C. § 1320a-7b and related regulations or (C) to the Knowledge of Sellers, have engaged in activity likely to result in criminal or civil money penalties, or mandatory or permissive exclusion from any Government Payment Program.

(e)     No Acquired Entity has been, or is currently, a party to a corporate integrity agreement or settlement with, or mandated by, any Governmental Entity.

3.25.  No Material Misstatements or Omissions.  No representation or warranty by Sellers in this Agreement and no statement contained in the Disclosure Schedules to this Agreement or any certificate or other document furnished or to be furnished to Buyer pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading; provided, however, that this Section 3.25 shall not apply to any projections or forward-looking financial data.

## ARTICLE IV

### Representations and Warranties of Sellers About Sellers

Except as set forth in the corresponding sections of the Disclosure Schedules, each Seller, severally, and not jointly and severally, with respect to itself only, represents and warrants to Buyer as of the date hereof and as of the Closing Date as follows:

4.1.  Capacity.  Such Seller (a) is an individual residing at the address for such individual set forth opposite such Seller's name on Schedule A and (b) has full legal capacity and legal right to execute and deliver each of the Transaction Documents and to perform his or her obligations thereunder.

4.2.  Binding Effect.  Each of the Transaction Documents to which such Seller is or may become a party is, or, when executed and delivered in accordance with this Agreement will

992976v.19 3899/00002

be, legal, valid and binding obligations of such Seller enforceable against such Seller in accordance with its terms, except (x) as limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or similar Laws affecting the enforcement of creditors' rights generally and (y) Laws relating to the availability of specific performance, injunctive relief or relied on other equitable remedies (the "Bankruptcy and Equity Exception").

4.3.     Contravention.     Neither the execution, delivery and performance of the Transaction Documents by such Seller nor the consummation of the transactions contemplated thereunder by such Seller will (with or without notice or lapse of time or both) (a) conflict with, violate or breach any Law by which such Seller or any of his or her material assets or properties, including the Acquired Shares may be bound, or (b) conflict with, breach or result in a default under any material Contract to which such Seller is a party or by which such Seller or his or her Acquired Shares may be bound, in each case except for such violations, breaches, defaults, other events which could not reasonably be expected to materially and adversely affect the ability of such Seller to perform his or her obligations under the Transaction Documents or to consummate the transactions contemplated thereunder.

4.4.     Litigation.     There is no Action against such Seller or, to the knowledge of such Seller, any other Person (not including Buyer) involving any of the transactions contemplated hereunder or such Seller's Acquired Shares that, individually or in the aggregate, if determined adversely to such Seller, could reasonably be expected to materially and adversely affect the ability of such Seller to perform his or her obligations under this Agreement or the other Transaction Documents or to consummate the transactions contemplated hereunder or thereunder.

4.5.     Title to Acquired Shares.     Such Seller is the sole record, legal and beneficial owner of the respective number of Acquired Shares set forth opposite such Seller's name on Schedule B and has good and marketable title to such Acquired Shares. Such Seller's right, title and interest in his or her Acquired Shares are free and clear of all Encumbrances, transfer restrictions, rights of first refusal or first offer, options, voting trusts, voting contracts and restrictions of any nature whatsoever, other than (a) any restrictions on transfer under applicable state and federal securities Laws, and (b) the restrictions in (i) the buy-sell agreements (the "Buy-Sell Agreements") among the owners of each of HPC, LLC, Hemophilia Preferred Care of Memphis, Inc., HPC Biologicals, Inc., HPCNC, Inc., HPC Specialty Rx West Virginia Inc., and Hemophilia Preferred Care of Oklahoma, Inc., and Hemophilia Preferred Care of Mississippi, Inc., and (ii) the bylaws (the "Restricted Bylaws") of each of HPC Specialty Rx of Kansas, Inc. and HPC Specialty Rx Reed, Inc. By execution of this Agreement, each Seller waives all rights of first refusal, purchase rights, consent rights and other limitations on the transfer of Acquired Shares contained in the Buy-Sell Agreements and the Restricted Bylaws and expressly approves the transfer of the Acquired Shares as contemplated by this Agreement. Upon delivery to Buyer at the Closing by such Seller of the certificates representing such Seller's Acquired Shares for the sale, transfer, assignment, conveyance and delivery to Buyer, and upon Sellers' Representative's receipt the Estimated Closing Payment in accordance with Article II of this Agreement, Buyer will become the sole record legal and beneficial owner of such Seller's Acquired Shares and good and marketable title to such Seller's Acquired Shares will pass to Buyer, free and clear of any Encumbrances, other than restrictions on transfer under applicable state and federal securities Laws. Such Acquired Shares are all the securities of any kind, debt or

35

equity, of the Acquired Entities owned by such Seller. Such Seller acknowledges and agrees that such Seller's Pro Rata Share and Allocated Purchase Price(s) set forth on Schedule 2.6 are correct.

4.6.    Sophisticated Seller; Adequate Information; Securities Laws. Such Seller is a sophisticated seller with respect to the Acquired Shares and has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of such sale, is aware of and has considered the financial risks and financial hazards of selling the Acquired Shares on the terms set forth in the Transaction Documents and is willing to forego through such sale the potential for future economic gain that might be realized from the Acquired Shares. Such Seller has adequate information concerning the business and financial condition of the Acquired Entities and such other matters with respect to the Acquired Entities as a reasonable person would consider in evaluating the transactions contemplated hereby, including all information necessary to determine the fair market value of the Acquired Shares, to make an informed decision regarding the sale of the Acquired Shares to Buyer hereunder. Such Seller has evaluated the merits and risks of selling the Acquired Shares on the terms set forth in the Transaction Documents, and has independently, without reliance upon Buyer and based on such information as such Seller deemed appropriate, made his or her own analysis and decision to enter into this Agreement, the other Transaction Documents and to sell the Acquired Shares to Buyer. Such Seller has not offered to sell any portion of the Acquired Shares or any interest therein in a manner which violates any applicable securities law or would require the sale hereunder to be registered under the Securities Act of 1933, as amended.

4.7.    Transactions with the Acquired Entities. Except as set forth in Schedule 4.7, such Seller is not and has not been during the 12-month period immediately preceding the date of this Agreement (a) involved in any business arrangement, relationship or transaction with any of the Acquired Entities, other than an employment relationship, or (b) a party to any Contracts with the Acquired Entities.

ARTICLE V

Representations and Warranties of Buyer

Except as set forth in the corresponding sections of the Disclosure Schedules, Buyer represents and warrants to Sellers on the date hereof and as of the Closing Date as follows:

5.1.    Organization, Good Standing and Qualification; Authority. Buyer is a legal entity duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization and has all requisite corporate or similar power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted and is qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so organized, qualified or in good standing, or to have such power or authority, are not, individually or in the aggregate, reasonably likely to prevent, materially impair or materially delay the consummation of the transactions contemplated by this Agreement.

5.2.    Authorization.  Buyer has all requisite power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is a party and to perform its obligations hereunder and thereunder, and the execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party have been or, at the Closing will be duly authorized by all necessary corporate or other similar action on the part of Buyer.  Buyer has duly and validly executed and delivered this Agreement and, at the Closing will have duly and validly executed the other Transaction Documents to which it is a party. Assuming due authorization, execution and delivery by the other parties hereto and thereto, this Agreement and the other Transaction Documents to which it is a party constitute, or upon execution will constitute, a valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except as limited by the Bankruptcy and Equity Exception.

5.3.    Government Consents and Approvals; No Conflicts.

(a)    Other than in connection with obtaining CHOW Approvals and as listed at Schedule 5.3(a), no notices, reports or other filings are required to be made by Buyer with, nor are any consents, registrations, approvals, permits or authorizations required to be obtained by Buyer from, any Governmental Entity, in connection with the execution, delivery and performance of this Agreement and the other Transaction Documents by Buyer or the consummation by Buyer of the transactions contemplated hereby and thereby, except those for which the failure to obtain such consent, approval or waiver would not, individually or in the aggregate, be reasonably likely to prevent, materially impair or materially delay the consummation of the transactions contemplated by this Agreement.

(b)    Except as set forth on Schedule 5.3(b), the execution, delivery and performance of this Agreement and the other Transaction Documents by Buyer do not, and the consummation of the transactions contemplated hereby and thereby will not, constitute or result in (i) a breach or violation of, or a default under, the governing documents of Buyer, (ii) with or without notice, lapse of time or both, a breach or violation of, a termination (or right of termination) or a default under, the creation or acceleration of any obligations of Buyer pursuant to, any Contract binding upon Buyer or under any Law to which Buyer is subject, or (iii) any change in the rights or obligations of any party under any Contract binding on Buyer, except, in the case of clause (ii) or (iii) above, for any such breach, violation, termination, default, creation, acceleration or change that would not, individually or in the aggregate, be reasonably likely to prevent, materially impair or materially delay the consummation of the transactions contemplated by this Agreement.

5.4.    Litigation.  There are no civil, criminal or administrative actions, suits, claims, hearings, investigations or proceedings pending or, to the Knowledge of Buyer, threatened against Buyer, except for those that are not, individually or in the aggregate, reasonably likely to prevent, materially impair or materially delay the consummation of the transactions contemplated by this Agreement.

5.5.    Independent Investigation.    Buyer has conducted its own independent investigation, review and analysis of the business, results of operations, prospects, condition (financial or otherwise) and assets of the Acquired Entities, and acknowledges (subject to the

representations, warranties and covenants of Sellers contained herein and in the other Transaction Documents) that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of the Acquired Entities for such purpose.

## ARTICLE VI

### Covenants

6.1.    Conduct of Business Pending Closing.  Sellers agree that, from the date of this Agreement through the earlier to occur of (x) the Closing Date, and (y) the date on which this Agreement is terminated in accordance with the provisions of Section 10.1, Sellers shall cause the Acquired Entities to:

(a)    Conduct of Business.  Conduct the businesses of the Acquired Entities in a manner consistent with the past practices of the Acquired Entities, and not engage in any transactions out of the ordinary course of business consistent with past practice.

(b)    Payment of Obligations.  Promptly and timely pay and discharge, in the ordinary course of the Acquired Entities' business consistent with past practice, all Taxes and other obligations assessed, levied or imposed upon, or required to be withheld by, or otherwise owing by, any Acquired Entity, and shall not incur, assume, guarantee or otherwise become liable for any additional Debt.

(c)    Material Contracts; Governing Documents.  Perform and observe all of the terms and provisions of each Material Contract to be performed or observed by it, enforce each Material Contract in accordance with its terms and not enter into or terminate any Material Contracts or make any amendments or modifications to any Material Contracts. No Acquired Entity shall amend or modify any terms or provisions of its organizational or governing documents.

(d)    Representations and Warranties; Conditions.  Except for actions taken in the ordinary course of business consistent with past practice, not engage in any practice, take any action, fail to take any action or enter into any transaction that could reasonably be expected to (i) cause any of the representations and warranties of any Seller contained in the Transaction Documents to be untrue, inaccurate or incorrect at any time, or (ii) result in any of the conditions set forth in Article IX not being satisfied.

(e)    Sale of Assets; Encumbrances.  Except for sales of Inventory and immaterial dispositions of Assets in the ordinary course of business, preserve intact the Inventory and other assets of the Acquired Entities and not (i) transfer any material assets of any Acquired Entity, except Inventory sold in the ordinary course of business consistent with past practice, (ii) dispose of, or trade in, any of the Acquired Entities' equipment or fixtures, or (iii) create, incur, assume, or suffer to exist any Encumbrance upon or with respect to any assets of the Acquired Entities.

(f)    Compensation.  Not increase the aggregate amount of compensation of the directors, officers, employees, independent contractors or consultants of any Acquired Entity

earning more than $40,000 per annum, including base salaries and bonuses of all types, whether paid or accrued.

(g)     Change in Employee Benefit Plans.   Not make any material changes to any Employee Benefit Plans, other than those required by Law.

(h)     Restricted Payments; Securities.   Not (i) declare or make any Restricted Payment, (ii) issue, sell or grant any options, warrants or rights to purchase any securities of any Acquired Entity, (iii) issue, sell, acquire, redeem, repurchase or amend the terms of any securities of any Acquired Entity, (iv) loan or advance any funds, or any goods or property to, any of its Affiliates, (v) make any payments or otherwise transfer any consideration to any Seller or any of his or her Affiliates, whether on account of any liability or otherwise, or (vi) purchase or acquire any securities of any Person.

(i)     Compliance With Laws.   Comply in all material respects with all Laws applicable to any Acquired Entity.

(j)     Maintenance of Relationships.   Use its commercially reasonable efforts to preserve its current relationships with its customers, referral sources, suppliers, vendors and other Persons with which it has significant business relationships, including any existing provider agreements and/or participation rights in connection with all Government Payment Programs consistent with past practices.

(k)     Maintenance of Existence.   Preserve and maintain its corporate existence and good standing in the jurisdiction of its incorporation, and qualify and remain qualified as a foreign corporation in each jurisdiction in which such qualification is required.

(l)     Maintenance of Records.   Keep adequate records and books of account reflecting all its financial transactions, keep minute books containing accurate records of all meetings and accurately reflecting all corporate action of its shareholders and its board of directors (including committees) and keep stock books and ledgers correctly recording all transfers and issuances of all securities of the Acquired Entities.

(m)     Maintenance of Assets.   Maintain, keep and preserve the assets of the Acquired Entities in good working order and condition, ordinary wear and tear excepted.

(n)     Accounting Policies.   Not change any method of accounting or accounting practice or policy used by the Acquired Entities, other than such changes required by GAAP.

(o)     Actions.   Not settle or compromise any material Actions.

(p)     Other Actions.   Not engage in any other actions described in Section 3.4(b).

6.2.     Further Actions; Notification.

(a)     Prior to and following the Closing, Sellers' Representative and Buyer shall furnish to the other all information required or reasonably necessary for any Required Governmental Consents and any other application or other filing to be made pursuant to any

applicable Law in connection with the transactions contemplated by this Agreement. Sellers' Representative and Buyer shall promptly inform the other of any communication with any Governmental Entity regarding any such filings. Sellers' Representative and Buyer shall use commercially reasonable efforts to resolve such objections, if any, as may be asserted by any Governmental Entity with respect to the transactions contemplated by this Agreement under any applicable Laws.

(b)     Prior to and following the Closing, each Party shall use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement, including (i) the giving of all other notices to, the making of all other filings with, and the obtaining of all other authorizations, consents and approvals from, Governmental Entities and other Persons, including cooperating as necessary to reasonably support Buyer's efforts to obtain CHOW Approvals, (ii) the obtaining of any third party waivers, releases or consents, lease amendments and other agreements and documents required to satisfy the conditions set forth in Article IX, and (iii) the execution and delivery of any additional documents that may be necessary or desirable to consummate the transactions contemplated by, and to fully carry out the purposes of, this Agreement.

(c)     During the period from the date hereof to the Closing, Sellers' Representative or Buyer shall give prompt notice to the other of (i) the occurrence or nonoccurrence of any event that would cause any representation or warranty by any Seller, or by Buyer, as applicable, contained in this Agreement to be untrue or inaccurate in any material respect at or prior to the Closing Date, and (ii) any material failure by any of the Acquired Entities, Sellers' Representative or any Seller, or by Buyer, as applicable, to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by them hereunder; provided, however, that the delivery of any notice pursuant to this Section 6.2 shall not limit or otherwise affect the remedies available hereunder to the Party to which such notice is given.

(d)     Sellers agree that promptly following Buyer's request, before or after Closing, Sellers shall cause the Acquired Entities to take all actions reasonably necessary in order to assist the Buyer with the assignment of such Acquired Entity's NCPDP and NPI numbers to Buyer, including providing its user name and passwords and executing any required forms.

(e)     Each Seller agrees that, promptly following Buyer's request, before or after Closing, such Seller shall deliver to Buyer an executed "Sellers' Certification" document (California State Board of Pharmacy form 17A-8).

6.3.     Access. During the period from the date hereof to the Closing, Sellers shall cause each Acquired Entity to (a) permit Buyer and its representatives to have reasonable access (during normal business hours and upon reasonable prior written notice) to each Acquired Entity's premises, books, records, Contracts and other documents and, subject to the execution of customary confidentiality agreements with any applicable outside auditors and accountants, and cause each Acquired Entity's independent accountants to give Buyer and its representatives reasonable access to its accountants' work papers, (b) furnish to Buyer and its representatives such financial and operating data and other information as such Persons may reasonably request,

(c) instruct its officers, employees, directors, independent contractors, consultants, counsel and financial advisors to cooperate with Buyer and its representatives in their investigation of the businesses of the Acquired Entities and (d) cooperate to provide access to customers and suppliers.

6.4.    Confidentiality. Each Seller acknowledges that (a) during the course of his or her affiliation with the Acquired Entities, he or she and his or her Affiliates have produced and had access to Confidential Information relating to the Acquired Entities and (b) the unauthorized use or disclosure of any Confidential Information by any such Person at any time would deprive Buyer of the benefits of this Agreement and the transactions contemplated by this Agreement. Each Seller agrees that he or she will hold in confidence the Confidential Information and will not, directly or indirectly, disclose, publish, or otherwise make available any of the Confidential Information to the public or to any Person, except (x) to his or her own representatives who have a need to know such information in order for them to carry out their respective duties and obligations to such Seller or any of his or her Affiliates and who agree to maintain the confidentiality of such information on the terms contained herein; (y) where required to disclose or divulge by Law, legal process or the rules or regulations of any national securities exchange; or (z) in the context of, and to the extent necessary in, any dispute or litigation between Buyer, on the one hand, and Sellers' Representative and/or Sellers, on the other hand, in connection with this Agreement or any other Transaction Document; provided, however, that in the case of clause (y), such Seller shall provide Buyer with prior written notice thereof so that Buyer may seek an appropriate protective order or other appropriate remedy, and such Seller shall cooperate with Buyer in connection therewith and provided, further, that, in the event that a protective order or other remedy is not obtained, such Seller shall furnish only that portion of such information which, in the opinion of his or her counsel, such Seller is legally compelled to disclose and shall exercise commercially reasonable efforts to obtain reliable assurance that confidential treatment will be accorded any such information so disclosed.  Buyer and each Seller acknowledge and agree that the Confidentiality Agreement shall be terminated as of the date hereof pursuant to a termination entered into by the parties thereto.

6.5.    Non-Compete; Non-Solicitation.

(a)    Subject to Section 6.5(e), for a period of seven (7) years commencing on the Closing Date (the "Restricted Period"), no Seller shall, nor shall any Seller permit any of his or her Affiliates to, directly or indirectly, (i) engage in or assist others in engaging in the Competing Business in the Territory; (ii) have an interest in any Person that engages directly or indirectly in the Competing Business in the Territory in any capacity, including as a partner, shareholder, member, employee, principal, agent, trustee or consultant; or (iii) cause, induce or encourage any material actual or prospective client, customer, supplier or licensor of any Acquired Entity (including any existing or former client or customer of any Acquired Entity and any Person that becomes a client or customer of any Acquired Entity after the Closing), or any other Person who has a material business relationship with any Acquired Entity, to terminate or modify any such actual or prospective relationship. Notwithstanding the foregoing, a Seller may own, directly or indirectly, solely as an investment, securities of any Person traded on any national securities exchange if such Seller is not a controlling Person of, or a member of a group which controls, such Person and does not, directly or indirectly, own 2% or more of any class of securities of such Person.

41

(b)      During the Restricted Period, no Seller shall, nor shall any Seller permit any of his or her Affiliates to, directly or indirectly, hire or solicit any person who is offered employment or an independent contractor arrangement by any Acquired Entity or is or was employed or engaged as an independent contractor by any Acquired Entity during the Restricted Period, or encourage any such person to leave such employment or business relationship or hire any such person who has left such employment or business relationship, except pursuant to a general solicitation which is not directed specifically to any such persons; provided, that nothing in this Section 6.5(b) shall prevent any Seller or any of his or her Affiliates from hiring (i) any person whose employment or business relationship has been terminated by an Acquired Entity or (ii) after 180 days from the date of termination of such employment or business relationship, any person whose employment or business relationship has been terminated by such person.

(c)      Each Seller acknowledges that a breach or threatened breach of this Section 6.5 or Section 6.4 would give rise to irreparable harm to Buyer, for which monetary damages would not be an adequate remedy, and hereby agree that in the event of a breach or a threatened breach by such Seller of any such obligations, Buyer shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

(d)      Each Seller acknowledges that the restrictions contained in this Section 6.5 and in Section 6.4 are reasonable and necessary to protect the legitimate interests of Buyer and constitute a material inducement to Buyer to enter into this Agreement and consummate the transactions contemplated by this Agreement. In the event that any covenant contained in this Section 6.5 should ever be adjudicated to exceed the time, geographic, product or service or other limitations permitted by applicable Law in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time, geographic, product or service or other limitations permitted by applicable Law. The covenants contained in this Section 6.5, in Section 6.4 and each provision hereof and thereof are severable and distinct covenants and provisions. The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

(e)      Notwithstanding the foregoing, it is acknowledged and agreed that the foregoing covenants in this Section 6.5 shall not apply to the individuals listed on Schedule 6.5(e).

6.6.    Employees.

(a)      Employment. Buyer will continue to employ substantially all of the current (as of the date of this Agreement) employees, independent contractors and consultants of the Acquired Entities, other than any employees that are on disability or leave of absence (other than temporary and ordinary course vacation) as of the Closing Date (such continuing employees, independent contractors and consultants, the "Continuing Employees"). Subject to the terms of the Equity Equivalence Agreement, Buyer may, in its sole discretion, modify, amend or

terminate the employment terms, business arrangements or benefits of the Continuing Employees at any time after the Closing Date; provided, that during the first six months following the Closing Date, any downward adjustment to the compensation of, or termination of employment of, any Acquired Entity's senior management (other than Ronald Cieutat or other employees with written employment agreements) shall require approval of the Shareholder Representative.

(b)  Outstanding Employment Agreements. Except as set forth in Schedule 3.7(a), there are no outstanding agreements, understandings or commitments of any Acquired Entity with respect to any employment, compensation, commissions or bonuses.

(c)  No Rights of Officers or Employees. The Parties expressly acknowledge and agree that the matters and agreements set forth in this Section 6.6 are strictly agreements between Sellers and Buyer and no present or former officer or employee of any Acquired Entity has any rights (directly, as a third party beneficiary or otherwise) under this Section 6.6 and shall not have any right to enforce any of the agreements set forth herein.

6.7.  Brokers' Fees. Sellers' Representative (on behalf of Sellers) (i) will be solely responsible for any obligations to any Person listed in Schedule 3.16, and (ii) will pay or reimburse Buyer for any Losses resulting from or arising out of any such obligations owed to any Person listed in Schedule 3.16.

6.8.  Insurance Matters. Sellers' Representative and each Seller shall cooperate as reasonably requested by Buyer in the submission and resolution of claims under Insurance Policies relating to the Acquired Entities and arising from events that occurred before the Closing Date ("Pre-Closing Claims"), including making available at Buyer's cost all books, records and other documents and materials that are under the direct or indirect control of the Acquired Entities or any Seller and that Buyer reasonably considers necessary for the resolution of Pre-Closing Claims. For the avoidance of doubt, any insurance proceeds resulting from Pre-Closing Claims shall be paid to Buyer, except to the extent that Losses arising out of any events giving rise to such Pre-Closing Claims have been paid by or on behalf of Sellers or their Affiliates.

6.9.  Seller Restrictions. From the date of this Agreement to the Closing, each Seller agrees that it shall not (a) sell, transfer, encumber, assign or otherwise dispose of, or enter into any Contract with respect to the sale, transfer, encumbrance, assignment or other disposition of, any of such Seller's Acquired Shares or (b) take any action, or omit to take any action, which would have the effect of preventing or disabling such Seller from delivering such Seller's Acquired Shares to Buyer at the Closing.

6.10.  Disclosure Schedule Updates. Sellers' Representative may, from time to time prior to or at the Closing, by notice to Buyer, supplement, amend or create any Section of the Disclosure Schedule, in order to add information or correct previously supplied information. No such supplement, amendment or addition shall be evidence, in and of itself, that the representations and warranties in the corresponding Section are no longer true and correct in all material respects. It is specifically agreed that the Disclosure Schedule may be supplemented, amended and/or added to, to add immaterial, as well as material, items thereto. No such supplement, amendment or addition shall be deemed to cure any breach for purposes of

Section 9.3(b) or Section 10.1(c)(i). If, however, the Closing occurs, any such supplement, amendment or addition will be effective to cure and correct for all other purposes any breach of, or inaccuracy in, any representation, warranty, or covenant which would have existed if such supplement, amendment or addition had not been made, and all references to any part of the Disclosure Schedule which is supplemented or amended shall for all purposes after the Closing be deemed to be a reference to the Disclosure Schedule as so supplemented or amended. In such case, Buyer shall be deemed to have waived any and all rights, remedies or other recourse to which Buyer might otherwise be entitled in respect of such breach or inaccuracy.

6.11.  Further Assurances. Following the Closing, each of the Parties shall, and shall cause its Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other Transaction Documents.

6.12.  Open Diligence Matters Covenant. Sellers agree that, from the date of this Agreement, Sellers shall, and shall cause the Acquired Entities to, use commercially reasonable efforts to address the diligence matters set forth on Schedule 6.12 to the reasonable satisfaction of Buyer prior to Closing, and to continue to assist Buyer with addressing any such diligence matters that remain outstanding after Closing to the extent requested by Buyer.

## ARTICLE VII

### Taxes

7.1.  Indemnification.

(a)  Sellers shall indemnify and hold harmless the Buyer Indemnitees from and against (i) any and all liabilities for Taxes of the Acquired Entities for Pre-Closing Tax Periods, (ii) any and all liabilities of the Acquired Entities pursuant to Treasury Regulations Section 1.1502-6 (or any analogous or similar state, local, or foreign Law) for Taxes of any affiliated, consolidated, combined or unitary group of which any of the Acquired Entities has been a member prior to the Closing, (iii) Sellers' share of Transfer Taxes (as set forth in Section 7.7) and (iv) reasonable accounting, legal and other out of pocket expenses incurred after the Closing resulting from or attributable to any breach by Sellers' Representative or any other Seller of his or her covenants, agreements or obligations under this Article VII or the conduct of any Tax Proceeding (except as otherwise provided in Section 7.4), but only to the extent that such Tax liabilities exceed the aggregate amount of such Taxes that was taken into account in determining Net Working Capital, reduced by any prior offsets to Sellers' liability under this Section 7.1(a) or Section 7.2(e), and without duplication for any amounts paid by or on behalf of Sellers pursuant to Section 7.2. For the avoidance of doubt, no indemnification is provided by Sellers under this Section 7.1 with respect to the amount of any Tax attributes (including losses, deductions, credits and tax basis) that carry forward from a Pre-Closing Tax Period to a Post-Closing Tax Period.

(b)  Sellers' Representative (on behalf of Sellers) shall pay to the Buyer Indemnitees any amount required to be paid by Sellers pursuant to Section 7.1(a), and Buyer shall pay to Sellers' Representative (on behalf of Seller Indemnitees) any amount required to be paid by it

44

pursuant to Section 7.1(d), within the later of (x) five days after the indemnitor receives written notice from the indemnitee under Section 7.1 requesting such payment and (y) two days prior to the date that the indemnified Tax or expense is required to be paid.

(c)    The amount of any indemnity pursuant to this Section 7.1 shall be determined net of any Tax benefits obtained by the Indemnitee or its Affiliates in connection with the incurrence of the item for which indemnification is due hereunder. Any payments made by or on behalf of Sellers or Buyer under this Article VII or Section 11.3 shall be considered by the parties as an adjustment to the Purchase Price and the parties shall not take any position on any Tax Return or otherwise that is inconsistent with that position.

(d)    Buyer shall indemnify and hold harmless the Seller Indemnitees from and against (i) any and all liabilities for Taxes of the Acquired Entities for Post-Closing Tax Periods and reasonable accounting, legal and other out of pocket expenses incurred after the Closing resulting from or attributable to, any breach by Buyer of its covenants, agreements or obligations under this Article VII, and (ii) Buyer's share of Transfer Taxes (as set forth in Section 7.7).

7.2.    <u>Filing and Payment Responsibility</u>.

(a)    Sellers and Buyer shall cause each Acquired Entity, to the extent permitted by Law, to close its taxable year as of the Closing Date. Sellers' Representative shall timely prepare and file, or cause to be timely prepared and filed, all such Tax Returns.

(b)    Sellers' Representative shall timely prepare, or cause to be timely prepared, all Tax Returns of the Acquired Entities for Pre-Closing Tax Periods (other than a Pre-Closing Tax Period included in a Straddle Period). Such Tax Returns shall be prepared in a manner consistent with the prior practices applicable to the preparation of such Tax Returns, except as otherwise required by Law. Sellers' Representative shall provide each such Tax Return to Buyer no less than fifteen (15) days prior to the due date for filing such Tax Return (including extensions, with Buyer (at the expense and direction of Sellers' Representative (on behalf of Sellers)) to apply for any extensions). Buyer shall sign and timely file, or cause to be signed and timely filed, all Tax Returns referenced in the prior sentence, or shall timely provide Sellers' Representative with the necessary authorizations to sign and to file such Tax Returns.

(c)    Buyer shall timely prepare and file, or cause to be timely prepared and filed, all Tax Returns of the Acquired Entities for all Straddle Periods (other than any Tax Returns described in Section 7.2(a)). Buyer shall provide, or cause to be provided, to Sellers' Representative a copy of each such Tax Return at least thirty (30) days prior to the due date for filing such Tax Return (including extensions) for Sellers' Representative's review and comment. Buyer shall make such revisions to such Tax Returns as are reasonably requested by Sellers' Representative to the extent that such revisions relate to Taxes of any Pre-Closing Tax Period.

(d)    Buyer and Sellers' Representative shall provide each other with a copy of any Tax Return of the Acquired Entities that it or he files or causes to be filed after the Closing pursuant to Section 7.2(b) or (c), no later than ten (10) days after the filing of each such Tax Return.

(e)    Sellers' Representative shall, not less than two (2) calendar days prior to the due date (without regard to extensions) of any Tax Return referred to in Section 7.2(a) or Section