representations, warranties and covenants of Sellers contained herein and in the other Transaction Documents) that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of the Acquired Entities for such purpose.

## ARTICLE VI

### Covenants

6.1.    Conduct of Business Pending Closing. Sellers agree that, from the date of this Agreement through the earlier to occur of (x) the Closing Date, and (y) the date on which this Agreement is terminated in accordance with the provisions of Section 10.1, Sellers shall cause the Acquired Entities to:

(a)    Conduct of Business. Conduct the businesses of the Acquired Entities in a manner consistent with the past practices of the Acquired Entities, and not engage in any transactions out of the ordinary course of business consistent with past practice.

(b)    Payment of Obligations. Promptly and timely pay and discharge, in the ordinary course of the Acquired Entities' business consistent with past practice, all Taxes and other obligations assessed, levied or imposed upon, or required to be withheld by, or otherwise owing by, any Acquired Entity, and shall not incur, assume, guarantee or otherwise become liable for any additional Debt.

(c)    Material Contracts; Governing Documents. Perform and observe all of the terms and provisions of each Material Contract to be performed or observed by it, enforce each Material Contract in accordance with its terms and not enter into or terminate any Material Contracts or make any amendments or modifications to any Material Contracts. No Acquired Entity shall amend or modify any terms or provisions of its organizational or governing documents.

(d)    Representations and Warranties; Conditions. Except for actions taken in the ordinary course of business consistent with past practice, not engage in any practice, take any action, fail to take any action or enter into any transaction that could reasonably be expected to (i) cause any of the representations and warranties of any Seller contained in the Transaction Documents to be untrue, inaccurate or incorrect at any time, or (ii) result in any of the conditions set forth in Article IX not being satisfied.

(e)    Sale of Assets; Encumbrances. Except for sales of Inventory and immaterial dispositions of Assets in the ordinary course of business, preserve intact the Inventory and other assets of the Acquired Entities and not (i) transfer any material assets of any Acquired Entity, except Inventory sold in the ordinary course of business consistent with past practice, (ii) dispose of, or trade in, any of the Acquired Entities' equipment or fixtures, or (iii) create, incur, assume, or suffer to exist any Encumbrance upon or with respect to any assets of the Acquired Entities.

(f)    Compensation. Not increase the aggregate amount of compensation of the directors, officers, employees, independent contractors or consultants of any Acquired Entity

earning more than $40,000 per annum, including base salaries and bonuses of all types, whether paid or accrued.

(g)     Change in Employee Benefit Plans.  Not make any material changes to any Employee Benefit Plans, other than those required by Law.

(h)     Restricted Payments; Securities.  Not (i) declare or make any Restricted Payment, (ii) issue, sell or grant any options, warrants or rights to purchase any securities of any Acquired Entity, (iii) issue, sell, acquire, redeem, repurchase or amend the terms of any securities of any Acquired Entity, (iv) loan or advance any funds, or any goods or property to, any of its Affiliates, (v) make any payments or otherwise transfer any consideration to any Seller or any of his or her Affiliates, whether on account of any liability or otherwise, or (vi) purchase or acquire any securities of any Person.

(i)     Compliance With Laws.  Comply in all material respects with all Laws applicable to any Acquired Entity.

(j)     Maintenance of Relationships. Use its commercially reasonable efforts to preserve its current relationships with its customers, referral sources, suppliers, vendors and other Persons with which it has significant business relationships, including any existing provider agreements and/or participation rights in connection with all Government Payment Programs consistent with past practices.

(k)     Maintenance of Existence.  Preserve and maintain its corporate existence and good standing in the jurisdiction of its incorporation, and qualify and remain qualified as a foreign corporation in each jurisdiction in which such qualification is required.

(l)     Maintenance of Records.  Keep adequate records and books of account reflecting all its financial transactions, keep minute books containing accurate records of all meetings and accurately reflecting all corporate action of its shareholders and its board of directors (including committees) and keep stock books and ledgers correctly recording all transfers and issuances of all securities of the Acquired Entities.

(m)     Maintenance of Assets.  Maintain, keep and preserve the assets of the Acquired Entities in good working order and condition, ordinary wear and tear excepted.

(n)     Accounting Policies. Not change any method of accounting or accounting practice or policy used by the Acquired Entities, other than such changes required by GAAP.

(o)     Actions.  Not settle or compromise any material Actions.

(p)     Other Actions.  Not engage in any other actions described in Section 3.4(b).

6.2.    Further Actions; Notification.

(a)     Prior to and following the Closing, Sellers' Representative and Buyer shall furnish to the other all information required or reasonably necessary for any Required Governmental Consents and any other application or other filing to be made pursuant to any

applicable Law in connection with the transactions contemplated by this Agreement. Sellers' Representative and Buyer shall promptly inform the other of any communication with any Governmental Entity regarding any such filings. Sellers' Representative and Buyer shall use commercially reasonable efforts to resolve such objections, if any, as may be asserted by any Governmental Entity with respect to the transactions contemplated by this Agreement under any applicable Laws.

(b)    Prior to and following the Closing, each Party shall use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement, including (i) the giving of all other notices to, the making of all other filings with, and the obtaining of all other authorizations, consents and approvals from, Governmental Entities and other Persons, including cooperating as necessary to reasonably support Buyer's efforts to obtain CHOW Approvals, (ii) the obtaining of any third party waivers, releases or consents, lease amendments and other agreements and documents required to satisfy the conditions set forth in Article IX, and (iii) the execution and delivery of any additional documents that may be necessary or desirable to consummate the transactions contemplated by, and to fully carry out the purposes of, this Agreement.

(c)    During the period from the date hereof to the Closing, Sellers' Representative or Buyer shall give prompt notice to the other of (i) the occurrence or nonoccurrence of any event that would cause any representation or warranty by any Seller, or by Buyer, as applicable, contained in this Agreement to be untrue or inaccurate in any material respect at or prior to the Closing Date, and (ii) any material failure by any of the Acquired Entities, Sellers' Representative or any Seller, or by Buyer, as applicable, to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by them hereunder; provided, however, that the delivery of any notice pursuant to this Section 6.2 shall not limit or otherwise affect the remedies available hereunder to the Party to which such notice is given.

(d)    Sellers agree that promptly following Buyer's request, before or after Closing, Sellers shall cause the Acquired Entities to take all actions reasonably necessary in order to assist the Buyer with the assignment of such Acquired Entity's NCPDP and NPI numbers to Buyer, including providing its user name and passwords and executing any required forms.

(e)    Each Seller agrees that, promptly following Buyer's request, before or after Closing, such Seller shall deliver to Buyer an executed "Sellers' Certification" document (California State Board of Pharmacy form 17A-8).

6.3.    Access. During the period from the date hereof to the Closing, Sellers shall cause each Acquired Entity to (a) permit Buyer and its representatives to have reasonable access (during normal business hours and upon reasonable prior written notice) to each Acquired Entity's premises, books, records, Contracts and other documents and, subject to the execution of customary confidentiality agreements with any applicable outside auditors and accountants, and cause each Acquired Entity's independent accountants to give Buyer and its representatives reasonable access to its accountants' work papers, (b) furnish to Buyer and its representatives such financial and operating data and other information as such Persons may reasonably request,

40

(c) instruct its officers, employees, directors, independent contractors, consultants, counsel and financial advisors to cooperate with Buyer and its representatives in their investigation of the businesses of the Acquired Entities and (d) cooperate to provide access to customers and suppliers.

6.4.    Confidentiality.  Each Seller acknowledges that (a) during the course of his or her affiliation with the Acquired Entities, he or she and his or her Affiliates have produced and had access to Confidential Information relating to the Acquired Entities and (b) the unauthorized use or disclosure of any Confidential Information by any such Person at any time would deprive Buyer of the benefits of this Agreement and the transactions contemplated by this Agreement. Each Seller agrees that he or she will hold in confidence the Confidential Information and will not, directly or indirectly, disclose, publish, or otherwise make available any of the Confidential Information to the public or to any Person, except (x) to his or her own representatives who have a need to know such information in order for them to carry out their respective duties and obligations to such Seller or any of his or her Affiliates and who agree to maintain the confidentiality of such information on the terms contained herein; (y) where required to disclose or divulge by Law, legal process or the rules or regulations of any national securities exchange; or (z) in the context of, and to the extent necessary in, any dispute or litigation between Buyer, on the one hand, and Sellers' Representative and/or Sellers, on the other hand, in connection with this Agreement or any other Transaction Document; provided, however, that in the case of clause (y), such Seller shall provide Buyer with prior written notice thereof so that Buyer may seek an appropriate protective order or other appropriate remedy, and such Seller shall cooperate with Buyer in connection therewith and provided, further, that, in the event that a protective order or other remedy is not obtained, such Seller shall furnish only that portion of such information which, in the opinion of his or her counsel, such Seller is legally compelled to disclose and shall exercise commercially reasonable efforts to obtain reliable assurance that confidential treatment will be accorded any such information so disclosed.  Buyer and each Seller acknowledge and agree that the Confidentiality Agreement shall be terminated as of the date hereof pursuant to a termination entered into by the parties thereto.

6.5.    Non-Compete; Non-Solicitation.

(a)    Subject to Section 6.5(c), for a period of seven (7) years commencing on the Closing Date (the "Restricted Period"), no Seller shall, nor shall any Seller permit any of his or her Affiliates to, directly or indirectly, (i) engage in or assist others in engaging in the Competing Business in the Territory; (ii) have an interest in any Person that engages directly or indirectly in the Competing Business in the Territory in any capacity, including as a partner, shareholder, member, employee, principal, agent, trustee or consultant; or (iii) cause, induce or encourage any material actual or prospective client, customer, supplier or licensor of any Acquired Entity (including any existing or former client or customer of any Acquired Entity and any Person that becomes a client or customer of any Acquired Entity after the Closing), or any other Person who has a material business relationship with any Acquired Entity, to terminate or modify any such actual or prospective relationship. Notwithstanding the foregoing, a Seller may own, directly or indirectly, solely as an investment, securities of any Person traded on any national securities exchange if such Seller is not a controlling Person of, or a member of a group which controls, such Person and does not, directly or indirectly, own 2% or more of any class of securities of such Person.

41

(b)      During the Restricted Period, no Seller shall, nor shall any Seller permit any of his or her Affiliates to, directly or indirectly, hire or solicit any person who is offered employment or an independent contractor arrangement by any Acquired Entity or is or was employed or engaged as an independent contractor by any Acquired Entity during the Restricted Period, or encourage any such person to leave such employment or business relationship or hire any such person who has left such employment or business relationship, except pursuant to a general solicitation which is not directed specifically to any such persons; provided, that nothing in this Section 6.5(b) shall prevent any Seller or any of his or her Affiliates from hiring (i) any person whose employment or business relationship has been terminated by an Acquired Entity or (ii) after 180 days from the date of termination of such employment or business relationship, any person whose employment or business relationship has been terminated by such person.

(c)      Each Seller acknowledges that a breach or threatened breach of this Section 6.5 or Section 6.4 would give rise to irreparable harm to Buyer, for which monetary damages would not be an adequate remedy, and hereby agree that in the event of a breach or a threatened breach by such Seller of any such obligations, Buyer shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

(d)      Each Seller acknowledges that the restrictions contained in this Section 6.5 and in Section 6.4 are reasonable and necessary to protect the legitimate interests of Buyer and constitute a material inducement to Buyer to enter into this Agreement and consummate the transactions contemplated by this Agreement. In the event that any covenant contained in this Section 6.5 should ever be adjudicated to exceed the time, geographic, product or service or other limitations permitted by applicable Law in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time, geographic, product or service or other limitations permitted by applicable Law. The covenants contained in this Section 6.5, in Section 6.4 and each provision hereof and thereof are severable and distinct covenants and provisions. The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

(e)      Notwithstanding the foregoing, it is acknowledged and agreed that the foregoing covenants in this Section 6.5 shall not apply to the individuals listed on Schedule 6.5(e).

6.6.    Employees.

(a)      Employment.  Buyer will continue to employ substantially all of the current (as of the date of this Agreement) employees, independent contractors and consultants of the Acquired Entities, other than any employees that are on disability or leave of absence (other than temporary and ordinary course vacation) as of the Closing Date (such continuing employees, independent contractors and consultants, the "Continuing Employees").  Subject to the terms of the Equity Equivalence Agreement, Buyer may, in its sole discretion, modify, amend or

terminate the employment terms, business arrangements or benefits of the Continuing Employees at any time after the Closing Date; provided, that during the first six months following the Closing Date, any downward adjustment to the compensation of, or termination of employment of, any Acquired Entity's senior management (other than Ronald Cieutat or other employees with written employment agreements) shall require approval of the Shareholder Representative.

(b)     Outstanding Employment Agreements. Except as set forth in Schedule 3.7(a), there are no outstanding agreements, understandings or commitments of any Acquired Entity with respect to any employment, compensation, commissions or bonuses.

(c)     No Rights of Officers or Employees. The Parties expressly acknowledge and agree that the matters and agreements set forth in this Section 6.6 are strictly agreements between Sellers and Buyer and no present or former officer or employee of any Acquired Entity has any rights (directly, as a third party beneficiary or otherwise) under this Section 6.6 and shall not have any right to enforce any of the agreements set forth herein.

6.7.   Brokers' Fees. Sellers' Representative (on behalf of Sellers) (i) will be solely responsible for any obligations to any Person listed in Schedule 3.16, and (ii) will pay or reimburse Buyer for any Losses resulting from or arising out of any such obligations owed to any Person listed in Schedule 3.16.

6.8.   Insurance Matters. Sellers' Representative and each Seller shall cooperate as reasonably requested by Buyer in the submission and resolution of claims under Insurance Policies relating to the Acquired Entities and arising from events that occurred before the Closing Date ("Pre-Closing Claims"), including making available at Buyer's cost all books, records and other documents and materials that are under the direct or indirect control of the Acquired Entities or any Seller and that Buyer reasonably considers necessary for the resolution of Pre-Closing Claims. For the avoidance of doubt, any insurance proceeds resulting from Pre-Closing Claims shall be paid to Buyer, except to the extent that Losses arising out of any events giving rise to such Pre-Closing Claims have been paid by or on behalf of Sellers or their Affiliates.

6.9.   Seller Restrictions. From the date of this Agreement to the Closing, each Seller agrees that it shall not (a) sell, transfer, encumber, assign or otherwise dispose of, or enter into any Contract with respect to the sale, transfer, encumbrance, assignment or other disposition of, any of such Seller's Acquired Shares or (b) take any action, or omit to take any action, which would have the effect of preventing or disabling such Seller from delivering such Seller's Acquired Shares to Buyer at the Closing.

6.10.  Disclosure Schedule Updates. Sellers' Representative may, from time to time prior to or at the Closing, by notice to Buyer, supplement, amend or create any Section of the Disclosure Schedule, in order to add information or correct previously supplied information. No such supplement, amendment or addition shall be evidence, in and of itself, that the representations and warranties in the corresponding Section are no longer true and correct in all material respects. It is specifically agreed that the Disclosure Schedule may be supplemented, amended and/or added to, to add immaterial, as well as material, items thereto. No such supplement, amendment or addition shall be deemed to cure any breach for purposes of

43

Section 9.3(b) or Section 10.1(c)(i). If, however, the Closing occurs, any such supplement, amendment or addition will be effective to cure and correct for all other purposes any breach of, or inaccuracy in, any representation, warranty, or covenant which would have existed if such supplement, amendment or addition had not been made, and all references to any part of the Disclosure Schedule which is supplemented or amended shall for all purposes after the Closing be deemed to be a reference to the Disclosure Schedule as so supplemented or amended. In such case, Buyer shall be deemed to have waived any and all rights, remedies or other recourse to which Buyer might otherwise be entitled in respect of such breach or inaccuracy.

6.11.   Further Assurances. Following the Closing, each of the Parties shall, and shall cause its Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other Transaction Documents.

6.12.   Open Diligence Matters Covenant. Sellers agree that, from the date of this Agreement, Sellers shall, and shall cause the Acquired Entities to, use commercially reasonable efforts to address the diligence matters set forth on Schedule 6.12 to the reasonable satisfaction of Buyer prior to Closing, and to continue to assist Buyer with addressing any such diligence matters that remain outstanding after Closing to the extent requested by Buyer.

ARTICLE VII

Taxes

7.1.   Indemnification.

(a)   Sellers shall indemnify and hold harmless the Buyer Indemnitees from and against (i) any and all liabilities for Taxes of the Acquired Entities for Pre-Closing Tax Periods, (ii) any and all liabilities of the Acquired Entities pursuant to Treasury Regulations Section 1.1502-6 (or any analogous or similar state, local, or foreign Law) for Taxes of any affiliated, consolidated, combined or unitary group of which any of the Acquired Entities has been a member prior to the Closing, (iii) Sellers' share of Transfer Taxes (as set forth in Section 7.7) and (iv) reasonable accounting, legal and other out of pocket expenses incurred after the Closing resulting from or attributable to any breach by Sellers' Representative or any other Seller of his or her covenants, agreements or obligations under this Article VII or the conduct of any Tax Proceeding (except as otherwise provided in Section 7.4), but only to the extent that such Tax liabilities exceed the aggregate amount of such Taxes that was taken into account in determining Net Working Capital, reduced by any prior offsets to Sellers' liability under this Section 7.1(a) or Section 7.2(e), and without duplication for any amounts paid by or on behalf of Sellers pursuant to Section 7.2. For the avoidance of doubt, no indemnification is provided by Sellers under this Section 7.1 with respect to the amount of any Tax attributes (including losses, deductions, credits and tax basis) that carry forward from a Pre-Closing Tax Period to a Post-Closing Tax Period.

(b)   Sellers' Representative (on behalf of Sellers) shall pay to the Buyer Indemnitees any amount required to be paid by Sellers pursuant to Section 7.1(a), and Buyer shall pay to Sellers' Representative (on behalf of Seller Indemnitees) any amount required to be paid by it

44

pursuant to Section 7.1(d), within the later of (x) five days after the indemnitor receives written notice from the indemnitee under Section 7.1 requesting such payment and (y) two days prior to the date that the indemnified Tax or expense is required to be paid.

(c)     The amount of any indemnity pursuant to this Section 7.1 shall be determined net of any Tax benefits obtained by the Indemnitee or its Affiliates in connection with the incurrence of the item for which indemnification is due hereunder.  Any payments made by or on behalf of Sellers or Buyer under this Article VII or Section 11.3 shall be considered by the parties as an adjustment to the Purchase Price and the parties shall not take any position on any Tax Return or otherwise that is inconsistent with that position.

(d)     Buyer shall indemnify and hold harmless the Seller Indemnitees from and against (i) any and all liabilities for Taxes of the Acquired Entities for Post-Closing Tax Periods and reasonable accounting, legal and other out of pocket expenses incurred after the Closing resulting from or attributable to, any breach by Buyer of its covenants, agreements or obligations under this Article VII, and (ii) Buyer's share of Transfer Taxes (as set forth in Section 7.7).

7.2.     Filing and Payment Responsibility.

(a)     Sellers and Buyer shall cause each Acquired Entity, to the extent permitted by Law, to close its taxable year as of the Closing Date. Sellers' Representative shall timely prepare and file, or cause to be timely prepared and filed, all such Tax Returns.

(b)     Sellers' Representative shall timely prepare, or cause to be timely prepared, all Tax Returns of the Acquired Entities for Pre-Closing Tax Periods (other than a Pre-Closing Tax Period included in a Straddle Period).  Such Tax Returns shall be prepared in a manner consistent with the prior practices applicable to the preparation of such Tax Returns, except as otherwise required by Law. Sellers' Representative shall provide each such Tax Return to Buyer no less than fifteen (15) days prior to the due date for filing such Tax Return (including extensions, with Buyer (at the expense and direction of Sellers' Representative (on behalf of Sellers)) to apply for any extensions).  Buyer shall sign and timely file, or cause to be signed and timely filed, all Tax Returns referenced in the prior sentence, or shall timely provide Sellers' Representative with the necessary authorizations to sign and to file such Tax Returns.

(c)     Buyer shall timely prepare and file, or cause to be timely prepared and filed, all Tax Returns of the Acquired Entities for all Straddle Periods (other than any Tax Returns described in Section 7.2(a)).  Buyer shall provide, or cause to be provided, to Sellers' Representative a copy of each such Tax Return at least thirty (30) days prior to the due date for filing such Tax Return (including extensions) for Sellers' Representative's review and comment. Buyer shall make such revisions to such Tax Returns as are reasonably requested by Sellers' Representative to the extent that such revisions relate to Taxes of any Pre-Closing Tax Period.

(d)     Buyer and Sellers' Representative shall provide each other with a copy of any Tax Return of the Acquired Entities that it or he files or causes to be filed after the Closing pursuant to Section 7.2(b) or (c), no later than ten (10) days after the filing of each such Tax Return.

(e)     Sellers' Representative shall, not less than two (2) calendar days prior to the due date (without regard to extensions) of any Tax Return referred to in Section 7.2(a) or Section

7.2(b), provide Buyer with the funds to timely pay the Tax liability due and attributable to the Pre-Closing Tax Period with respect to each such Tax Return, but only to the extent such Tax liability exceeds the aggregate amount of Taxes that was taken into account in determining Net Working Capital, reduced by any prior offsets to Sellers' liability under Section 7.1(a) or this Section 7.2(e). In the case of a Tax Return filed pursuant to an extension, appropriate adjustments shall be made between Sellers and Buyer if, at the time the Tax Return is actually filed, the Taxes due and attributable to the Pre-Closing Tax Period with respect to such Tax Return are more or less than the amount, if any, previously paid by or on behalf of Sellers.

(f)    Allocation of Tax Liability. In the event applicable Law does not require or permit the parties to close federal, state, local or foreign Tax periods as of the Closing Date, the allocation of Tax liability between the Pre-Closing Tax Period and the Post-Closing Tax Period comprising a Straddle Period shall be made in accordance with this Section 7.2(f) as follows:

(i)    in the case of Taxes based upon income, gross receipts (such as sales Taxes) or specific transactions involving Taxes other than Taxes based upon income or gross receipts, the amount of Taxes attributable to any Pre-Closing Tax Period or Post-Closing Tax Period included in the Straddle Period shall be determined by closing the books of the applicable Acquired Entity as of the close of the Closing Date and by treating each of such Pre-Closing Tax Period and Post-Closing Tax Period as a separate taxable year; and

(ii)    in the case of Taxes that are determined on a basis other than income, gross receipts or specific transactions, the amount of Taxes attributable to any Pre-Closing Tax Period included in the Straddle Period shall be equal to the amount of such Taxes for the Straddle Period multiplied by a fraction, the numerator of which is the number of days in the Pre-Closing Tax Period included in the Straddle Period and the denominator of which is the total number of days in the Straddle Period, and the amount of such Taxes attributable to any Post-Closing Tax Period included in a Straddle Period shall be the excess of the amount of the Taxes for the Straddle Period over the amount of Taxes attributable to the Pre-Closing Tax Period included in such Straddle Period.

7.3.    Tax Refunds. Any refunds of Taxes (including any interest paid thereon) for Pre-Closing Tax Periods received by any of the Acquired Entities or by Buyer or its Affiliates with respect to any of the Acquired Entities or credited against the Tax liability of any of the Acquired Entities, Buyer or its Affiliates ("Sellers' Refunds"), shall be for the benefit of Sellers, and Buyer shall cause the Acquired Entities to pay to Sellers' Representative (on behalf of Sellers) any Sellers' Refunds promptly upon receipt or credit thereof. In addition, if the aggregate payments of estimated taxes made by, or on behalf of, one or more Acquired Entities before the Closing for any Straddle Period exceed the Tax liability of such Acquired Entity or Acquired Entities for the Pre-Closing Tax Period included in such Straddle Period, Buyer shall pay, or cause to be paid, such excess amount to Sellers' Representative (on behalf of Sellers) promptly upon receiving the benefit of such excess amount through a reduction of any Tax payment required to be made by the Acquired Entities or by Buyer or its Affiliates for Post-Closing Tax Periods. Sellers' Representative shall have the right, at Sellers' Representative's (on behalf of Sellers) expense, to request that Buyer pursue any Sellers' Refund.

7.4.    Audits.

(a)    Buyer shall promptly notify Sellers' Representative in writing upon receipt by Buyer, the Acquired Entities or Buyer's other Affiliates of notice of any pending or threatened Tax audit or assessment which could affect the indemnification obligations of Sellers in respect of any Pre-Closing Tax Period. Subject to Section 7.4(b), Sellers' Representative shall have the sole right, at Sellers' Representative's (on behalf of Sellers) expense, to represent the interests of the Acquired Entities and to employ counsel of his choice in any Tax Proceeding relating to Pre-Closing Tax Periods (other than a Tax Proceeding involving a Straddle Period), by notifying Buyer in writing within thirty (30) days from Sellers' Representative's receipt from Buyer of the notice described in the first sentence of this Section 7.4(a) of its intention to assume control of the conduct of such Tax Proceeding. If a shorter response period is required by such notice, and Buyer has not received Sellers' Representative's notification by the time the response to the relevant Governmental Entity is required, Buyer may temporarily assume responsibility for such Tax Proceeding, but shall relinquish control to Sellers' Representative if Sellers' Representative satisfies the notification requirement within the time period specified in the preceding sentence. Buyer shall be entitled (at Buyer's expense) to attend such Tax Proceeding (whether such Tax Proceeding is conducted in person, by telephone or otherwise) with its representatives and to receive copies of all written communications, materials and submissions related to such Tax Proceeding received from, or provided to, the Governmental Entity and Sellers' Representative shall keep Buyer informed on a timely basis of all developments. If Sellers' Representative declines to assume the control of such Tax Proceeding, Buyer shall have the right, at Sellers' Representative's (on behalf of Sellers) expense, to assume control of the conduct and resolution of such Tax Proceeding.

(b)    Buyer shall have the right, with counsel of its choice at Buyer's expense, to represent the interests of the Acquired Entities in any Tax Proceeding involving a Straddle Period of an Acquired Entity. Sellers' Representative may participate in any such Tax Proceeding at his (on behalf of Sellers) own expense, and Sellers' Representative shall be kept informed of the progress of such Tax Proceeding. Sellers' Representative's consent shall be required prior to the settlement of any Tax Proceeding relating to a Straddle Period, which consent shall not be unreasonably withheld, conditioned or delayed.

(c)    In the event a Tax Proceeding involves Pre-Closing Tax Periods and Post-Closing Tax Periods and the parties are not able to separate the periods into separate Tax Proceedings, Sellers' Representative and Buyer shall jointly control the conduct and resolution of such Tax Proceeding or portion thereof; provided, however, if any issue in such Tax Proceeding affects exclusively (i) Pre-Closing Tax Periods, then the procedures of Section 7.4(a) shall apply with respect to such issue and/or (ii) Post-Closing Tax Periods, then Buyer shall have the right to control such Tax Proceeding with respect to such issue. Buyer and Sellers' Representative shall each be entitled to employ counsel of its or his choice at its or his (on behalf of Sellers) own expense.

7.5.    Cooperation. After the Closing, Buyer, Sellers and Sellers' Representative shall provide each other with such cooperation and information relating to the Acquired Entities as Buyer or Sellers' Representative may reasonably request in (i) preparing or filing any Tax Return, (ii) the claiming of any Tax refund for the account of Sellers pursuant to Section 7.3, or

(iii) conducting or defending any Tax Proceeding with respect to a Pre-Closing Tax Period. Each Party shall bear its own expenses in complying with the foregoing provisions.

7.6.    Coordination with Other Provisions.  Notwithstanding anything in this Agreement to the contrary, (a) Section 7.1 shall constitute the sole source of indemnification rights under this Agreement for Taxes and associated expenses of the kind described thereunder and (b) the procedural provisions of this Article VII shall govern all claims for indemnification of such Taxes and associated expenses.

7.7.    Transfer Taxes.  Sellers' Representative (on behalf of Sellers), on the one hand, and Buyer, on the other hand, shall assume liability for and pay 50 percent of all Transfer Taxes arising out of or in connection with the transactions effected pursuant to this Agreement as well as all out-of-pocket expenses associated with the preparation and filing of the Tax Returns under this Section 7.7. Buyer shall timely file or cause to be filed all necessary documentation and Tax Returns with respect to such Transfer Taxes.

7.8.    Period of Limitation.  Any claim for indemnification for Taxes under this Article VII shall be brought no later than the tenth Business Day immediately following the expiration of the statute of limitations for the assessment of Taxes that are the subject of the indemnification claim; otherwise the Person bringing the claim (and its Affiliates) shall have no rights to indemnification under this Agreement.

7.9.    Amended Returns.  Buyer shall not file, or cause to be filed, any amended Tax Return or Tax refund claim with respect to any Pre-Closing Tax Period without Sellers' Representative's written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

7.10.   Section 336(e) and Comparable Elections.  Sellers and each Acquired Entity agree to make timely elections under Section 336(e) of the Code with respect to each of the Acquired Entities, as well as such elections under any state or local Law equivalent of Section 336(e). Attached as Schedule 7.10 is a schedule (the "Initial Section 336 Allocation Statement") showing an agreed allocation for purposes of Section 336 of the Code (and the state and local equivalents thereof) of the "aggregate deemed sales price" of the assets of the Acquired Entities among the assets of the Acquired Entities, in accordance with applicable Treasury Regulations. Within sixty (60) days following the Closing, Buyer shall provide an update to the Initial Section 336 Allocation Statement, which update will be limited to adding or removing assets (and corresponding values) of the Acquired Entities as of the Closing. Seller's Representative shall have 30 days following receipt of the Initial Section 336 Allocation Schedule to provide comments thereon and Buyer and Sellers' Representative shall work in good faith to reach agreement on any matters in dispute. In the event the dispute cannot be resolved it shall be referred to the Tax Arbitrator, whose authority will be limited to evaluating the value of assets added to the schedule update. Sellers' Representative and Buyer shall present their respective positions to the Tax Arbitrator, which shall decide which position shall be adopted. The decision of the Tax Arbitrator shall be final and binding, and its fees and costs shall be paid one-half by Sellers' Representative and one-half by Buyer. The Initial Section 336 Allocation Statement, as amended to reflect agreed or resolved changes, shall become the "Final Section 336 Allocation Statement". The Final Section 336 Allocation Statement shall be amended to reflect any

adjustment to the Purchase Price hereunder. Sellers' Representative and Buyer shall prepare and file, or cause to be prepared and filed, all Tax Returns consistent, and shall not take, or permit to be taken, any position in a Tax Proceeding inconsistent, with the Final Section 336 Allocation Statement as amended pursuant to the preceding sentence.

7.11.    Right of Offset.  Without limiting their respective rights under this Article VII in any respect, (a) Sellers' Representative (on behalf of Sellers) may (but shall not be obligated to) offset amounts owed by Buyer to Sellers' Representative (on behalf of Sellers) under this Article VII against amounts otherwise payable by Sellers' Representative (on behalf of Sellers) to Buyer under this Article VII and (b) Buyer may (but shall not be obligated to) offset amounts owed by Sellers' Representative (on behalf of Sellers) to Buyer under this Article VII in accordance with Section 11.10.  The Parties agree that the exercise of such right of offset will not constitute a breach of a covenant under this Agreement, and that neither the exercise of nor the failure to exercise such right of offset will constitute an election of remedies or limit a Party in any manner in the enforcement of any other remedies that may be available to it.

## ARTICLE VIII

### Appointment and Authority of Sellers' Representative

8.1.    Appointment.  Sellers hereby appoint Ronald Cieutat as Sellers' Representative to act as the agent of Sellers for the purpose of the Transaction Documents and the transactions contemplated thereunder. Ronald Cieutat hereby accepts such appointment as Sellers' Representative, and agrees not to voluntarily resign from such role without Buyer's prior written consent.   If at any time Ronald Cieutat is unable or is unwilling to serve as Sellers' Representative, then Sellers hereby agree that, except as provided below, Todd Vereen shall automatically be deemed appointed as Sellers' Representative in place of Ronald Cieutat, to act as the agent of Sellers for the purpose of the Transaction Documents and the transactions contemplated thereunder. Todd Vereen hereby accepts such potential automatic deemed appointment, and, except as provided below, agrees to serve as Sellers' Representative in accordance with the terms hereof upon Ronald Cieutat becoming unable or unwilling to do so (without any further action by any party). Notwithstanding the foregoing, Sellers representing a majority of the Pro Rata Shares may elect to appoint someone other than Todd Vereen as replacement Sellers' Representative (or elect to replace Todd Vereen after his automatic appointment as Sellers' Representative) by providing written notice of such election to Buyer; provided that such proposed replacement Sellers' Representative is reasonably acceptable to Buyer.

8.2.    Authority to Make Decisions.  Sellers agree that Sellers' Representative shall have the power and authority to take all actions and make all decisions on behalf of, and to bind, all of Sellers, and that Buyer shall have the right to rely on such authority of, and actions taken and decisions made by, Sellers' Representative with respect to this Agreement, the Sellers' Note, the Equity Equivalence Agreement and the transactions contemplated hereunder and thereunder. Each Seller acknowledges and agrees that such Seller shall be bound by the actions and decisions of Sellers' Representative, and that such Seller shall have no claims against Buyer with respect to any actions taken or decisions made by Buyer in reliance on such actions and decisions of Sellers' Representative. Any references to "Sellers" under this Agreement, the Sellers' Note and

the Equity Equivalence Agreement shall be deemed to include Sellers' Representative, as appropriate given the context.

8.3.    Authority and Covenant to Receive Payments.  Each Seller agrees that (i) Sellers' Representative shall have the power and authority to receive from Buyer any and all amounts payable by Buyer to Sellers under this Agreement, the Sellers' Note and the Equity Equivalence Agreement, on behalf of Sellers, and that Buyer shall have the right to rely on such authority of Sellers' Representative to receive all such payments on behalf of Sellers, and (ii) no Seller shall have any claims against Buyer with respect to any payments made by Buyer to Sellers' Representative on behalf of Sellers.  Sellers' Representative agrees to receive from Buyer any and all amounts payable by Buyer to Sellers under this Agreement, the Sellers' Note and the Equity Equivalence Agreement, on behalf of Sellers, and to allocate and distribute such payments to Sellers in such amounts, at such times and on such terms as may be separately agreed by Sellers and Sellers' Representative.

8.4.    Authority and Covenant to Make Payments.  Each Seller agrees that (i) Sellers' Representative shall have the power and authority to pay to Buyer, on behalf of Sellers, any and all amounts payable to Buyer under this Agreement, the Sellers' Note and the Equity Equivalence Agreement, and that Buyer shall have the right to rely on such authority of Sellers' Representative to make such payments on behalf of Sellers, (ii) Sellers' Representative shall have the power and authority to determine the amount and timing of any payments required to be made to Buyer under this Agreement, the Sellers' Note and the Equity Equivalence Agreement, and no Seller shall have the right to dispute any such determination, (iii) no Seller shall have any claim against Buyer with respect to any amounts paid by Sellers' Representative to Buyer on behalf of any Seller, (iv) such Seller shall pay or reimburse Sellers' Representative for his or her share of any such payments made by Sellers' Representative on behalf of Sellers, in such amounts and at such times as may be separately agreed by Sellers and Sellers' Representative, and (v) in the event that Sellers' Representative fails to timely pay in full any amounts payable to Buyer under this Agreement, the Sellers' Note or the Equity Equivalence Agreement, Buyer shall have the right (but not the obligation) to require one or more other Sellers to directly pay any or all of such unpaid amounts to Buyer.  Sellers' Representative agrees (A) to timely pay to Buyer any and all amounts payable by Sellers to Buyer under this Agreement, the Sellers' Note and the Equity Equivalence Agreement, on behalf of Sellers, (B) that it shall be Sellers' Representative's responsibility to deal directly with the other Sellers with respect to his receipt of payment or reimbursement from the other Sellers for their respective shares of any such payments made by Sellers' Representative on their behalf, and (C) that Sellers' Representative shall not have any claim against Buyer with respect to any such amounts that any other Seller fails to pay or reimburse to Sellers' Representative.

8.5.    Indemnification of Sellers' Representative.  Each Seller, jointly and severally, agrees to indemnify and hold Sellers' Representative harmless from and against any and all Losses incurred by Sellers' Representative arising out of or relating to any action taken or omitted to be taken by Sellers' Representative in such capacity, except to the extent that any such Losses result from the bad faith, gross negligence or willful misconduct of Sellers' Representative.

992976v.19 3899/00002

ARTICLE IX

Conditions to Closing

9.1.    Conditions to Obligations of Sellers and Buyer.  The respective obligations of Sellers and Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction or, to the extent permitted by applicable Law, the waiver by Sellers' Representative (on behalf of Sellers) or Buyer, respectively, at or prior to the Closing of each of the following conditions:

(a)    Litigation. No court or other Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Law or Order (whether temporary, preliminary or permanent) that is in effect and restrains, enjoins or otherwise prohibits consummation of the transactions contemplated by this Agreement and no Action has been filed or threatened in writing seeking any of the foregoing (an "Opposing Claim").

(b)    Government Approvals; Waiting Periods.  All approvals, if any, required to be obtained from any Governmental Entity prior to Closing for the consummation of the transactions contemplated by the Transaction Documents shall have been duly issued or granted and all applicable mandatory pre-closing waiting periods shall have expired or otherwise been terminated.

9.2.    Conditions to the Obligations of Sellers.    The obligations of Sellers to consummate the transactions contemplated by this Agreement are further subject to the satisfaction or the waiver by Sellers' Representative at or prior to the Closing of each of the following conditions:

(a)    Performance of Obligations by Buyer.  Buyer shall have performed and complied in all material respects with all agreements, covenants and obligations required to be performed or complied with or by it under this Agreement at or prior to the Closing.

(b)    Representations and Warranties.  The representations and warranties of Buyer set forth in this Agreement shall be true and correct as of the Closing, unless a representation or warranty expressly relates to any earlier date (in which case such representation or warranty shall have been true and correct as of such earlier date) with the same effect as if made as of the Closing.

(c)    Sellers' Note. Sellers' Representative shall have received a promissory note issued by Eli Global, LLC, in an aggregate original principal amount of $12,200,000, in substantially the form of, and having the terms set forth on, Exhibit D (the "Sellers' Note"), duly executed by Eli Global, LLC.

(d)    Equity Equivalence Agreement. Sellers' Representative shall have received the Equity Equivalence Agreement, duly executed by Buyer.

(e)    Termination of Confidentiality Agreement. Sellers' Representative shall have received an agreement terminating the Confidentiality Agreement, duly executed by Eli Global, LLC.

992976v.19 3899/00002

(f)     Closing Certificate. Sellers' Representative shall have received a certificate of Buyer, dated the Closing Date and signed by its duly authorized officer, certifying that the conditions set forth in Sections 9.2(a) and (b) have been satisfied.

(g)     Corporate Proceedings. Sellers' Representative shall have received a certificate of Buyer, dated the Closing Date and signed by its duly authorized officer, certifying that attached thereto are true and complete copies of all resolutions adopted by the board of directors (or other applicable governing body) of Buyer authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby.

(h)     Employment Agreements. Sellers' Representative shall have received the Employment Agreements, duly executed by each of Ronald Cieutat and the other members of the management team, if any, required by Buyer.

9.3.     Conditions to the Obligations of Buyer. The obligations of Buyer to consummate the transactions contemplated by this Agreement are further subject to the satisfaction or the waiver by Buyer at or prior to the Closing of each of the following conditions:

(a)     Performance of Obligations of Sellers' Representative and Sellers.     Sellers' Representative and Sellers shall have performed and complied in all material respects with all agreements, covenants and obligations required to be performed or complied with or by them under this Agreement at or prior to the Closing.

(b)     Representations and Warranties. The representations and warranties of Sellers set forth in this Agreement shall be true and correct as of the Closing, unless such representation or warranty expressly relates to any earlier date (in which case such representation or warranty shall have been true and correct as of such earlier date) with the same effect as if made as of the Closing.

(c)     No Material Adverse Effect. Since the date of this Agreement, there shall not have occurred any Material Adverse Effect.

(d)     Required Governmental Consents. All Required Governmental Consents required to be obtained prior to Closing, which are specified on Schedule 9.3(d), shall have been obtained, and Buyer shall have received evidence thereof in a form reasonably satisfactory to Buyer, including (to the extent listed on Schedule 9.3(d)) material licenses, permits and authorizations from Governmental Entities which are necessary or required for the consummation of the transactions herein and for Buyer to own and operate the Acquired Entities and control the operation of their businesses and be paid by Government Payment Programs and all other payors, in a manner consistent with the Acquired Entities' operation of their businesses immediately prior to the Closing Date (collectively, "CHOW Approvals"), including assurances reasonably acceptable to Buyer that any material licenses, permits and authorizations not actually issued as of the Closing will be issued in the normal course following Closing.

(e)     Required Contract Consents.  All of the consents and waivers specified on Schedule 9.3(e) that are or would be required under the Material Contracts as a result of the transactions contemplated by this Agreement (including the change of control of each Acquired Entity) shall have been obtained, and Buyer shall have received evidence thereof in a form reasonably satisfactory to Buyer.

(f)     Resignations.  Buyer shall have received the resignations, effective as of immediately following the Closing, with respect to each individual's service in the position of a director, manager or officer of any Acquired Entity set forth in Schedule 9.3(f).

(g)     Acquired Shares.  Sellers shall have tendered for delivery to Buyer certificates representing all of the Acquired Shares, free and clear of any Encumbrance (other than restrictions on transfer under applicable state and federal securities Laws), duly endorsed in blank or accompanied by stock or LLC interest powers duly endorsed in blank, or in the case of uncertificated LLC interests, assignments of such interests.

(h)     Legal Opinion.  Buyer shall have received the opinion of Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C., counsel to Sellers, in form and substance acceptable to Buyer.

(i)     Employment Agreements.  Buyer shall have received the Employment Agreements, duly executed by each of Ronald Cieutat and the other members of the management team, if any, designated by Buyer.

(j)     Intellectual Property Assignment.  Buyer shall have received an intellectual property assignment transferring to Buyer all of Ronald Cieutat's right, title and interest in and to all Intellectual Property relating to his invention commonly referred to as the HPC Web Portal, in form and substance acceptable to Buyer, duly executed by Ronald Cieutat.

(k)     Termination of Confidentiality Agreement.  Buyer shall have received an agreement terminating the Confidentiality Agreement, duly executed by HPC, LLC.

(l)     FIRPTA Certificate.  Buyer shall have received a certificate executed by each Seller that, as of the Closing Date, such Seller is not a "foreign person" within the meaning of Section 1445 of the Code and the Regulations thereunder, in form and substance acceptable to Buyer;

(m)     Bill of Sale.  Buyer shall have received a duly executed bill of sale in the form attached hereto as Exhibit E.

(n)     Closing Certificate.  Buyer shall have received a certificate executed by Sellers' Representative, dated the Closing Date, certifying that the conditions set forth in Sections 9.3(a), (b) and (c) have been satisfied.

(o)     Corporate Proceedings.  Buyer shall have received a certificate from Sellers' Representative, dated the Closing Date and signed by a duly authorized officer of each Acquired Entity, certifying that attached thereto are true and complete copies of all resolutions adopted by the board of directors (or other applicable governing body) of such Acquired Entity, authorizing

the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby.

(p)    Payoff Letter.  Buyer shall have received a payoff letter from Hancock Bank (a trade name of Whitney Bank), confirming that all amounts owed by the Acquired Entities to Hancock Bank (a trade name of Whitney Bank) have been paid off.

(q)    Evidence of Termination of Liens. Buyer shall have received evidence reasonably satisfactory to Buyer of termination of all of the liens listed on Schedule 9.3(q).

(r)    Due Diligence.  The diligence issues listed on Schedule 9.3(r) shall have been addressed to the reasonable satisfaction of the Buyer.

(s)    Powers of Attorney.  Buyer shall have received executed powers of attorney from the applicable Acquired Entities holding DEA certificates, consistent with applicable DEA requirements.

## ARTICLE X

### Termination

10.1.  Termination.  Notwithstanding anything herein to the contrary, this Agreement may be terminated and the transactions contemplated by this Agreement may be abandoned at any time prior to the Closing:

(a)    by the mutual written consent of Sellers' Representative and Buyer;

(b)    by Buyer, by giving written notice of such termination to Sellers' Representative on or after the date that is six months following the date of this Agreement, if the Closing shall not have occurred prior to such date;

(c)    (i) by Buyer, if there has been a breach of any representation, warranty, covenant or agreement made by Sellers or Sellers' Representative in this Agreement, or any such representation and warranty shall have become untrue after the date of this Agreement, in each case such that the conditions set forth in Section 9.3(a) or 9.3(b) would not be satisfied and such breach or condition is not curable or, if curable, is not cured prior to 30 days after written notice thereof is given by Buyer to Sellers' Representative; or (ii) by Sellers' Representative, if there has been a breach of any representation, warranty, covenant or agreement made by Buyer in this Agreement, or any such representation and warranty shall have become untrue after the date of this Agreement, in each case such that the conditions set forth in Section 9.2(a) or 9.2(b) would not be satisfied and such breach or condition is not curable or, if curable, is not cured prior to 30 days after written notice thereof is given by Sellers' Representative to Buyer; or

(d)    by Buyer or Sellers' Representative, if (i) any Order permanently restraining, enjoining or otherwise prohibiting consummation of the transactions contemplated by this Agreement shall become final and non-appealable or (ii) an Opposing Claim exists.

The Party desiring to terminate this Agreement pursuant to clause (c) or (d) of this Section 10.1 shall, in the case of Buyer, give written notice of such termination to Sellers' Representative, and, in the case of Sellers' Representative, give written notice of such termination to Buyer.

10.2. <u>Effect of Termination and Abandonment</u>. In the event of termination of this Agreement and the abandonment of the transactions contemplated hereby pursuant to Section 10.1, this Agreement shall become void and of no effect with no liability to any Person on the part of any Party; provided, that Section 6.4, this Section 10.2 and Articles I and XII shall survive the termination of this Agreement; and provided, further, that except as otherwise provided herein, no such termination shall relieve any Party of any liability or damages to any other Party resulting from any breach of this Agreement prior to any such termination.

ARTICLE XI

Survival and Indemnification

11.1. <u>Survival</u>.

(a)    Except as set forth in Section 11.1(b), the representations and warranties contained in this Agreement, together with the associated rights of indemnification, shall survive the Closing hereunder and continue in full force and effect for 12 months following the Closing and shall thereupon expire, together with the associated rights of indemnification, except (i) to the extent that a claim for breach thereof has been asserted in writing prior to such expiration or (ii) with respect to any claim of fraud or intentional misrepresentation (in which event, with respect to either (i) or (ii), the representation or warranty and the associated rights of indemnification shall survive with respect to such claim until such claim has been resolved). Each of the covenants and agreements contained herein shall survive the Closing and continue in full force and effect until performed in accordance with their terms.

(b)    The Fundamental Representations, the Tax Representations and the representations and warranties contained in Sections 5.1 (Organization, Good Standing and Qualification; Authority) and 5.2 (Authorization) shall survive the Closing hereunder and continue in full force and effect, together with the associated rights of indemnification, indefinitely. The representations regarding healthcare matters in Section 3.24, together with the associated rights of indemnification, shall survive the Closing for a period of five years after the Closing, and shall thereupon expire, together with the associated rights of indemnification, except (i) to the extent that a claim for breach thereof has been asserted in writing prior to such expiration or (ii) with respect to any claim of fraud or intentional misrepresentation (in which event, with respect to either (i) or (ii), the representation or warranty and the associated rights of indemnification shall survive with respect to such claim until such claim has been resolved).

11.2. <u>Indemnification by Buyer</u>. From and after the Closing, Buyer shall indemnify, defend and hold harmless Sellers, their Affiliates, and the officers, directors, employees, successors and any assigns of any of the foregoing (collectively, the "Seller Indemnitees") against any Losses incurred by any of the Seller Indemnitees arising out of or relating to: (a) any breach of any representation or warranty made by Buyer in Article V of this Agreement; and/or (b) any breach of any covenant, agreement or obligation of Buyer contained in this Agreement.

11.3.  Indemnification by Sellers.  Subject to Section 11.4, from and after the Closing, each Seller, jointly and severally (to the extent provided in Section 11.4(c)), shall indemnify, defend and hold harmless Buyer and its Affiliates, and the officers, directors, employees, successors and any assigns of any of the foregoing (collectively, the "Buyer Indemnitees") against all Losses incurred by any of the Buyer Indemnitees arising out of or relating to:

(a)     any breach of any representation or warranty made by Sellers in Article III or Article IV of this Agreement (other than any Tax Representation, which are covered in Section 11.5); and/or

(b)     any breach of any covenant, agreement or obligation of Sellers' Representative or such Seller contained in this Agreement.

11.4.  Limitations on Rights of Indemnitees.

(a)     For purposes of determining the amount of any Losses that are the subject matter of a claim for indemnification hereunder (but not for purposes of determining whether there has been a breach), each representation and warranty in this Agreement will be read without regard and without giving effect to the term "material", "Material Adverse Effect" or any similar term or materiality qualification (fully as if any such word or phrase were deleted from such representation and warranty).

(b)     Sellers shall not be obligated to pay any claim for indemnification pursuant to Section 11.3(a) if, with respect to any individual item of Loss, such item is less than $10,000 ("Minor Claim"); it being understood that no Minor Claim shall apply or be counted towards the Threshold.

(c)     Sellers shall not be required to indemnify Buyer Indemnitees with respect to any claim for indemnification resulting from or arising out of matters described in Section 11.3(a) unless and until the aggregate amount of all such claims by Buyer Indemnitees for such matters exceeds the Threshold, in which event Buyer Indemnitees shall be entitled to recover such Losses from the first dollar of such Losses and not merely the excess of such Losses above the Threshold Amount; provided, however, that the Threshold shall not apply to Losses in respect of fraud or intentional misrepresentation or any Losses resulting from a breach of a Fundamental Representation and Buyer Indemnitees shall be entitled to recover any such Losses from the first dollar of such Losses. In addition, Sellers' maximum aggregate liability to Buyer Indemnitees resulting from or arising out of the matters described in Section 11.3(a) shall not exceed in the aggregate the Cap; provided, however that the Cap shall not apply to Losses in respect of fraud or intentional misrepresentation or any Losses resulting from a breach of a Fundamental Representation, in which case the Sellers' maximum aggregate liability to Buyer Indemnitees resulting from or arising out of the matters described in Section 11.3(a) shall not exceed in the aggregate the greater of (i) the Purchase Price and (ii) the Enterprise Value.

(d)     Except in the case of Ronald Cieutat and Todd Vereen, who shall have joint and several liability for all Sellers' indemnification obligations resulting from or arising out of matters described in Section 11.3(a) and Section 11.3(b), each Seller's maximum aggregate liability to Buyer Indemnitees for any claim for indemnification resulting from or arising out of

matters described in Section 11.3(a) (other than breach of the representations and warranties made by such Seller in Article IV of this Agreement) and Section 11.3(b), shall not exceed (i) such Seller's Pro Rata Share of the Losses arising from such claim, or (ii) such Seller's Pro Rata Share of the Cap; provided, however that the foregoing limits shall not apply to Losses in respect of fraud or intentional misrepresentation.

11.5.    Specific Indemnifications.    Notwithstanding anything to the contrary in this Article XI (including any limitations set forth in Section 11.4), Sellers shall indemnify, defend and hold harmless the Buyer Indemnitees against all Losses incurred by any Buyer Indemnitees arising out of or relating to any Tax Representations. Notwithstanding anything to the contrary in this Article XI or elsewhere in this Agreement, the obligations under this Section 11.5 shall survive indefinitely.

11.6.    Procedure for Third Party Claims.

(a)    If any third party shall notify any Party (the "Indemnitee") with respect to any matter (a "Third Party Claim") which may give rise to a claim for indemnification against any other Party (the "Indemnitor") under this Article XI, then the Indemnitee shall promptly notify the Indemnitor thereof in writing; provided, however, that no delay on the part of the Indemnitee in notifying the Indemnitor shall relieve the Indemnitor from any obligation hereunder except to the extent the Indemnitor is materially prejudiced thereby.

(b)    The Indemnitor shall have the right, at its option, to assume the defense of any Third Party Claim with its own counsel.  If the Indemnitor elects to assume the defense of such Third Party Claim as aforesaid, then:

(i)    notwithstanding anything to the contrary contained in this Agreement, the Indemnitor shall not be required to pay or otherwise indemnify the Indemnitee against any attorneys' fees incurred by the Indemnitee in connection with such Third Party Claim following the Indemnitor's election to assume the defense of such Third Party Claim, unless (A) the Indemnitor fails to defend diligently the action or proceeding within 20 days after receiving notice of such failure from the Indemnitee; or (B) the Indemnitee reasonably shall have concluded (upon advice of its counsel) that (x) there may be one or more legal defenses available to such Indemnitee or other Indemnitees that are not available to the Indemnitor or (y) an actual conflict exists which makes representation of both the Indemnitor and the Indemnitee inappropriate under applicable standards of professional conduct; in the case of each of (A) or (B) above, the Indemnitor shall only be required to pay the fees of one counsel of the Indemnitee in each applicable country;

(ii)    the Indemnitee shall make available to the Indemnitor all books, records and other documents and materials that are under the direct or indirect control of the Indemnitee or any of the Indemnitee's agents and that are reasonably necessary for the defense of such Third Party Claim;

(iii)    the Indemnitee shall otherwise cooperate as reasonably requested by the Indemnitor in the defense of such Third Party Claim;

57

(iv)     the Indemnitee shall not admit any liability with respect to such Third Party Claim;

(v)     the Indemnitor shall not, without the written consent of the Indemnitee, which shall not be unreasonably withheld, conditioned or delayed, settle or compromise any pending or threatened Action in respect of which indemnification may be sought hereunder (whether or not the Indemnitee is an actual or potential party to such Action) or consent to the entry of any judgment (A) which does not, to the extent that the Indemnitee or any of its Affiliates may have any liability with respect to such Action, include as an unconditional term thereof the delivery by the claimant or plaintiff to the Indemnitee of a written release of the Indemnitee and its Affiliates from all liability in respect of such Action, (B) which includes any statement as to or an admission of fact, culpability or a failure to act, by or on behalf of the Indemnitee or any of its Affiliates, or (C) in any manner that involves any injunctive relief against the Indemnitee or any of its Affiliates or may materially and adversely affect the Indemnitee or any of its Affiliates; and

(vi)     if the Indemnitor does not elect to assume the defense of such Third Party Claim within twenty (20) days after receipt of notice from the Indemnitee as described above, then the Indemnitee shall proceed diligently to defend such Third Party Claim with the assistance of counsel reasonably satisfactory to the Indemnitor, provided, however, that the Indemnitee shall not settle, adjust or compromise such Third Party Claim, or admit any liability with respect to such Third Party Claim, without the prior written consent of the Indemnitor, such consent not to be unreasonably withheld, conditioned or delayed.

11.7.    Indemnification Payments as Purchase Price Adjustment.  Any payments made by Buyer or by or on behalf of any Seller under this Article XI shall be considered an adjustment to the Purchase Price.

11.8.    Exclusive Remedy.  Except as provided in Section 6.5(c) and Section 12.10 and except in the case of fraud or intentional misrepresentation, from and after the Closing, the indemnification rights provided in this Article XI shall be the sole and exclusive remedy available to the Parties hereto with respect to any breach of the representations, warranties, covenants or agreements of the Parties in this Agreement.

11.9.    Certain Additional Matters.

(a)     The amount of any and all Losses under this Article XI shall be determined net of (i) any Tax benefits obtained by the Indemnitee or its Affiliates in connection with the incurrence of the item for which indemnification is due hereunder and (ii) any amounts recovered by an Indemnitee or its Affiliates pursuant to any insurance policy, title insurance policy, indemnity, reimbursement arrangement or contract pursuant to which or under which such Indemnitee or Affiliate is a party or has rights; provided, that any amounts under the foregoing clause (ii) shall be reduced by any increased costs (including increased insurance premiums) associated with such recovery.

58

(b)    No Seller shall have any obligation to indemnify any Buyer Indemnitee for any liability taken into account in determining the Net Working Capital (and, for sake of clarity, no amount taken into account in determining the Net Working Capital shall be counted toward the Cap).

(c)    For the avoidance of doubt, if an Indemnitee is entitled to indemnification under more than one provision of Section 11.2 or 11.3, as applicable, or for a breach of more than representation or warranty, such Indemnitee may assert a claim under any applicable provision; provided, however, that such Indemnitee may not recover, and the Indemnitor shall not be required to indemnify the Indemnitee, more than once in respect of the same Loss.

11.10.  Set-Off.  Sellers hereby acknowledge and agree that Buyer is authorized, at any time and from time to time, to the fullest extent permitted by Law, to set-off and apply any and all amounts payable by Buyer to any Seller or Sellers' Representative (on behalf of Sellers) (including amounts outstanding under the Sellers' Note or any amounts payable to any Seller pursuant to the Equity Equivalence Agreement or under Article VII) against any amounts payable by any Seller or by Sellers' Representative (on behalf of Sellers) to Buyer under this Article XI, under Article VII or otherwise upon providing at least 10 days' prior written notice.

## ARTICLE XII

### Miscellaneous

12.1.  Publicity.  No press releases or public announcements with respect to the transactions contemplated by this Agreement and filings with any third party and/or any Governmental Entity (including any national securities exchange or interdealer quotation service) with respect thereto, shall be issued or made by the Acquired Entities, Sellers' Representative or any Seller, on the one hand, or Buyer, on the other hand, prior to or after Closing without the prior written consent of the Buyer or Sellers' Representative, as the case may be, except as may be required by Law or by obligations pursuant to any listing agreement with or rules of any national securities exchange or interdealer quotation service or by the request of any Governmental Entity.

12.2.  Entire Agreement.  This Agreement (including the Schedules and Exhibits hereto) and the other Transaction Documents constitute the entire agreement among the Parties and supersede any prior understandings or agreements by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof and thereof.

12.3.  Succession and Assignment.  Except as otherwise provided herein, this Agreement may not, without the prior written consent of each of the Parties, be assigned by any of the Parties by operation of Law or otherwise, and any attempted assignment shall be null and void; provided, that, after the Closing, Buyer may assign this Agreement in connection with any merger, asset sale, or sale of capital stock involving any of the Acquired Entities; provided that in the event of any assignment of this Agreement, Buyer shall not be released from its obligations hereunder without the consent of Sellers' Representative (which consent shall not be unreasonably withheld); and provided further that Buyer may freely assign all or part of its rights hereunder to any Affiliate of Buyer.  Subject to the foregoing, this Agreement shall be binding

upon and inure to the benefit of the Parties and their respective heirs, successors, permitted assigns and legal representatives. Notwithstanding the foregoing, nothing in this Agreement shall prevent Buyer from pledging or assigning its rights under this Agreement for the benefit of certain lenders or credit providers.

12.4.    Expenses.    Sellers and Buyer shall each bear their respective expenses in connection with the transactions contemplated by this Agreement (the "Transaction Expenses"). Sellers' Representative (on behalf of Sellers) shall bear all the Transaction Expenses incurred by the Acquired Entities on or prior to the Closing.

12.5.    Interpretation.    The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement. Definitions shall apply equally to both the singular and plural forms of the terms defined.

12.6.    Notices.    All notices, requests, demands, claims, and other communications hereunder (each, a "Notice") shall be in writing, and shall be given (and shall be deemed to have been duly given upon receipt or refusal of receipt) by personal delivery, electronic facsimile transmission or email, overnight courier or registered or certified mail, postage prepaid, and addressed to the intended recipient as set forth below (or at such other address as shall be specified in a Notice given in accordance with this Section 12.6). Each Seller acknowledges and agrees that notice to Sellers' Representative shall constitute notice to each Seller.

If to any Seller, Sellers' Representative or, prior to the Closing, the Acquired Entities:

Ronald Cieutat
c/o HPC, LLC
63 South Royal Street, Suite 800
Mobile, AL 36602-3235
Email: rcieutat@hpcspecialtyrx.com

with a copy to (which shall not constitute notice):

Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C.
One Eastover Center
100 Vision Drive, Suite 400
Jackson, Mississippi 39211
Attention: Jon D. Seawright
Email: jseawright@bakerdonelson.com

If to Buyer or, following the Closing, the Acquired Entities:

c/o Eli Global, LLC
2222 Sedwick Road
Durham, NC 27713
Attention: Greg Lindberg, Peter Nordberg, Michael Pereira
Email: gel@eliglobal.com; pnordberg@eliglobal.com; mpereira@eliglobal.com

with a copy to:

Richards Kibbe & Orbe LLP
200 Liberty Street
New York, NY 10281-1003
Attention: Jahan Sharifi
Email: jsharifi@rkollp.com

12.7.    Governing Law.  This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of New York without giving effect to the principles of conflict of laws.

12.8.    Amendments and Waivers.  No amendment or waiver of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Sellers' Representative and Buyer.  No waiver by any Party of any default or any breach of any representation, warranty, covenant or agreement hereunder shall be deemed to extend to any prior or subsequent default or breach or affect in any way any rights arising by virtue of any such prior or subsequent occurrence.

12.9.    Severability.  If any provision of this Agreement for any reason shall be held to be illegal, invalid or unenforceable, such illegality shall not affect any other provision of this Agreement; provided that the material economic substance of the transactions contemplated hereby are preserved.  Subject to the foregoing provision, this Agreement shall be amended so as to enforce the illegal, invalid or unenforceable provision to the maximum extent permitted by applicable Law, and the Parties shall cooperate in good faith to further modify this Agreement so as to preserve to the maximum extent possible the intended benefits to be received by the Parties.

12.10.    Arbitration of Disputes.  Any and all disputes arising out of, relating to, or in connection with this Agreement, including any question regarding its existence, validity, or termination, and any question as to whether a particular dispute is arbitrable hereunder, shall be referred to and finally resolved by binding arbitration administered by the International Chamber of Commerce and conducted pursuant to its Rules of Arbitration by three arbitrators appointed in accordance with said Rules, with the two co-arbitrators (one appointed by Sellers' Representative and one by Buyer) and such two arbitrators shall have 30 days from the appointment of the second arbitrator to nominate a third arbitrator who shall act as the chair.  The place of arbitration shall be New York County, New York, and the language to be used in the arbitral proceedings shall be English.  Judgment upon the award may be entered by any court having jurisdiction thereof.  The Parties hereby waive any defense of lack of personal jurisdiction or forum non conveniens or other similar doctrine in any legal proceedings

61

concerning or arising out of any such arbitration. Notwithstanding the other terms of this section, prior to or pending arbitration, nothing shall preclude any Party that is party to the dispute from seeking interim equitable or injunctive relief, or both, or specific performance from the competent court of law; provided that the pursuit of any such interim equitable or injunctive relief or specific performance shall not be a waiver of the duty of the Parties party to such dispute to resolve such dispute pursuant to the arbitration procedures described in this section.

12.11. No Third Party Beneficiaries. This Agreement shall not confer any rights or remedies upon any Person (including any Continuing Employees pursuant to Section 6.6), other than Sellers, Sellers' Representative, Buyer, the Buyer Indemnitees, the Seller Indemnitees, and their respective successors and permitted assigns.

12.12. No Presumption Against Drafting Party. Each Party acknowledges that each Party has been represented by counsel in connection with this Agreement, each of the other Transaction Documents and the transactions contemplated hereby and thereby. Accordingly, any rule of Law or any legal decision that would require interpretation of any claimed ambiguities in this Agreement or any other Transaction Document against the drafting party has no application and is expressly waived.

12.13. Signatures. This Agreement shall be effective upon delivery of original signature pages or .pdf or facsimile copies thereof executed by each of the Parties. This Agreement may be executed in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

12.14. Computation of Time. Whenever the last day for the exercise of any privilege or the discharge of any duty hereunder shall fall upon a day that is not a Business Day, the Party having such privilege or duty may exercise such privilege or discharge such duty on the next succeeding day which is a Business Day.

12.15. Release. Effective as of the Closing, each Seller, for and on behalf of itself and its Affiliates (other than the Acquired Entities) and any Person who may claim by, through or on behalf of such Persons (collectively, the "Releasing Parties"), fully, unconditionally and irrevocably releases and discharges the Acquired Entities from any and all claims, demands, agreements, contracts, covenants, torts, suits, causes of action, Encumbrances, debts, obligations and liabilities of whatever kind or nature, in law, equity or otherwise, whether known or unknown, suspected or unsuspected, that any of such Releasing Parties now has, has ever had or may hereafter have (each, a "Sellers' Claims") against any of the Acquired Entities arising out of or based on facts occurring prior to the Closing in respect of matters relating to the Acquired Entities, and each Seller covenants not to sue Buyer or any of the Acquired Entities for any of the foregoing; provided, however, that nothing contained herein shall affect the rights of any Seller to enforce this Agreement and the other Transaction Documents. Each Seller, on behalf of himself or herself and each of his or her Affiliates (other than the Acquired Entities), represents and warrants that such Seller has not assigned or transferred any interest in any Sellers' Claim.

*[signature pages follow]*

992976v.19 3899/00002

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

<u>Sellers</u>:

**RONALD CIEUTAT**

_Ronald Cieutat_

**TODD VEREEN**

_____

**TERRY SIMISON**

_____

**DAVID GLENN FINNEGAN**

_____

**FLOYD SLAY, JR.**

_____

**TIMOTHY ANDREWS**

_____

[Signature Page to Equity Purchase Agreement]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

Sellers:

RONALD CIEUTAT

TODD VEREEN

TERRY SIMISON

_____

DAVID GLENN FINNEGAN

_____

FLOYD SLAY, JR.

_____

TIMOTHY ANDREWS

_____

[Signature Page to Equity Purchase Agreement]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

Sellers:

RONALD CIEUTAT

_____

TODD VEREEN

_____

TERRY SIMISON

_____

DAVID GLENN FINNEGAN

_____

FLOYD SLAY, JR.

_____

TIMOTHY ANDREWS

_____

[Signature Page to Equity Purchase Agreement]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

Sellers:

**RONALD CIEUTAT**

_____

**TODD VEREEN**

_____

**TERRY SIMISON**

_____

**DAVID GLENN FINNEGAN**

_____

**FLOYD SLAY, JR.**

_____

**TIMOTHY ANDREWS**

_____

[Signature Page to Equity Purchase Agreement]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

Sellers:

RONALD CIEUTAT

_____

TODD VEREEN

_____

TERRY SIMISON

_____

DAVID GLENN FINNEGAN

_____

FLOYD SLAY, JR.

*Floyd Slay, Jr.*

TIMOTHY ANDREWS

_____

[Signature Page to Equity Purchase Agreement]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

<u>Sellers</u>:

RONALD CIEUTAT

_____

TODD VEREEN

_____

TERRY SIMISON

_____

DAVID GLENN FINNEGAN

_____

FLOYD SLAY, JR.

_____

TIMOTHY ANDREWS

_____

[Signature Page to Equity Purchase Agreement]

TYLA FOWLKES

_____

DEBRA LITTLE

_____

JOSHUA WHITES

_____

THOMAS WILLIAMS

_____

ERIN ANDERSON

_____

JAN WHEELER

_____

[Signature Page to Equity Purchase Agreement]

**TYLA FOWLKES**

_____

**DEBRA LITTLE**

_____ _Debra Little_____

**JOSHUA WHITES**

_____

**THOMAS WILLIAMS**

_____

**ERIN ANDERSON**

_____

**JAN WHEELER**

_____

[Signature Page to Equity Purchase Agreement]

TYLA FOWLKES

_____

DEBRA LITTLE

_____

JOSHUA WHITES

_____

THOMAS WILLIAMS

_____

ERIN ANDERSON

_____

JAN WHEELER

_____

**TYLA FOWLKES**

_____

**DEBRA LITTLE**

_____

**JOSHUA WHITES**

_____

**THOMAS WILLIAMS**

_____

**ERIN ANDERSON**

_____

**JAN WHEELER**

_____

TYLA FOWLKES

_____

DEBRA LITTLE

_____

JOSHUA WHITES

_____

THOMAS WILLIAMS

_____

ERIN ANDERSON

_____

JAN WHEELER

_____

[Signature Page to Equity Purchase Agreement]

**TYLA FOWLKES**

_____


**DEBRA LITTLE**

_____


**JOSHUA WHITES**

_____


**THOMAS WILLIAMS**

_____


**ERIN ANDERSON**

_____


**JAN WHEELER**

_Jan Wheeler_
_____

EUGENE DREHER, IV

NANCY DREHER

_____

JOSEPH MOOSE

_____

PHILIP EPSTEIN

_____

CORY WIGGINS

_____

MICHAEL DANDURAND

_____

EUGENE DREHER, IV

_____

NANCY DREHER

_____

JOSEPH MOOSE

_____

PHILIP EPSTEIN

_____

CORY WIGGINS

_____

MICHAEL DANDURAND

_____

[Signature Page to Equity Purchase Agreement]

EUGENE DREHER, IV

_____

NANCY DREHER

_____

JOSEPH MOOSE

_____

PHILIP EPSTEIN

_____

CORY WIGGINS

_____

MICHAEL DANDURAND

_____

[Signature Page to Equity Purchase Agreement]

VINCENT DREHER, IV

_____

NANCY DREHER

_____

JOSEPH MOOSE

_____

PHILIP EPSTEIN

_____

CORY WIGGINS

_____

MICHAEL DANDURAND

_____

[Signature Page to Equity Purchase Agreement]

EUGENE DREHER, IV

_____

NANCY DREHER

_____

JOSEPH MOOSE

_____

PHILIP EPSTEIN

_____

CORY WIGGINS

_____

MICHAEL DANDURAND

_____

[Signature Page to Equity Purchase Agreement]

EUGENE DREHER, IV

_____


NANCY DREHER

_____


JOSEPH MOOSE

_____


PHILIP EPSTEIN

_____


CORY WIGGINS

_____


MICHAEL DANDURAND

_____


[Signature Page to Equity Purchase Agreement]

BENJAMIN DANDURAND

_____

WILLIAM MCFARLAND

_____

MICHAEL RUDGE

_____

ANGELA CLARK

_____

CAROL REED

_____

Sellers' Representative:

RONALD CIEUTAT

_____

**BENJAMIN DANDURAND**

_____

**WILLIAM MCFARLAND**

_____

**MICHAEL RUDGE**

_____

**ANGELA CLARK**

_____

**CAROL REED**

_____

**Sellers' Representative:**

**RONALD CIEUTAT**

_____

[Signature Page to Equity Purchase Agreement]

BENJAMIN DANDURAND

---

WILLIAM MCFARLAND

---

MICHAEL RUDGE

---

ANGELA CLARK

---

CAROL REED

---

Sellers' Representative:

RONALD CIEUTAT

---

[Signature Page to Equity Purchase Agreement]

BENJAMIN DANDURAND

_____

WILLIAM MCFARLAND

_____

MICHAEL RUDGE

_____

ANGELA CLARK

_____

CAROL REED

_____

Sellers' Representative:

RONALD CIEUTAT

_____

[Signature Page to Equity Purchase Agreement]

BENJAMIN DANDURAND

_____

WILLIAM MCFARLAND

_____

MICHAEL RUDGE

_____

ANGELA CLARK

_____

CAROL REED

*Carol Reed*

Sellers' Representative:

RONALD CIEUTAT

_____

BENJAMIN DANDURAND

_____

WILLIAM MCFARLAND

_____

MICHAEL RUDGE

_____

ANGELA CLARK

_____

CAROL REED

_____

Sellers' Representative:

RONALD CIEUTAT

_____

[Signature Page to Equity Purchase Agreement]

**Buyer:**

**HPCSP INVESTMENTS, LLC**

By: _____
      Name: Greg E. Lindberg
      Title: Manager

[Signature Page to Equity Purchase Agreement]

As to Section 7.10 only:

**Acquired Entities:**

HPC, LLC

By: _____
    Name: Ronald J Cicuto
    Title: CEO

**HEMOPHILIA PREFERRED CARE OF MEMPHIS, INC.**

By: _____
    Name: Ronald J Cicuto
    Title: CEO

**HPC BIOLOGICALS, INC.**

By: _____
    Name: Ronald J Cicuto
    Title: CEO

**HPCNC, INC.**

By: _____
    Name: Ronald J Cicuto
    Title: CEO

**HPC SPECIALTY RX WEST VIRGINIA INC.**

By: _____
    Name: Ronald J Cicuto
    Title: CEO

**HPC SPECIALTY RX OF KANSAS, INC.**

By: _____
    Name: Ronald J Cicuto
    Title: CEO

[Signature Page to Equity Purchase Agreement]

HEMOPHILIA PREFERRED CARE OF
OKLAHOMA, INC.

By: _____
Name: Ronald J Cieutat
Title: CEO

HPC SPECIALTY RX REED, INC.

By: _____
Name: Ronald J Cieutat
Title: CEO

HEMOPHILIA PREFERRED CARE OF
MISSISSIPPI, INC.

By: _____
Name: Ronald J Cieutat
Title: CEO

[Signature Page to Equity Purchase Agreement]

# EXHIBIT D

DOCUMENT 2

ELECTRONICALLY FILED
5/8/2024 4:31 PM
02-CV-2024-901211.00
CIRCUIT COURT OF
MOBILE COUNTY, ALABAMA
SHARLA KNOX, CLERK

## IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

| | | |
|---|---|---|
| HPC, LLC; HEMOPHILIA PREFERRED CARE OF MEMPHIS, INC.; HPCNC INC.; HPC SPECIALTY RX WEST VIRGINIA, INC.; AND HPC BIOLOGICALS, INC., | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) ) ) ) | Civil Action No. |
| RONALD CIEUTAT; NICKOLAS SHOEMAKER; KEITRUS CLARK; NEXT STEP SPECIALTY PHARMACY, L.L.C.; NEXT STEP TENNESSEE, LLC; NEXT STEP NORTH CAROLINA, LLC; NEXT STEP NEW ORLEANS, LLC; AND NEXT STEP WEST VIRGINIA, LLC., | ) ) ) ) ) ) ) ) ) ) ) | _____ |
| Defendants. | ) | |

## COMPLAINT

Plaintiffs HPC, LLC; Hemophilia Preferred Care of Memphis, Inc.; HPC Biologicals, Inc.; HPCNC Inc.; and HPC Specialty Rx West Virginia, Inc.; (collectively, "Plaintiffs" or "HPC") brings this Complaint against Defendants Ronald Cieutat ("Cieutat"), Nickolas Shoemaker ("Shoemaker"), Keitrus Clark ("Clark"), Next Step Specialty Pharmacy L.L.C. ("Next Step Specialty") Next Step Tennessee, LLC, ("Next Step Tennessee"), Next Step North Carolina, LLC ("Next Step North Carolina"), Next Step New Orleans, LLC ("Next Step New Orleans, LLC ("Next Step New Orleans"), and Next Step West Virginia, LLC ("Next Step West Virginia") (collectively, "Defendants") to remedy their collective actions to damage HPC's business and hinder its mission to provide necessary healthcare to its patients with significant and life threatening medical conditions. Specifically, Mr. Cieutat has opened competing facilities and lured

1

away and hired HPC's staff, including other defendants, to take HPC's patients. Defendants are

causing Plaintiffs to lose more than $500,000 per month in gross revenue. HPC alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1.    HPC, LLC is an Alabama limited liability company with its principal place of

business at 576 Azalea Road, Suite 100 Mobile, Alabama 36609.

2.    Hemophilia Preferred Care of Memphis, Inc. is an Alabama corporation with its

principal place of business at 6423 Shelby View Drive, Suite 100 Memphis, Tennessee 38134.

3.    HPCNC, Inc. is an Alabama corporation with its principal place of business at 3100

Cottage Hill Road, Suite 200, Mobile, Alabama 36606.

4.    HPC Biologicals, Inc. is an Alabama corporation with its principal place of business

at 1234 David Drive South, Suite A, Morgan City, LA 70380.

5.    HPC Specialty Rx West Virginia, Inc. is an Alabama corporation with its principal

place of business at 3100 Cottage Hill Rd, Ste. 200, Mobile, Alabama 36606.

6.    Mr. Cieutat is an adult resident of Baldwin County, Alabama.

7.    Mr. Shoemaker is an adult resident of Baldwin County, Alabama.

8.    Ms. Clark an adult resident of Shelby County, Tennessee.

9.    Next Step Specialty is an Alabama limited liability company with its principal place

of business in Alabama and is registered to do business in Alabama. Next Step Specialty is and

was at all times relevant herein regularly and systematically doing business in Alabama and venue

is proper here.

10.    Next Step Tennessee is an Alabama limited liability company with its principal

place of business in Tennessee and is registered to do business in Alabama. Next Step Tennessee

DOCUMENT 2

is and was at all times relevant herein regularly and systematically doing business in Alabama and venue is proper here.

11.     Next Step North Carolina is an Alabama limited liability company with its principal place of business in North Carolina and is registered to do business in Alabama. Next Step North Carolina is and was at all times relevant herein regularly and systematically doing business in Alabama and venue is proper here.

12.     Next Step New Orleans is an Alabama limited liability company with its principal place of business in Louisiana and is registered to do business in Alabama. Next Step New Orleans is and was at all times relevant herein regularly and systematically doing business in Alabama and venue is proper here.

13.     Next Step West Virginia is an Alabama limited liability company with its principal place of business in West Virginia and is registered to do business in Alabama. Next Step West Virginia is and was at all times relevant herein regularly and systematically doing business in Alabama and venue is proper here.

14.     This Court has jurisdiction over this case pursuant to *Code of Alabama* §§ 12-11 30 and 31 (1975), and because the case involves a contract to be performed in whole or in part in Alabama.

15.     Venue is proper in this Court pursuant to *Code of Alabama,* § 6-3-7 (1975), since the facts giving rise to this case primarily occurred in or around, Mobile, Alabama.

## FACTUAL ALLEGATIONS

I.     **HPC's Business**

DOCUMENT 2

16.      Hemophilia and other immunoglobulin disorders are rare and severe conditions in which the blood does not clot properly. The condition is usually present at birth and there is currently no cure.

17.      The CDC estimates that approximately 400 babies are born each year with hemophilia.  Approximately 30,000 people in the United States and 1.1 million worldwide live with hemophilia.[1]

18.      These conditions can lead to spontaneous bleeding as well as bleeding following injuries or surgery.

19.      Proper care for these disorders is critical to prevent fatalities. The CDC reports mortality and hospitalization rates for bleeding complications from hemophilia were 40% lower among people who received care in hemophilia treatment centers than among those who did not receive this care.[2]

20.      Plaintiffs are specialty infusion health care companies with expertise in serving immunoglobulin and bleeding disorder patients in the home setting. Plaintiffs' mission is focused on treating patients who suffer from these potentially fatal conditions and improving their quality of life.

21.      HPC, LLC opened its doors in 2002 after being co-founded by Defendant Ronald Cieutat and Todd Vereen.

22.      Plaintiffs originally began treating patients with hemophilia, but eventually expanded their business to include services targeted at Crohn's Disease, Hepatitis C, immune deficiencies, multiple sclerosis, rheumatoid arthritis, and other specialized conditions.

---

[1] https://www.cdc.gov/ncbddd/hemophilia/data.html
[2] *Id.*

23.    Plaintiffs have centered their entire business model on providing a comprehensive system of care for individuals experiencing chronic medical conditions.

24.    Plaintiffs' care teams provide coordinated services, support, and education that help patients and healthcare providers manage a patient's disease, ensure proper medication use, and assist with the management of the financial and insurance aspects of the drug therapy.

25.    Plaintiffs also facilitate the critical monitoring of treatment and doses for insurers, as well as the efficiency, effectiveness, and outcomes of drug therapies for manufacturers.

26.    Plaintiffs meet the highest standards of quality and excellence in the specialty pharmacy industry. Among others, Plaintiffs have been awarded accreditation from organizations that establish meaningful quality standards for the healthcare industry including: the Accreditation Commission for Health Care, the Community Health Accreditation Partner, the Joint Commission on Accreditation of Healthcare Organizations, and the Utilization Review Accreditation Commission.

27.    Plaintiffs' patient-centered team approach, community and home-based care and support, and personalized services enable them to empower individual patients' quality of life.

28.    This field is extremely competitive, and Plaintiffs have established themselves as industry leaders. Plaintiffs have maintained this position because of the goodwill they have established with their patients and business partners.

29.    A high volume of Plaintiffs' business comes from patient referrals, making patient satisfaction Plaintiffs' top priority.

30.    To ensure they are always meeting patient needs, Plaintiffs have invested significant resources into their staff.

31.     Plaintiffs employ fully licensed nurses, pharmacists, pharmacy technicians, sales professionals, and client advocates.

32.     All of Plaintiffs' employees are entrusted with a large amount of Plaintiffs' confidential information so patients can be properly cared for. This information includes, but is not limited to, patient information, client information, manufacturer information, supplier information, financial information, business plans, employee information, medication information, and research data and results. This confidential information is not available to the public. This confidential information is collectively referred to throughout the Complaint as "Confidential Information."

33.     Much of this Confidential Information is also protected health information under the Health Insurance Portability and Accountability Act.

34.     This Confidential Information has been compiled by Plaintiffs at great expense and over a great amount of time.

35.     Plaintiffs give their employees the opportunity to gain specialized knowledge and experiences and to establish personal relationships with HPC's patients, customers, suppliers, and other employees.

36.     This Confidential Information gives Plaintiffs a competitive advantage over other businesses in their field.

37.     Disclosure of this Confidential Information will greatly and irreparably damage Plaintiffs' business.

38.     HPC ensures that the patient's record and information is treated with confidentiality, safeguarded against loss, and unofficial use.

6

39.    Client advocates are uniquely essential to Plaintiffs' business model as they help track patient relations and ensure they have positive experiences.

40.    Plaintiffs provide their services in Alabama, Tennessee, North Carolina, West Virginia, and Louisiana.

## II.    Mr. Cieutat's Employment with HPC

41.    Mr. Cieutat co-founded HPC LLC in 2002 in Saraland, Alabama, located in Mobile County.

42.    Mr. Cieutat served as HPC LLC's Chief Executive Officer from January 19, 2018, to October 15, 2019. Mr. Cieutat's position as a Chief Executive Officer was a position that was uniquely essential to the management, organization, and service of Plaintiffs' business.

43.    As CEO, Mr. Cieutat was responsible for expanding the company, driving profitability, setting the vision, values, and corporate culture of the company.

44.    While working as CEO, Mr. Cieutat executed the Equity Purchase Agreement. A true and correct copy of the Equity Purchase Agreement is attached as Exhibit 1.

45.    Under Section 6.4 of the Equity Purchase Agreement, Mr. Cieutat agreed to "hold in confidence the Confidential Information [he was provided with] and will not directly or directly, disclose, publish, or otherwise make available any of the Confidential Information to the public or to any Person[.]"

46.    On October 15, 2019, Mr. Cieutat's employment with Plaintiffs ended.

47.    Upon information and belief, Mr. Cieutat has been receiving Confidential Information from former employees of Plaintiffs, including Mr. Shoemaker and Ms. Clark, and is using it to compete unfairly with HPC.

7

48.     Upon information and belief, Mr. Cieutat has been providing Plaintiffs' Confidential Information to his staff to compete with Plaintiffs, in violation of the confidentiality provision of the Private Equity Agreement.

III.    **Mr. Shoemaker's Employment with HPC**

49.     In 2018, Plaintiffs hired Mr. Shoemaker as the Chief Financial Officer and Vice President for HPC, LLC. Mr. Shoemaker's positions as a Chief Financial Officer and Vice President were positions that were uniquely essential to the management, organization, and service of Plaintiffs' business.

50.     The executed Executive Employment Agreement governed the parties' employment relationship ("Shoemaker Executive Employment Agreement"). A true and correct copy is attached as Exhibit 2.

51.     Mr. Shoemaker's Executive Employment Agreement laid out the terms and conditions related to Mr. Shoemaker's employment.

52.     The Shoemaker Executive Employment Agreement required Mr. Shoemaker to abide by specific covenants to protect Plaintiffs' legitimate business interests and its confidential information and goodwill.

53.     Per Sections 9(c)-9(e) of the Shoemaker Executive Employment Agreement, Mr. Shoemaker agreed to protect Plaintiffs' Confidential Information.

54.    Section 9(e) of the Shoemaker Executive Employment Agreement specifically
provided:

(e)    Executive agrees that for a period of two (2) years following the cessation
of his/her employment with the Companies (whether such cessation of employment is voluntary
or involuntary), Executive will not directly or indirectly (i) be employed by any person or entity
which engages in a Competitive Business, which is located or has an office which is located
within a fifty (50) mile radius of any office of any of the Companies, (ii) own any interest in or
render services to, any such person or entity which engages in a Competitive Business which is
located or has an office which is located within a fifty (50) mile radius of any of the Companies
except that Executive may own two (2) percent or less of entities that engage in a Competitive
Business. Executive acknowledges and agrees that during the course and solely as a result of
employment by the Companies, Executive will come into contact with and become aware of
some, most or all of the Companies' staff, and acquire confidential information regarding their

knowledge, skills, abilities, salaries, benefits and other matters with respect to such staff not
generally known to the public. Executive further acknowledges and agrees that any solicitation,
luring away or hiring of such staff of the Companies will be highly detrimental to the business
of the Companies and will cause the Companies serious loss of business and great and
irreparable harm. Consequently, Executive covenants and agrees that during the course of
employment by the Companies and for a period of two (2) years after cessation of such
employment (whether such cessation of employment is voluntary or involuntary), Executive
shall not, without the consent of the Company Representative, directly or indirectly, on behalf
of himself/herself or another, solicit any staff of any Company to leave employment with any
Company. Executive agrees that during the course and as a result of employment by the
Companies, he/she will come into contact with and become aware of some, most or all of the
Companies' clients, their names and addresses, the nature, duration and costs of their products,
goods, services, needs, the methods, procedures and techniques utilized by the Companies to
contact clients or to solicit clients, and leads and referrals to prospective clients. Executive
further agrees that loss of such clients will cause the Companies great and irreparable harm.
Accordingly, Executive agrees that for a period of two (2) years following the cessation of
his/her employment with the Companies (whether such cessation of employment is voluntary or
involuntary), he will not, without the express written permission of the Companies, directly or
indirectly solicit, contact, call upon, communicate with or attempt to communicate with any
client or prospective client of the Companies for the purpose of engaging in a Competitive
Business. For the purposes of this paragraph, the term "contact" means interaction between
Executive and the client or prospective client the purpose of which was to engage in a
Competitive Business.

55.    As a condition to his employment with Plaintiffs, Mr. Shoemaker also executed
several other documents to confirm his commitment to safeguard Plaintiffs' Confidential

9

DOCUMENT 2

Information. These documents include: a Confidentiality Statement, Conflict of Interest Employment Statement, and Non-Disclosure, Confidentiality and Non-Compete Agreement.

56.    The Confidentiality Statement specified that Mr. Shoemaker would "respect and preserve the privacy confidentiality and security of confidential information and [Plaintiffs'] owned equipment/property." A true and correct copy of the Confidentiality Statement is attached as Exhibit 3.

57.    The Conflict of Interest Employment Statement required Mr. Shoemaker to "certify that [Mr. Shoemaker] [has] no relationships that could be considered an existing or potential conflict of interest. Furthermore, [Mr. Shoemaker] understand[s] that [Mr. Shoemaker] has a duty to report any relationship that may arise, that could be perceived as a conflict of interest or may be considered a conflict of interest between [Mr. Shoemaker] and [Plaintiffs]." A true and correct copy of the Conflict of Interest Employee Statement is attached as Exhibit 4.

58.    The Non-Disclosure, Confidentiality and Non-Compete Agreement provided "[d]uring the term of employment, [Mr. Shoemaker] shall not, direct or indirectly, either as an employee, employer, consultant, agent, principal, partner, stockholder, corporate officer, director, or in any other individual or representative capacity, engage or participate in any business that is in competition in any manner whatsoever with the business of [Plaintiffs]." A true and correct copy of the Non-Disclosure, Confidentiality and Non-Compete Agreement is attached as Exhibit 5.

59.    Mr. Shoemaker further re-affirmed his commitment to upholding these covenants by completing annual trainings on these topics and certifying his completion of said trainings. A true and correct copies of Mr. Shoemaker's Certificate of Completion for his trainings are attached as Exhibit 6.

60.     In consideration for Plaintiffs employing Mr. Shoemaker in a position that was uniquely essential to Plaintiffs' business in which he would gain specialized knowledge and experience and would establish personal relationships with the employer's patients, customers, suppliers, and other employees, Mr. Shoemaker agreed to the following: "On termination of employment, whether such termination is voluntary or involuntary, the employee shall not directly or indirectly engage in competition with the employer in the territory defined below and for the period specified in this Agreement. The employee agrees to not engage in competition with the employer in the territory where the employee is assigned to perform duties, including, but not limited to, area the employee will work in the States of Alabama, Mississippi, Florida, Tennessee, Arkansas, Oklahoma, Iowa, Louisiana, and Texas ('the territory"), for a period of two (2) years after the date of termination of employment ("Restrictive Period"). Ex. 5.

61.     Furthermore, Mr. Shoemaker agreed that he would not "solicit or do business with or attempt to solicit or do business with any of HPC's patients, nurses, clients, manufacturers, pharmacies, hemophilia factor distributors or suppliers, and independent contractors including all persons to who [Plaintiffs] ha[ve] been retained to do work for, whether or not for compensation, for a period of two (2) years following his [] termination as an employee HPC [sic], whether voluntary or involuntary. Ex. 5.

62.     Additionally, Mr. Shoemaker agreed that he would not, "while serving as an employee for HPC and for a period of two (2) years following either the termination of his [] service as an employee of HPC for any reason, whether voluntary or involuntary, either disclose or divulge this confidential information to anyone or use this confidential information or proprietary information in any manner to compete with HPC…" Ex. 5.

63.     Upon information and belief, Mr. Shoemaker violated these obligations.

64.    Furthermore, as HPC's Chief Financial Officer and Vice President, Mr. Shoemaker was given access to information that he otherwise would not have had access to.

65.    By virtue of his employment with HPC, Mr. Shoemaker owed HPC the duties to act in good faith, trust confidence, honesty, loyalty, and in the best interests of HPC, not to HPC's detriment.

66.    Upon information and belief, Mr. Shoemaker breached these fiduciary duties he owed HPC.

67.    Mr. Shoemaker resigned on September 28, 2023.

68.    Following Mr. Shoemaker's termination, Plaintiffs became concerned that there was an increased likelihood that Mr. Shoemaker would violate his restrictive covenants.

69.    While searching their systems, Plaintiffs discovered a document linked to Mr. Shoemaker's account.

70.    The document's metadata confirms that the document was created in May 2022 by Mr. Shoemaker, while he was still employed by Plaintiffs.

71.    The document states, "Next Step consists of current owners Mr. Cieutat, **Mr. Shoemaker,** Jan Wheeler, and Lisa Falkenberg." (emphasis added) A true and correct of the document retrieved from Mr. Shoemaker's HPC account is attached as Exhibit 7.

72.    The document also lists Next Step's mission as "[B]uilding on longstanding community and patient relationships, Mr. Cieutat and team hope to provide high quality, high value care to the hemophilia and bleeding disorder communities. In addition to supporting these therapies, Mr. Cieutat, Mrs. Wheeler, and Mr. Shoemaker have also found success beyond just dispensing medications in building a full service patient relations program which provided a front

DOCUMENT 2

end insurance verification and approval service, proper medication dispensing, and in-home patient medication infusions and care." Ex. 7.

73.      Mr. Shoemaker was actively working with Next Step Specialty, Next Step Tennessee, Next Step North Carolina, Next Step New Orleans, and Next Step West Virginia, as an owner, while employed by Plaintiffs and subject to and in violation of the restrictive covenants in the Agreement and other duties that he owed to Plaintiffs.

74.      Mr. Shoemaker did not disclose his connection to Next Step Specialty, Next Step Tennessee, Next Step North Carolina, Next Step New Orleans, and Next Step West Virginia to Plaintiffs.

75.      Based on information and belief, Mr. Shoemaker is currently employed by Next Step Specialty, Next Step Tennessee, Next Step North Carolina, Next Step New Orleans, and Next Step West Virginia.

76.      Based on information and belief, Mr. Shoemaker has violated his restrictive covenants and provided Next Step Specialty, Next Step Tennessee, Next Step North Carolina, Next Step New Orleans, and Next Step West Virginia with Plaintiffs' Confidential Information.

## IV.    Ms. Clark's Employment with HPC

77.      Ms. Clark began working for Plaintiffs in December 2014 as a Community Advocate. Mr. Clark's position as a Community Advocate was a position that was uniquely essential to the management, organization, and service of Plaintiffs' business.

78.      As a condition of her employment, Ms. Clark executed an employment agreement ("Clark Employment Agreement"). A true and accurate copy is attached as Exhibit 8.

79.      The Clark Employment Agreement laid out the terms and conditions related to Ms. Clark's employment.

80.     The Clark Employment Agreement required Mr. Clark to abide by specific covenants to protect Plaintiffs' legitimate business interests and its confidential information and goodwill.

81.     The Clark Employment Agreement also stated "[d]uring the term of employment, the employee shall not, directly or indirectly, either as an employee, employer, consultant, agent, principal, partner, stockholder, corporate officer, director, or in any other individual or representative capacity, engage or participate in any business that is in competition in any manner whatsoever with the business of employer." Ex. 8.

82.     In consideration for Plaintiffs employing Ms. Clark in a position that was uniquely essential to Plaintiffs business in which she would gain specialized knowledge and experience and would establish personal relationships with the employer's patients, customers, suppliers, and other employees, Ms. Clark agreed to the following: "On termination of employment, whether such termination is voluntary or involuntary, the employee shall not directly or indirectly engage in competition with the employer in the territory defined below and for the period specified in this Agreement. The employee agrees to not engage in competition with the employer in the territory where the employee is assigned to perform duties, including, but not limited to, area the employee will work in the States of Alabama, Mississippi, Florida, Tennessee, Arkansas, Oklahoma, Iowa, Louisiana, and Texas ("the territory"), for a period of two (2) years after the date of termination of employment ("Restrictive Period"). Ex. 8.

83.     Furthermore, Ms. Clark agreed covenanted that she would not "solicit or do business with or attempt to solicit or do business with any of HPC's patients, nurses, clients, manufacturers, pharmacies, hemophilia factor distributors or suppliers, and independent contractors including all persons to whom HPC has been retained to do work for, whether or not

14

DOCUMENT 2

for compensation, for a period of two (2) years following [] her termination an employee HPC [sic], whether voluntary or involuntary." Ex. 8.

84.    Additionally, Ms. Clark agreed and covenanted that she would not, "while serving as an employee for HPC and for a period of two (2) years following either the termination of [] her service as an employee of HPC for any reason, whether voluntary or involuntary, either disclose or divulge this confidential information to anyone or use this confidential information or proprietary information in any manner to compete with HPC…" Ex. 8.

85.    In addition to the duties and obligations Ms. Clark owed HPC under the Clark Employment Agreement, Ms. Clark also owed HPC the duties to act in good faith, trust confidence, honesty, loyalty, and in the best interests of HPC, not to HPC's detriment.

86.    Upon information and belief, Ms. Clark breached these fiduciary duties she owed HPC.

87.    Ms. Clark resigned from Plaintiffs' employment in February 2024 and began working for Next Step Specialty, Next Step Tennessee, Next Step North Carolina, Next Step New Orleans, and Next Step West Virginia.

88.    Following Ms. Clark's resignation, patients Ms. Clark was working with, began leaving Plaintiffs businesses, to join Next Step Specialty, Next Step Tennessee, Next Step North Carolina, Next Step New Orleans, and Next Step West Virginia.

89.    To date, approximately eight patients Ms. Clarke worked with, have left Plaintiffs' business and based on information and belief, have become patients of Next Step Specialty, Next Step Tennessee, Next Step North Carolina, Next Step New Orleans, and Next Step West Virginia.

90.    These patients have left as a result of Ms. Clark's unlawful solicitation and competition with Plaintiffs.

## V.    Defendants' Tortious Interference

91.    Next Step Specialty, Next Step Tennessee, Next Step North Carolina, Next Step New Orleans, and Next Step West Virginia are a pharmacy/health care companies focused on treating hemophilia bleeding disorders.

92.    Next Step Specialty was founded in 2022 by Mr. Cieutat, following the end of his employment with Plaintiffs.

93.    Next Step Tennessee was founded in 2023 by Mr. Cieutat, following the end of his employment with Plaintiffs.

94.    Next Step North Carolina was founded in 2024 by Mr. Cieutat, following the end of his employment with Plaintiffs.

95.    Next Step New Orleans was founded in 2024 by Mr. Cieutat, following the end of his employment with Plaintiffs.

96.    Next Step West Virginia was founded in 2024 by Mr. Cieutat, following the end of his employment with Plaintiffs.

97.    Next Step Specialty, Next Step Tennessee, Next Step North Carolina, Next Sept New Orleans, and Next Step West Virginia has opened and is operating facilities in the same geographic areas as Plaintiffs including Mobile, Alabama, Tennessee, North Carolina, and Louisiana.

98.    Next Step Specialty, Next Step Tennessee, Next Step North Carolina, Next Step New Orleans, and Next Step West Virginia are in direct competition with Plaintiffs, both by the services each entity provides and based also on the geographic region that these services are being provided in.

DOCUMENT 2

99.    The only address associated with Next Step Specialty, Next Step Tennessee, Next Step North Carolina, Next Step New Orleans, and Next Step West Virginia is listed as 1 South Royal Street, Fourth Floor, Mobile, AL 36602.

100.    This address is just 8 miles from Plaintiffs' business.

101.    Next Step Specialty, Next Step Tennessee, Next Step North Carolina, Next Step New Orleans, and Next Step West Virginia provide services in the same geographic areas as Plaintiffs.

102.    Next Step Specialty, Next Step Tennessee, Next Step North Carolina, Next Step New Orleans, and Next Step West Virginia are direct competitors to Plaintiffs.

103.    Based on information and belief, Next Step Specialty, Next Step Tennessee, Next Step North Carolina, Next Step New Orleans, Next Step West Virginia, and Mr. Cieutat were aware that their competitor, Plaintiffs, employed Mr. Shoemaker, and Ms. Clark.

104.    Based on information and belief, Next Step Specialty, Next Step Tennessee, Next Step North Carolina, Next Step New Orleans, Next Step West Virginia, and Mr. Cieutat are aware that Mr. Shoemaker, and Ms. Clark are subject to restrictive covenants and tortiously interfered with their contractual relationships.

105.    Based on information and belief, Next Step Specialty, Next Step Tennessee, Next Step North Carolina, Next Step New Orleans, Next Step West Virginia, and Mr. Cieutat induced Mr. Shoemaker's resignation with Plaintiffs.

## CAUSES OF ACTION

### Count I
### Breach of Contract (Ron Cieutat)

106.    Plaintiffs restate and reallege each of the previous paragraphs of this Complaint as if fully rewritten.

17

DOCUMENT 2

107.    Mr. Cieutat's position as Chief Executive Officer at HPC was a position that was uniquely essential to the management, organization, and service of Plaintiffs' business.

108.    The Equity Purchase Agreement is a valid and enforceable contract under Alabama law.

109.    Mr. Cieutat is bound by several restrictive covenants including: not using, disclosing, publishing, communicating, or making available Plaintiffs' Confidential Information to any party outside of the company

110.    Upon information and belief, Mr. Cieutat has disclosed Plaintiffs' Confidential Information.

111.    This conduct as set forth above, is in violation of the agreement Mr. Cieutat executed with Plaintiffs and has caused damages to Plaintiffs.

**Count II**
**Breach of Contract (Nikolas Shoemaker)**

112.    Plaintiffs restate and reallege each of the previous paragraphs of this Complaint as if fully rewritten.

113.    Mr. Shoemaker's positions as Chief Financial Officer and Vice President were positions that were uniquely essential to the management, organization, and service of Plaintiffs' business.

114.    Mr. Shoemaker's Executive Employment Agreement is a valid and enforceable contract under Alabama law.

115.    As a condition of his employment with Plaintiffs, Mr. Shoemaker is bound by several restrictive covenants including: (a) not using, disclosing, publishing, communicating, or making available Plaintiffs' Confidential Information to any party outside of the company; or (b)

18

not accepting employment with any of Plaintiffs' competition during his employment and during the two year period following his employment's termination, within a 50-mile radius.

116.    Mr. Shoemaker is prohibited from soliciting or servicing any contacts he made while employed by Plaintiffs.

117.    This conduct as set forth above, is in violation of the Shoemaker Executive Employment Agreement Mr. Shoemaker executed with Plaintiffs and has caused damages to Plaintiffs.

### Count III
### Breach of Contract (Keitrus Clark)

118.    Plaintiffs restate and reallege each of the previous paragraphs of this Complaint as if fully rewritten.

119.    Ms. Clark's position as a Community Advocate was a position that was uniquely essential to the management, organization, and service of Plaintiffs' business.

120.    Ms. Clark's Employment Agreement with Plaintiffs is a valid and enforceable contract under Alabama law.

121.    As a condition of her employment with Plaintiffs, Ms. Clark is bound by several restrictive covenants including: (a) not disclosing, publishing, communicating, or making available Plaintiffs' Confidential Information to any party outside of the company; or (b) not accepting employment with any of Plaintiffs' competition during his employment and during the two year period following her employment's termination, within a 50-mile radius.

122.    Ms. Clark is prohibited from soliciting or servicing any contacts she made while employed by Plaintiffs.

DOCUMENT 2

123.   Ms. Clark accepted employment with Next Step Specialty, Next Step Tennessee, Next Step North Carolina, Next Step New Orleans, and Next Step West Virginia, Plaintiffs' direct competitors within a 50-mile radius, in February 2024.

124.   This conduct as set forth above, is in violation of the Clark Employment Agreement Ms. Clark executed with Plaintiffs and has caused damages to Plaintiffs.

**Count IV**
**Breach of Fiduciary Duty**
**(Nickolas Shoemaker)**

125.   Plaintiffs restate and reallege each of the previous paragraphs of this Complaint as if fully rewritten.

126.   Mr. Shoemaker was previously employed by HPC as its Chief Financial Officer and Vice President.

127.   As HPC's Chief Financial Officer and Vice President, Mr. Shoemaker was given access to Confidential Information that he otherwise would not have had access to.

128.   By virtue of his employment with HPC, Mr. Shoemaker owed HPC the duties to act in good faith, trust, confidence, honesty, loyalty, and in the best interests of HPC, not to HPC's detriment.

129.   Upon information and belief, Mr. Shoemaker breached these fiduciary duties he owed HPC by misappropriating and using HPC's Confidential Information for his and the Defendants benefit and personal gain.

130.   The improper use of this Confidential Information by Mr. Shoemaker has caused and will continue to cause HPC damages.

DOCUMENT 2

## Count V
## Breach of Fiduciary Duty
## (Keitrus Clark)

131.    Plaintiffs restate and reallege each of the previous paragraphs of this Complaint as if fully rewritten.

132.    Ms. Clark was previously employed by HPC as its Community Advocate.

133.    As HPC's Community Advocate, Ms. Clark was given access to information, patients, customers, and/or clients of HPC that she otherwise would not have had access to.

134.    By virtue of her employment with HPC, Ms. Clark owed HPC the duties to act in good faith, trust, confidence, honesty, loyalty, and in the best interests of HPC, not to HPC's detriment in her position of special trust and responsibility to manage and protect HPC's interests, with its customer/patients.

135.    Upon information and belief, Ms. Clark breached these fiduciary duties she owed HPC by misappropriating and using HPC's Confidential Information, as well as, soliciting patients, customers, and/or clients of HPC for her and the Defendants benefit and personal gain.

136.    The improper use of this Confidential Information and solicitation of HPC's patients, clients, and/or clients of HPC has caused and will continue to cause HPC damages.

## Count VI
## Tortious Interference with Contractual or Business Relations (Next Step Specialty, Next Step Tennessee, Next Step North Carolina, Next Step New Orleans, Next Step West Virginia, and Mr. Ceiutat)

137.    Plaintiffs restate and reallege each of the previous paragraphs of this Complaint as if fully rewritten.

21

138.    At all times relevant hereto, Next Step Specialty, Next Step Tennessee, Next Step North Carolina, Next West Virginia, and Mr. Cieutat were aware that Mr. Shoemaker, and Ms. Clark were employed by Plaintiffs and subject to restrictive covenants.

139.    Next Step Specialty, Next Step Tennessee, Next Step North Carolina, Next Step New Orleans, Next Step West Virginia, and Mr. Cieutat induced Mr. Shoemaker and Ms. Clark's resignations from Plaintiffs to allow for them to be employed by Next Step.

140.    Next Step Specialty, Next Step Tennessee, Next Step North Carolina, Next Step New Orleans, Next Step West Virginia, and Mr. Cieutat solicited Plaintiffs' customers who Plaintiffs have contractual or business relationships with in violation of the employment agreements and fiduciary duties owed to Plaintiffs by Mr. Cieutat.

141.    As a result of Next Step Specialty, Next Step Tennessee, Next Step North Carolina, Next Step New Orleans, Next Step West Virginia, and Mr. Cieutat's conduct, Plaintiffs have been damaged.

### Count VII
### Misappropriation of Confidential Information and Trade Secrets
**(Next Step Specialty, Next Step Tennessee, Next Step North Carolina, Next Step New Orleans, Next Step West Virginia, Mr. Cieutat, Mr. Shoemaker, and Ms. Clark)**

142.    Plaintiffs restate and reallege each of the previous paragraphs of this Complaint as if fully rewritten.

143.    Mr. Cieutat, Mr. Shoemaker, and Ms. Clark obtained Confidential Information and trade secrets of Plaintiffs in connection with their employment with Plaintiffs.

144.    Mr. Cieutat, Mr. Shoemaker, and Ms. Clark, without the privilege to do so and in direct violation of their respective employment agreements, disclosed, misappropriated, and/or improperly used the Confidential Information and trade secrets taken from Plaintiffs for the benefit